Lawrence M. Rolnick (NY Bar No. 2024784)
(*pro hac vice* forthcoming)
lrolnick@rksllp.com
Marc B. Kramer (NY Bar No. 2167146)
(*pro hac vice* forthcoming)
mkramer@rksllp.com
Michael J. Hampson (NY Bar No. 4699120)
(*pro hac vice* forthcoming)
mhampson@rksllp.com
Nicole T. Castiglione (NY Bar No. 5380803)
(*pro hac vice* forthcoming)
ncastiglione@rksllp.com
**ROLNICK KRAMER SADIGHI LLP**
1251 Avenue of the Americas
New York, NY 10020
(212) 597-2800

Scott L. Metzger (Bar No. 089718)
metzger@dmwplc.com
John C. Wynne (Bar No. 083041)
wynne@dmwplc.com
**DUCKOR METZGER & WYNNE,**
A Professional Law Corporation
101 West Broadway, Suite 1700
San Diego, California 92101
(619) 209-3000; (619) 209-3043 fax

Attorneys for Plaintiffs, ALGER DYNAMIC OPPORTUNITIES FUND, ALGER SICAV – ALGER DYNAMIC OPPORTUNITIES FUND, ALGER SICAV – ALGER WEATHERBIE SPECIALIZED GROWTH FUND, ALGER WEATHERBIE SPECIALIZED GROWTH FUND, ALGER WEATHERBIE SPECIALIZED GROWTH PORTFOLIO, WEATHERBIE GROWTH FUND, L.P., and WEATHERBIE LONG/SHORT FUND, L.P.

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALGER DYNAMIC OPPORTUNITIES FUND, ALGER SICAV – ALGER DYNAMIC OPPORTUNITIES FUND, ALGER SICAV – ALGER WEATHERBIE SPECIALIZED GROWTH FUND, ALGER WEATHERBIE SPECIALIZED GROWTH FUND, ALGER WEATHERBIE SPECIALIZED GROWTH PORTFOLIO, WEATHERBIE | CASE NO: '24CV0451 L SBC<br><br>**COMPLAINT AND JURY DEMAND** |

GROWTH FUND, L.P., and WEATHERBIE LONG/SHORT FUND, L.P.,

Plaintiffs,

v.

ACADIA PHARMACEUTICALS INC. and STEPHEN R. DAVIS,

Defendants.

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

# TABLE OF CONTENTS


Page

NATURE OF THE ACTION ........ 6

JURISDICTION AND VENUE ........ 10

PARTIES ........ 11

I. Plaintiffs ........ 11

II. Defendants ........ 12

III. Relevant Non-Parties ........ 13

FACTUAL ALLEGATIONS ........ 13

I. Acadia's Reporting Obligations as a Public Company ........ 13

II. Pimavanserin ........ 17

III. The FDA's Approval Process ........ 18

IV. The -019 Study ........ 20

V. The End of Phase II Meeting ........ 21

VI. The Harmony Study ........ 24

VII. Defendants and Stankovic Capitalize on the Positive Buzz From the Harmony Study to Enrich Themselves ........ 28

VIII. Acadia Discloses Cherry-Picked Data from the Harmony Study to Investors at the CTAD Meeting ........ 30

IX. Defendants and Stankovic Double-Down on their Misrepresentations to Investors and File An sNDA that is Doomed to Fail ........ 36

X. Defendants and Stankovic Continue to String Investors Along as the FDA Reviews the Pimavanserin sNDA ........ 41

XI. The Truth Begins to Emerge as the FDA Expresses Doubt Regarding, and Eventually Denies, the Pimavanserin sNDA ........ 52

XII. The FDA Maintains Its Position on the Harmony Study and Acadia is Forced to File A Substantially Narrowed sNDA ........ 57

## TABLE OF CONTENTS (cont)

Page


XIII. Additional Facts About Defendants' and Stankovic's Fraud Are Still Being Revealed ........ 60

FALSE AND MISLEADING STATEMENTS ........ 62

I. False and Misleading Statements and Omissions About the Harmony Study and Acadia's Agreement with the FDA ........ 62

II. False and Misleading Statements About the Effectiveness of Acadia's Internal Disclosure Controls and Procedures ........ 91

SUMMARY OF DEFENDANTS' SCIENTER ........ 93

PLAINTIFFS' ACTUAL RELIANCE ........ 97

PRESUMPTION OF RELIANCE ........ 100

LOSS CAUSATION ........ 101

NO SAFE HARBOR ........ 113

FIRST CAUSE OF ACTION ........ 114

SECOND CAUSE OF ACTION ........ 117

THIRD CAUSE OF ACTION ........ 119

FOURTH CAUSE OF ACTION ........ 120

FIFTH CAUSE OF ACTION ........ 122

SIXTH CAUSE OF ACTION ........ 124

SEVENTH CAUSE OF ACTION ........ 125

PRAYER FOR RELIEF ........ 127

JURY DEMAND ........ 128

Plaintiffs Alger Dynamic Opportunities Fund, Alger SICAV – Alger Dynamic Opportunities Fund, Alger SICAV – Alger Weatherbie Specialized Growth Fund, Alger Weatherbie Specialized Growth Fund, Alger Weatherbie Specialized Growth Portfolio, Weatherbie Growth Fund, L.P., and Weatherbie Long/Short Fund, L.P. (collectively, "Plaintiffs") are purchasers of the common stock of Acadia Pharmaceuticals Inc. ("Acadia" or the "Company"). Plaintiffs, through their undersigned attorneys, by way of this Complaint and Jury Demand, bring this action against Defendant Acadia and its Chief Executive Officer ("CEO"), Stephen R. Davis ("Davis"), and allege the following upon personal information as to themselves and their own acts, and upon information and belief as to other matters.

Plaintiffs' information and belief is based on, *inter alia*, an investigation by their attorneys, which includes, among other things, a review and analysis of: Acadia's public filings with the United States Securities and Exchange Commission ("SEC"), Acadia's press releases and public statements, Acadia's earnings call transcripts and presentations, media and analyst reports concerning Acadia, documents publicly filed in *City of Birmingham Relief & Retirement System et al. v. Acadia Pharmaceuticals Inc. et al.*, No. 3:21-cv-00762-WQH (S.D. Cal.) (the "Class Action"), *Kanner et al. v. Baker et al.*, No. 3:23-cv-002293-WQH (S.D. Cal.) (the "Derivative Action"), and other publicly available documents concerning Acadia.

Many of the facts supporting the allegations contained herein are known only to Defendants or are exclusively within their custody and/or control. Plaintiffs believe that further substantial evidentiary support will exist for the allegations in this Complaint after a reasonable opportunity for discovery.

///

///

## NATURE OF THE ACTION

1. This is an action to recover significant investment losses suffered as a result of the numerous false and misleading statements and omissions made by Defendants and Acadia's former President and Head of Research and Development, Srdjan (Serge) R. Stankovic ("Stankovic"), regarding a supplemental new drug application ("sNDA") that Acadia submitted to the Food and Drug Administration ("FDA" or the "Agency") to expand the use of its only commercial drug, pimavanserin.

2. Pimavanserin was approved by the FDA in April 2016 to treat hallucinations and delusions associated with Parkinson's disease psychosis, and Acadia has been working since that time to expand pimavanserin's use. There is no FDA-approved treatment for dementia-related psychosis more broadly – which includes dementia from Alzheimer's disease, dementia with Lewy bodies, vascular dementia, and frontotemporal dementia – so expanding pimavanserin's use would have been transformative for Acadia. Indeed, analysts predicted that, if broadly approved to treat dementia-related psychosis, pimavanserin could generate Acadia over $1 billion in sales in the United States in the near-term and more than $3 billion in sales worldwide over the next decade.

3. Thus, on October 4, 2017, Acadia announced that it had initiated a study – eventually dubbed the "Harmony Study" – to evaluate pimavanserin for the broad treatment of dementia-related psychosis. A few years later, on September 9, 2019, Acadia announced that the Harmony Study had met its primary endpoint – a highly statistically significant longer time to relapse compared to a placebo – and that the Study was so successful that it was being terminated early. Given the success of the Harmony Study, Acadia announced that it would be submitting an sNDA for the

broad treatment of dementia-related psychosis. Significantly, Acadia told the market that, in reviewing the sNDA, the FDA had prospectively agreed to look only at the results from the Harmony Study as a whole and would not be taking into account the composition of, or response in, any particular subgroup of dementia patients.

4. The price of Acadia's common stock surged by more than 50% in response to Acadia's announcement regarding the Harmony Study and pimavanserin sNDA. Just 11 days later, Acadia, Davis, and Stankovic seized upon the Company's inflated stock price to raise $287.5 million in gross proceeds in a follow-on stock offering. Davis and Stankovic then offloaded hundreds of thousands of shares of Acadia stock, netting them more than $24 million and $19 million, respectively, in proceeds. Prior to this time, neither Davis nor Stankovic had sold a single share of Acadia stock.

5. Over the next year-and-a-half, Acadia, Davis, and Stankovic misled investors that the pimavanserin sNDA would be approved by the FDA to treat dementia-related psychosis by repeatedly referencing the seemingly positive results from the Harmony Study and Acadia's purported agreement with the FDA.

6. But the Harmony Study and Acadia's agreement with the FDA were not as Acadia, Davis, and Stankovic had represented. As has now been revealed, the FDA explicitly told Acadia – and Stankovic, in particular – that it would be analyzing the "actual composition and response of patients" in each dementia subgroup in determining whether to approve pimavanserin for a broad indication for dementia-related psychosis.

7. This was problematic because the Harmony Study revealed that pimavanserin ***was actually less effective than a placebo*** in treating dementia-related psychosis for patients suffering from vascular dementia and frontotemporal dementia.

Moreover, the Harmony Study only treated nine patients with dementia with Lewy bodies during the double-blind period, far too few to demonstrate pimavanserin's effect on this particular dementia subgroup. And though the Harmony Study treated 123 patients with Alzheimer's disease – by far the largest subgroup – the relapse rate was not nominally significant. Rather, the overall positive results from the Harmony Study were driven almost entirely by the results of the patients suffering from Parkinson's disease psychosis – ***an indication for which pimavanserin was already approved to treat***.

8. Acadia, Davis, and Stankovic hid this information from the market and, when it was eventually disclosed, cautioned investors not to "overinterpret" it given that the Harmony Study was not designed to test pimavanserin's effectiveness in any particular dementia subgroup "in any meaningful statistical way." In other words, Acadia, Davis, and Stankovic reinforced the misinterpretation that they had created in the market that, because Acadia was pursuing an indication of pimavanserin to treat dementia-related psychosis broadly, the FDA would be evaluating the results from the Harmony Study as a whole and not considering the data from each of the dementia subgroups.

9. With only a month to go before the FDA was required to issue an official decision on the pimavanserin sNDA, Acadia shocked the market by announcing that the FDA had "identified deficiencies that preclude[d]" it from discussing certain approval prerequisites, like labeling and post-marketing requirements, with the Company at that time. The price of Acadia's common stock plummeted more than 43% in response.

10. Nevertheless, the market was still hopeful that the FDA could approve the pimavanserin sNDA on time, as Acadia described the Agency's feedback as not a

"final decision," and vowed to work with the FDA to resolve any such deficiencies. Surprisingly then, Acadia announced on April 5, 2021, that it had received a Complete Response Letter ("CRL") from the FDA declining to approve the pimavanserin sNDA. Although Acadia did not release the text of the CRL, it explained that the FDA "cited a lack of statistical significance in some of the subgroups of dementia, and insufficient numbers of patients with certain less common dementia subtypes as lack of substantial evidence of effectiveness to support approval." The price of Acadia common stock slid a further 17% on this news.

11. Over the next eight months, the news about the Harmony Study and the potential for pimavanserin to treat dementia-related psychosis got even worse. In August 2021, Acadia announced that the FDA had recommended that it conduct additional clinical studies in each of the dementia subgroups for which it was seeking to treat – rather than simply performing new analyses of the existing data from the Harmony Study – if Acadia wished to resubmit the pimavanserin sNDA. A few months after that, in December 2021, Acadia threw in the towel and announced that it would be resubmitting the pimavanserin sNDA solely for the treatment of Alzheimer's disease psychosis, not dementia-related psychosis broadly. The price of Acadia's common stock declined more than 20% in response.

12. The effect of Defendants' and Stankovic's material misrepresentations and omissions was to artificially inflate the price of Acadia's common stock.

13. Plaintiffs purchased Acadia common stock at a time when – unbeknownst to Plaintiffs – Acadia, Davis, and Stankovic were misrepresenting the Harmony Study, the terms and full extent of Acadia's agreement with the FDA about the pimavanserin sNDA, and the effectiveness of Acadia's internal disclosure controls and procedures.

14. As the truth was slowly revealed to the market and as the previously concealed risks materialized, the price of Acadia common stock plummeted, and Plaintiffs suffered significant losses.

15. Plaintiffs therefore bring this action under the federal securities laws, common law, and California statutory law to recover the investment losses they suffered as a result of Defendants' and Stankovic's materially false and misleading statements and omissions of material fact.

## JURISDICTION AND VENUE

16. The claims asserted herein arise under and pursuant to Sections 10(b), 18, and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b), 78r, and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, the common law, and California statutory law.

17. This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331, and has supplemental jurisdiction over the common law and California statutory law claims pursuant to 28 U.S.C. § 1367.

18. Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391. Many of the acts giving rise to the violations complained of herein, including the dissemination of false and misleading information, occurred in this District. Acadia has its principal place of business in this District and Defendants and Stankovic committed tortious acts and transacted business in this District.

19. In connection with the acts, transactions and conduct alleged herein, Defendants and Stankovic, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails,

interstate telephone communications and the facilities of a national securities exchange and market.

**PARTIES**

**I. Plaintiffs**

20. Plaintiff Alger Dynamic Opportunities Fund is a series of The Alger Funds II, a Massachusetts trust whose investment adviser has its main office in New York, New York. The dates on which Plaintiff Alger Dynamic Opportunities Fund purchased Acadia common stock during the relevant period are set forth in Exhibit A.

21. Plaintiff Alger SICAV – Alger Dynamic Opportunities Fund is a series of Alger SICAV, a Société d'investissement à capital variable – Grand Duchy of Luxembourg whose investment adviser has its main office in New York, New York. The dates on which Plaintiff Alger SICAV – Alger Dynamic Opportunities Fund purchased Acadia common stock during the relevant period are set forth in Exhibit B.

22. Plaintiff Alger SICAV – Alger Weatherbie Specialized Growth Fund is a series of Alger SICAV, a Société d'investissement à capital variable – Grand Duchy of Luxembourg whose investment adviser has its main office in New York, New York. The dates on which Plaintiff Alger SICAV – Alger Weatherbie Specialized Growth Fund purchased Acadia common stock during the relevant period are set forth in Exhibit C.

23. Plaintiff Alger Weatherbie Specialized Growth Fund is a series of The Alger Funds whose investment adviser has its main office in New York, New York. The dates on which Plaintiff Alger Weatherbie Specialized Growth Fund purchased Acadia common stock during the relevant period are set forth in Exhibit D.

24. Plaintiff Alger Weatherbie Specialized Growth Portfolio is a series of The Alger Portfolios whose investment adviser has its main office in New York, New

York. The dates on which Plaintiff Alger Weatherbie Specialized Growth Portfolio purchased Acadia common stock during the relevant period are set forth in Exhibit E.

25. Plaintiff Weatherbie Growth Fund, L.P. is a Delaware limited partnership whose investment adviser has its main office in Boston, Massachusetts. The dates on which Plaintiff Weatherbie Growth Fund, L.P. purchased Acadia common stock during the relevant period are set forth in Exhibit F.

26. Plaintiff Weatherbie Long/Short Fund, L.P. is a Delaware limited partnership whose investment adviser has its main office in Boston, Massachusetts. The dates on which Plaintiff Weatherbie Long/Short Fund, L.P. purchased Acadia common stock during the relevant period are set forth in Exhibit G.

27. At all relevant times, Fred Alger Management, LLC and/or Weatherbie Management, LLC (collectively, "Alger") acted as investment adviser to Plaintiffs in connection with their purchases of Acadia common stock.

## II. <u>Defendants</u>

28. Defendant Acadia is a Delaware corporation with its principal place of business located at 12830 El Camino Real, Suite 400, San Diego, California. Acadia's common stock is publicly traded in the United States on the NASDAQ under the ticker symbol "ACAD." Acadia is a biopharmaceutical company that describes itself as "focused on the development and commercialization of innovative medicines to address unmet medical needs in central nervous system (CNS) disorders and rare diseases."

29. Defendant Davis is Acadia's President, CEO, and a member of its Board of Directors. Davis joined Acadia in 2014 and was its President, CEO, and a Board member throughout the relevant period.

///

**III. <u>Relevant Non-parties</u>**

30. Stankovic joined Acadia in 2015 and was its President and Head of Research and Development during the relevant period. Stankovic retired from Acadia on December 31, 2022, and passed away on December 29, 2023. Accordingly, Stankovic is not named as a defendant in this action. However, each and every misstatement or omission made or approved by Stankovic, as well as the facts supporting Stankovic's scienter, are attributable to Acadia, as Stankovic served as the Company's President and Head of Research and Development during the relevant period.

## FACTUAL ALLEGATIONS

**I. <u>Acadia's Reporting Obligations as a Public Company</u>**

31. Under the regulations and guidance promulgated by the SEC, companies whose stock is publicly traded in the United States – such as Acadia – have important public reporting and disclosure obligations.

32. Public companies are required to file with the SEC certain disclosure documents containing comprehensive information about their business operations and financial condition. Investors generally rely on the accuracy and transparency of these disclosures – as well as other public statements made by the company – when determining whether to invest.

33. The following table sets forth the relevant filings that Acadia made with the SEC during the relevant period, the date they were filed with the SEC, the Defendant signatory to the accompanying certifications, and how the filings are referred to throughout this Complaint:

///

///

| Description of the Filing | Date of the Filing | Defendant Signatory to the Accompanying SOX Certifications | Abbreviation |
|---|---|---|---|
| Form 10-Q for the quarter ended September 30, 2019 | October 31, 2019 | Davis | "3Q2019 10-Q" |
| Form 10-K for the quarter and year ended December 31, 2019 | February 27, 2020 | Davis | "2019 10-K" |
| Form 10-Q for the quarter ended March 31, 2020 | May 8, 2020 | Davis | "1Q2020 10-Q" |
| Form 10-Q for the quarter ended June 30, 2020 | August 6, 2020 | Davis | "2Q2020 10-Q" |
| Form 10-Q for the quarter ended September 30, 2020 | November 4, 2020 | Davis | "3Q2020 10-Q" |
| Form 10-K for the quarter and year ended December 31, 2020 | February 25, 2021 | Davis | "2020 10-K" |

34. Public companies like Acadia are required to maintain effective disclosure controls and procedures to ensure compliance with their SEC reporting obligations. Members of the company's executive team must be involved in creating and designing these controls and must personally guarantee their effectiveness.

35. The Committee of Sponsoring Organizations of the Treadway Commission's Internal Control – Integrated Framework defines an internal control as "a process, effected by an entity's board of directors, management, and other personnel, designed to provide reasonable assurance regarding the achievement of objectives relating to operations, reporting and compliance." With respect to the

reporting and compliance aspects of this definition, the Integrated Framework specifically states that "[w]hen internal control is determined to be effective, senior management and the board of directors have reasonable assurance [that] . . . the organization prepares reports in conformity with applicable laws, rules and regulations, and standards established by legislators, regulators, and standard setters, . . . [and that] the organization complies with applicable laws, rules and regulations." *See* The Committee of Sponsoring Organizations of the Treadway Commission's Internal Control – Integrated Framework § 3 ("Requirements for Effective Internal Control").

36. Section 404 of the Sarbanes-Oxley Act of 2002 ("SOX") requires public companies to publish information in their annual and quarterly reports concerning the scope and adequacy of their internal control structure to assess the effectiveness of such internal disclosure controls and procedures.

37. Section 302 of SOX requires a public company's CEO and CFO to provide certifications concerning their review of, and disclosure of information about, the company's internal controls. Specifically, pursuant to rules promulgated by the SEC to implement Section 302 of SOX, the CEO and CFO are required to certify in each periodic report that:

- he or she has reviewed the report;
- based on his or her knowledge, the report does not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by the report;
- he or she and the other certifying officers:
  - are responsible for establishing and maintaining "disclosure controls and procedures" [i.e., controls and other procedures of an issuer that are designed to ensure that information required to be disclosed by

the issuer in the reports filed or submitted by it under the Exchange Act is recorded, processed, summarized and reported, within the time periods specified in the SEC's rules and forms] for the issuer;

- o have designed such disclosure controls and procedures to ensure that material information is made known to them, particularly during the period in which the periodic report is being prepared;
- o have evaluated the effectiveness of the issuer's disclosure controls and procedures as of a date within 90 days prior to the filing date of the report; and
- o have presented in the report their conclusions about the effectiveness of the disclosure controls and procedures based on the required evaluation as of that date;

- he or she and the other certifying officers have disclosed to the issuer's auditors and to the audit committee of the board of directors (or persons fulfilling the equivalent function):
  - o any fraud, whether or not material, that involves management or other employees who have a significant role in the issuer's internal controls; and
- he or she and the other certifying officers have indicated in the report whether or not there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of their evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

*Certification of Disclosure in Companies' Quarterly and Annual Reports*, Exchange Act Release 34-46427, § II.A (Aug. 29, 2002) (footnotes omitted).

38. As set forth in Paragraph 33, Davis provided these disclosure control certifications in Acadia's 3Q2019 10-Q, 2019 10-K, 1Q2020 10-Q, 2Q2020 10-Q, 3Q2020 10-Q, and 2020 10-K.

///

///

## II. Pimavanserin

39. Pimavanserin is an antipsychotic that was approved for the treatment of hallucinations and delusions associated with Parkinson's disease psychosis by the FDA in April 2016 under the trade name NUPLAZID. NUPLAZID became available for prescription in the United States in May 2016.

40. During the relevant period, NUPLAZID was Acadia's only commercial product and, accordingly, the sole driver of its product sales. In 2017 – the first full year that NUPLAZID was available – Acadia's net product sales were $124.9 million. Acadia's net product sales from NUPLAZID increased to $223.8 million in 2018, $339.1 million in 2019, $441.8 million in 2020, and $484.1 million in 2021.

41. Acadia holds the worldwide commercialization rights to pimavanserin and "believe[s] that pimavanserin has the potential to address important unmet medical needs in neurological and psychiatric disorders in addition to [Parkinson's disease psychosis]."

42. Beyond the treatment of hallucinations and delusions associated with Parkinson's disease psychosis, Acadia believes that pimavanserin could treat dementia-related psychosis (or "DRP") more generally, including dementia from Alzheimer's disease, dementia with Lewy bodies, vascular dementia, and frontotemporal dementia.

43. More than 8 million Americans suffer from dementia and, given the aging population, the number of cases is expected to double by 2060. Depending on the dementia type and disease progression, approximately 20-70% of patients with dementia experience dementia-related psychosis.

44. The most common cause of dementia is Alzheimer's, followed by vascular dementia and dementia with Lewy bodies. Alzheimer's alone affects more

than 6 million Americans, with approximately 30% of those individuals experiencing some form of dementia-related psychosis. Parkinson's, on the other hand, affects only 1 million Americans, with between 20-40% of those individuals developing Parkinson's disease psychosis.

45. There is no FDA-approved treatment for dementia-related psychosis, so expanding the use of pimavanserin beyond just the treatment of Parkinson's disease psychosis – for which pimavanserin was already approved – would have been transformative for Acadia. Indeed, analysts predicted that, if broadly approved to treat dementia-related psychosis, pimavanserin could generate Acadia over $1 billion in sales in the United States in the near-term and more than $3 billion in sales worldwide over the next decade.

46. Accordingly, Acadia has been working to expand the label for pimavanserin for more than a decade.

## III. <u>The FDA's Approval Process</u>

47. To change a label, market a new dosage or strength of a drug, or change the way it manufactures a drug, a company must submit an efficacy supplement, known as a Supplemental New Drug Application ("sNDA"), to the FDA.

48. Once an sNDA is accepted, the Prescription Drug User Fee Act ("PDUFA") requires the FDA to take official action within 6 months for applications granted priority review and within 10 months for applications granted standard review. This deadline is known as the "PDUFA date." An application will receive priority review if the drug treats a serious condition and, if approved, would provide a significant improvement in the safety or effectiveness of the drug in treating, preventing, or diagnosing a particular condition.

///

49. The FDA then schedules internal filing and planning meetings to determine whether the sNDA is sufficiently complete as to permit a substantive review and, if so, to organize review tasks and establish an internal review timeline.

50. After the filing and planning meetings, the FDA begins its in-depth review of the drug's data and labeling. An internal mid-cycle meeting is also held, during which the FDA's review team presents the status of the application and all key findings, identifies any issues that could preclude the application from being approved, begins a high-level discussion of labeling, and, if necessary, revises the review plan and interim timelines, among other things.

51. The FDA then conducts an internal labeling planning meeting to discuss high level labeling concepts and major issues, and to agree on a schedule and framework for the labeling review process and future labeling meetings. The FDA begins its in-depth labeling review shortly after the labeling planning meeting.

52. One of the last steps in the FDA's review process is a late-cycle meeting with the applicant. The purpose of the late-cycle meeting is to discuss the status of the review, share information, identify deficiencies, and plan for the remainder of the review.

53. An internal wrap-up meeting is also held no later than eight months after the application acceptance date for standard review. The purpose of the wrap-up meeting is to facilitate the development of a comprehensive understanding of the safety, efficacy, and quality of the drug and a preliminary decision on regulatory action.

54. Finally, the FDA prepares an official action letter and action package that communicates the Agency's final decision to the applicant. If the FDA does not approve the drug, it sends the applicant a "Complete Response Letter" or "CRL,"

which outlines the deficiencies found by the review team and any recommendations for corrective action.

## IV. The -019 Study

55. In November 2013, Acadia initiated a Phase II feasibility study designed to examine the efficacy and safety of pimavanserin as a treatment for individuals with Alzheimer's disease psychosis (the "-019 Study"). The -019 Study was a randomized, double-blind, placebo-controlled study to test the efficacy and safety of pimavanserin in approximately 200 patients with Alzheimer's disease psychosis. Following a screening period, the patients were to be randomized on a one-to-one basis and receive either pimavanserin or a placebo once-daily for 12 weeks.

56. The -019 Study was designed to assess several key efficacy endpoints, including psychosis, agitation/aggression, and sleep/nighttime behavior on the Neuropsychiatric Inventory – Nursing Home scale, the Cohen-Mansfield Agitation Inventory scale, and the Alzheimer's Disease Cooperative Study – Clinical Global Impression of Change scale. Key efficacy endpoints were based on the change at week 6 from baseline, but the -019 Study also assessed additional exploratory endpoints, including the durability of response to pimavanserin through 12 weeks of treatment.

57. The -019 Study was conducted in a large network of research care homes in the United Kingdom and ultimately enrolled 181 patients with Alzheimer's disease psychosis.

58. On December 20, 2016, Acadia announced positive top-line results from the -019 Study. Acadia explained that pimavanserin met the -019 Study's primary endpoint and demonstrated efficacy "with a 3.76 point improvement in psychosis at week 6 compared to a 1.93 point improvement for placebo, representing a statistically

significant treatment improvement in the NPI-NH Psychosis score (p=0.0451)." Acadia further explained that "over the course of 12 weeks of treatment, pimavanserin did not impair cognition . . . and was similar to placebo. On the secondary endpoint of mean change in NPI-NH Psychosis score at week 12, pimavanserin maintained the improvement on psychosis observed at the week 6 primary endpoint, but did not statistically separate from placebo."

59. Unbeknownst to the market however, the -019 Study was poorly designed and inadequately controlled, and therefore could never serve as a basis to expand pimavanserin's use. As the FDA later explained when denying the pimavanserin sNDA:

> There was no type I error control for any of the secondary endpoints. Approximately 25% of the enrolled subjects did not meet the study's eligibility criteria. Approximately 20% of the study subjects took prohibited concomitant medications during the study. There were also problems with obtaining informed consent from legally authorized representatives before subjects were enrolled in the study that, although not directly influencing the results of the study, indicate that the study was not well-conducted.

60. Acadia, Davis, and Stankovic withheld this information from the market and, by doing so, misled investors that Acadia was steadily laying the groundwork to expand pimavanserin's use.

## V. <u>The End of Phase II Meeting</u>

61. Following completion of the -019 Study, Acadia had a private, "End of Phase II Meeting" with the FDA on May 15, 2017. As reflected in the FDA's minutes of the meeting, the purpose of the End of Phase II Meeting was for Acadia "to obtain feedback on [a] proposed study, ACP-103-045, and potential indication for the treatment of hallucinations and delusions associated with dementia-related psychosis." Acadia was seeking to expand the label for pimavanserin to include the

treatment of dementia-related psychosis broadly and, to do so, would have to submit an sNDA to the FDA.

62. Stankovic and eight other executives attended the End of Phase II Meeting on behalf of Acadia.

63. At the meeting, the FDA agreed that "the treatment of hallucinations and delusions in dementia-related psychosis [was] a potentially approvable indication." However, the FDA raised several concerns with the design and population of Acadia's proposed study – eventually dubbed the "Harmony Study" – as well as with the timing and endpoints for the study.

64. With respect to the overall design of the Harmony Study, the FDA expressed concerns about Acadia's proposal to use a randomized withdrawal trial to establish efficacy and suggested combining the Harmony Study with a post-marketing commitment for a safety study in frail, elderly subjects. After a lengthy discussion with Acadia, the FDA "agreed that the randomized withdrawal trial as described in the meeting briefing package would be acceptable as a well-controlled trial for submission of an sNDA for the indication of hallucinations and delusions associated with dementia-related psychosis."

65. With respect to the population of the Harmony Study, the FDA agreed with Acadia's proposed population "as long as subjects are ***stratified*** by their current clinical diagnosis (as proposed). ***Labeling will reflect the actual composition and response of patients enrolled in the study***." In other words, although the Harmony Study was not powered to determine pimavanserin's effectiveness in each dementia subgroup, the FDA would be analyzing each subgroup's composition and response in determining whether to approve pimavanserin for a broad indication for dementia-related psychosis.

66. The FDA thus warned Acadia, as specifically reflected in the FDA's minutes of the meeting, that pimavanserin's approval to treat dementia-related psychosis was dependent not on the overall results of the Harmony Study, but the specific response in each stratified subgroup of dementia patients.

67. Finally, with respect to the timing and selection of the Harmony Study's endpoints, the FDA "generally agreed with the timing and endpoints for the study," but expressed concern that "capturing certain relapse criteria could be difficult." Acadia took the position that "in the context of the overall existing and planned safety database for pimavanserin that the single well-controlled Phase 3 study in the proposed patient population would be sufficient for a sNDA filing in the proposed indication." The FDA responded that, if Acadia "***wish[ed] to rely on a single well-controlled study for [its] sNDA filing, the findings must be very persuasive. This means statistically significant with a very small probability of Type 1 error and a finding that is clinically meaningful.***"[1]

68. Alternatively, Acadia could have conducted multiple studies to test pimavanserin's effectiveness in each of the dementia subgroups encompassed within the umbrella of dementia-related psychosis: dementia from Alzheimer's disease, dementia with Lewy bodies, vascular dementia, frontotemporal dementia, and Parkinson's disease psychosis. But this would have been significantly more expensive and time-consuming and would have required pimavanserin to demonstrate statistically significant effectiveness in each subgroup. The FDA thus warned Acadia that, if it was intent on relying on a single study, "***the findings must be very persuasive***."

---

[1] Unless otherwise indicated, bold and italic emphasis used in quotations throughout this Complaint have been added and did not appear in the original quotation.

## VI. The Harmony Study

69. On October 4, 2017, Acadia announced that the FDA had granted pimavanserin a Breakthrough Therapy Designation, which is designed to facilitate and expedite the development and review of new drugs that address an unmet medical need in the treatment of a serious condition.

70. Acadia also announced that it had initiated the Harmony Study to evaluate pimavanserin for the treatment of dementia-related psychosis. The Harmony Study was a Phase III, double-blind, placebo-controlled study to evaluate the efficacy and safety of pimavanserin for the treatment of hallucinations and delusions associated with dementia-related psychosis.

71. The objective of the study was to test the ability of pimavanserin to prevent relapse of psychotic systems in a broad population of patients with the most common subtypes of dementia: Alzheimer's disease, dementia with Lewy bodies, Parkinson's disease dementia, vascular dementia, and frontotemporal dementia.

72. The Harmony Study planned to enroll approximately 360 patients in several different countries. The patients would first be given a dose of pimavanserin during a 12-week stabilization period. Patients who responded to pimavanserin during the stabilization period would then be randomized over a 26-week placebo-controlled double-blind period, with some patients receiving daily doses of pimavanserin and others receiving a placebo. The primary endpoint of the Harmony Study was the time to relapse in the double-blind period as assessed on either the Clinical Global Impression of Change scale or the Scale for the Assessment of Positive Symptoms – Hallucinations + Delusions.

73. Acadia further explained that the Harmony Study was supported by the results from the -019 Study and the results from the study that formed the basis for

the FDA's approval of pimavanserin to treat Parkinson's disease psychosis (the "-020 Study").

74. On September 9, 2019, Acadia issued a press release announcing that the Harmony Study had "met its primary endpoint, demonstrating a highly statistically significant longer time to relapse of psychosis compared to placebo in a planned interim efficacy analysis." Accordingly, "upon the recommendation of the study's independent data monitoring committee, which met to review the data from the planned interim efficacy analysis, the study will now be stopped early based on pre-specified stopping criteria requiring a one-sided p-value less than 0.0033 on the study's primary endpoint."

75. Acadia further explained that it was "planning to meet with the FDA regarding a supplemental NDA submission in 2020 and the results from the HARMONY study will be submitted for presentation at upcoming medical meetings." The press release went on:

> "We are very excited that today's results bring us one step closer to the potential of offering patients with dementia-related psychosis a critically needed treatment option," said Serge Stankovic, M.D., M.S.P.H., ACADIA's President. "We look forward to speaking with the FDA about a supplemental new drug application to support pimavanserin for the treatment of dementia-related psychosis. I want to thank all of the patients, their families, and the investigators for their participation in this important study."

76. During a call that day, Stankovic explained to investors that:

> [P]imavanserin was previously granted Breakthrough Therapy Designation for dementia-related psychosis. This was based on the seriousness of the disease with unmet need and the clinical results we have already observed, including our positive Alzheimer's disease psychosis study, which showed statistically significant reduction in psychotic symptoms in patients with Alzheimer's disease versus placebo without a negative impact on measure of cognitive function. And our positive Phase III pivotal study showing improvement in severity and frequency of hallucinations and delusions in patients with Parkinson's disease

> psychosis. This study included a prespecified subgroup analysis of dementia patients who, when treated with pimavanserin, also showed a statistically significant improvement in psychosis compared to placebo.
>
> ***I would also like to remind you that at the end of Phase II meeting with FDA, we confirm[ed] that for our supplemental NDA submission in DRP, we could rely on a single, well-controlled study whose results were both statistically and clinically very persuasive.***
>
> In addition to the pivotal HARMONY study, we plan to submit in the supplemental NDA positive data in patients with dementia from the 2 previous efficacy studies as well as additional safety data from our ongoing placebo-controlled postmarketing commitment safety study of pimavanserin in elderly frail patients with neuropsychiatric symptoms related to neurodegenerative disease.

77. When asked by an analyst about the composition of the patients in the Harmony Study, *i.e.*, the number of patients suffering from each form of dementia, Stankovic declined to provide a number but explained:

> The distribution of different dementia subtypes in our open-label stage as well as in the randomized population are similar and match roughly the epidemiology of the disease. ***Approximately 2/3 of patients were Alzheimer patients, about 15% of patients were with Parkinson's dementia, approximately 10% were with vascular dementia, and somewhat less than 10% patients with Lewy body dementia and with dementia with Lewy bodies, and the rest was frontotemporal dementia.***

78. Defendants' and Stankovic's statements created a misimpression in the market that the FDA had agreed to evaluate pimavanserin based on the results from the Harmony Study as a whole and ***would not*** be taking into account the composition of, or response in, any particular dementia subgroup. For example, analysts at Cowen noted in a September 9, 2019 report that "[g]iven that Alzheimer's patients represent 2/3 of study patients (ACAD comments on this morning's call), we believe this data [the overall, non-stratified results] will support broad label expansion." This was of

course not the case, as the FDA had explicitly told Acadia – and Stankovic, in particular – during the End of Phase II Meeting that it would be analyzing the "actual composition and response of patients" in each dementia subgroup when determining whether to approve pimavanserin for a broad indication for dementia-related psychosis.

79. Defendants' and Stankovic's statements also created the misimpression that all the patients enrolled in the Harmony Study responded similarly to pimavanserin, regardless of their particular type of dementia. Analysts at Needham wrote in a September 9, 2019 report, for example, that "mgmt commentary suggests that efficacy was similar across all subtypes." Analysts at J.P. Morgan likewise wrote that "management's comments on the open-label run-in period of the trial, which . . . supports that the large majority of DRP patients responded to pimavanserin." As the market would later learn, this was not the case.

80. Indeed, Acadia, Davis, and Stankovic knew by this point, at the absolute latest, that the Harmony Study was fundamentally flawed and could not possibly support a broad indication to treat dementia-related psychosis.

81. Specifically, and as the FDA would later point out when refusing to approve the pimavanserin sNDA, the Harmony Study only treated ***nine*** patients with dementia with Lewy bodies and ***three*** patients with frontotemporal dementia during the double-blind period, far too few to adequately demonstrate the effect of pimavanserin in either dementia subtype. Even worse, pimavanserin made ***absolutely no difference*** in the relapse rate for the 24 patients with vascular dementia who were treated during the double-blind period of the Harmony Study. And, although the Harmony Study treated 123 patients with Alzheimer's disease during the double-

blind period, the relapse rate for this dementia subgroup was not nominally significant.

82. Rather, the positive overall results of the Harmony Study were driven almost entirely by the results of the patients suffering from Parkinson's disease psychosis – ***an indication for which pimavanserin was already approved to treat***. As the FDA later explained, "[d]espite having fewer subjects (35) than the [Alzheimer's disease] subgroup, the effect of pimavanserin on time-to-relapse in the Parkinson's disease dementia (PDD) subgroup was highly nominally statistically significant. It appears that the finding in this subgroup is driving the overall study results." In fact, once the results from the patients suffering from Parkinson's disease psychosis were removed from the overall group, pimavanserin's effectiveness declined to a mere ***9%*** and was ***actually less effective than a placebo*** in treating dementia-related psychosis for patients suffering from vascular dementia and frontotemporal dementia.

## VII. <u>Defendants and Stankovic Capitalize on the Positive Buzz From the Harmony Study to Enrich Themselves</u>

83. The market was not privy to the design of or results from the Harmony Study, so the price of Acadia common stock ***surged by more than 50%***, from a closing price of $23.77 on September 6, 2019, to a closing price of $36.62 on September 9, 2019, in response to the Company's announcement.

84. Defendants and Stankovic seized upon Acadia's inflated stock price to raise hundreds of millions of dollars in a follow-on stock offering while, at the same time, Davis and Stankovic offloaded tens of millions of dollars of their own stock for a huge profit.

///

85. On September 17, 2019, just eight days after Acadia's announcement regarding the Harmony Study, the Company announced a public offering for $250 million of its common stock. Acadia also granted Bank of America Merrill Lynch and J.P. Morgan, who were acting as joint book-running managers for the offering, a 30-day option period to purchase up to an additional $37.5 million of Acadia common stock. The next day, Acadia announced that it had priced the offering at $40 per share, with 6,250,000 shares available to be purchased by the public and 937,500 by the underwriters.

86. The offering closed two days later, on September 20, 2019, and was fully sold, generating Acadia $287.5 million in gross proceeds.

87. At the same time, Davis and Stankovic sold tens of millions of dollars of their own Acadia stock for a huge profit. During the relevant period, ***Davis sold 541,205 shares of Acadia common stock for $24,771,568***. These sales were highly unusual, as Davis did not sell a single share of Acadia common stock before October 2019. And in the more than two years since Defendants' fraud was revealed, Davis sold less than half that amount for only $6.8 million.

88. The same is true of Stankovic. ***Stankovic sold 377,364 shares of Acadia stock during the relevant period for $19,095,304.*** These sales were highly unusual as, like Davis, Stankovic did not sell a single share of Acadia common stock before October 2019. And in the more than two years since Defendants' fraud was revealed, Stankovic sold only 9,476 shares of Acadia common stock for $180,261.

89. Though many of Davis's and Stankovic's sales of Acadia common stock were made pursuant to 10b-5 trading plans, the majority of those sales were pursuant to plans entered into ***after*** Davis and Stankovic were in possession of the critical results from the Harmony Study in September 2019, which revealed that

pimavanserin was not effective in treating dementia-related psychosis in several dementia subgroups and was therefore unlikely to be approved by the FDA.

## VIII. Acadia Discloses Cherry-Picked Data from the Harmony Study to Investors at the CTAD Meeting

90. On October 3, 2019, Acadia announced that the results from the Harmony Study had been accepted for a late-breaking oral communication at the 12th Annual Clinical Trials on Alzheimer's Disease ("CTAD") Meeting to be held December 4-7, 2019.

91. A few weeks later, on October 30, 2019, Acadia held a conference call to discuss its financial results for the third quarter of 2019 (the "3Q2019 Earnings Call"). During the conference call, Bank of America Merrill Lynch analyst Tazeen Ahmad asked the following question:

> We're looking forward to seeing your data set presented at CTAD on the 4th of December. And ahead of that, I'm just wondering if you could give us an idea of what additional details from the study you plan on showing? So should we expect to see a breakout of the different subsets of patients that were studied as part of the DRP indication?
>
> And I guess related to that, ***is your expectation that you would get a label just simply saying DRP? Or would it be specific to maybe the subgroups that seem to be most responsive if there were subgroups that were more responsive than others?***

92. Stankovic responded:

> Let me first tackle the -- what data we will plan to present at CTAD. We will be sharing all material top line results from the study, meaning efficacy data from the open-label portion of the trial, primary and key secondary endpoint details in the trial particularly, obviously in the randomized withdrawal portion as well as overall safety data. So as part of that to specifically to your question, we ***will be presenting the data related to different subtypes of dementia as well***.

> To your second question, ***all discussions that we had with the FDA and our initial intention were related to us pursuing indication of the treatment of hallucinations and delusions in dementia-related psychosis. So, yes, indeed that is what we are pursuing and that is what we had discussed with the FDA***.

93. Stankovic's statements reinforced the misimpression in the market that, because Acadia was pursuing an indication of pimavanserin to treat dementia-related psychosis broadly, the FDA would be evaluating the results from the Harmony Study as a whole and not considering the data from any individual dementia subgroup.

94. On December 4, 2019, Acadia presented certain topline results from the Harmony Study at the 12th Annual CTAD Meeting. During the presentation, Acadia revealed that it had enrolled 392 patients throughout the United States, Latin America, and Europe. However, only 217 of those patients progressed from the open-label portion to the double-blind portion of the Harmony Study. Of the 134 patients who were terminated from the Harmony Study early, 70 of them did not respond to pimavanserin in the 12 weeks that it was administered in the open-label period.

95. With respect to the 217 patients that proceeded to the double-blind portion of the Harmony Study, 112 were given a daily dose of a placebo and 105 were given a daily dose of pimavanserin. Acadia provided relapse data for 194 of those patients, 99 of which received a placebo and 95 of which received pimavanserin. Through 26 weeks of treatment, 28 patients receiving the placebo suffered a relapse event, compared to only 12 patients receiving pimavanserin. Acadia thus reported that patients receiving the placebo were 2.8x more likely to experience a relapse of dementia-related psychosis than patients receiving pimavanserin.

96. Acadia also reported that pimavanserin reduced the risk of "all-cause discontinuation" of the Harmony Study by 2.2x. 21 patients receiving pimavanserin discontinued the Harmony Study, compared to 38 patients receiving the placebo. Notably, and unlike the data it provided with respect to the open-label portion, Acadia did not provide the reason why any of the 59 patients discontinued the double-blind portion of the Harmony Study early.

97. Acadia also disclosed certain "Exploratory Analyses by Most Likely Clinical Diagnosis." During the open-label period, Acadia represented that pimavanserin "substantially reduced psychosis across all subtypes" by between 73.1% and 83.3%:




///

///

///

///

98. Acadia also provided "[s]tablization and relapse rates by most likely clinical diagnosis" for the patients in the Harmony Study:

| | Open-label Stabilization rate % | Double-blind relapse rate | |
|---|---|---|---|
| | | PBO % | PIM % |
| Overall | 61.8 | 28.3 | 12.6 |
| **Most Likely Clinical Diagnosis** | | | |
| AD | 59.8 | 22.6 | 13.1 |
| DLB | 45.5 | 66.7 | 0.0 |
| PDD | 71.2 | 50.0 | 6.7 |
| VaD | 71.4 | 16.7 | 16.7 |
| FTD | 50.0 | 0.0 | 100 |

Relapses on PBO (n/N): Overall=28/99; AD: 14/62; DLB 2/3; PDD: 10/20; VaD 2/12; FTD 0/2
Relapses on PIM (n/N): Overall=12/95; AD: 8/61; DLB 0/6; PDD: 1/15; VaD 2/12; FTD 1/1

99. The double-blind portion of the Harmony Study thus consisted of the following patients:

| Clinical Diagnosis | # of Patients Receiving A Placebo | # of Patients Receiving Pimavanserin | Total |
|---|---|---|---|
| Alzheimer's Disease | 62 | 61 | 123 |
| Dementia with Lewy Bodies | 3 | 6 | 9 |
| Parkinson's Disease Psychosis | 20 | 15 | 35 |
| Vascular Dementia | 12 | 12 | 24 |
| Frontotemporal Dementia | 2 | 1 | 3 |

100. The data thus revealed that, while patients suffering from Alzheimer's disease and Parkinson's disease psychosis had lower relapse rates on pimavanserin than on a placebo, pimavanserin made ***absolutely no difference*** for patients suffering

from vascular dementia, and actually caused a ***higher*** relapse rate for patients suffering from frontotemporal dementia. And although pimavanserin reduced the relapse rate for patients suffering from dementia with Lewy bodies, ***only 9 patients*** with this type of dementia-related psychosis were treated during the double-blind period.

101. As explained by Acadia's Senior Director of Clinical Research, Erin Foff, "the take-home here is that the relapse rates on pimavanserin were a little narrow and low overall in the individual groups, ranging from 0 in the DLB population to about 16.7% in the vascular dementia patients. And the range in the group receiving placebo was broader and higher, again, ranging from 16.7% to about 67%, not taking that FTD group into consideration."

102. Foff did, however, acknowledge that "***some of those categories have just extremely small numbers of patients. So just a word of caution on overinterpretation***." Foff further explained that, "***it's again, a bit hard to interpret these results given the small numbers. And we really were not powered to look at this in any meaningful statistical way. So the best we can do is just describe it***."

103. Acadia did not disclose how many patients in each particular dementia subgroup discontinued the double-blind period early and, if so, the reason for the discontinuation.

104. Finally, Davis revealed during the presentation that Acadia was "planning to meet with the FDA regarding an sNDA for pimavanserin as a treatment for [dementia-related psychosis] in the first half of 2020."

105. Overall, the market viewed the results presented from the Harmony Study positively, though investors were understandably concerned by the data provided with respect to the dementia subgroups.

106. Analysts at Cowen wrote, for example:

> Decreases in rate of relapse with pimavanserin treatment compared to PBO was observed in all subtypes except for VaD and FTD (although we note small patient numbers; there was only 1 patient enrolled with FTD). The relapse rate for AD patients (majority of the patients, 62/99) was reduced to 13.1% with pimavanserin compared to 22.6% with PBO. While we note the effect seen in AD was smaller than what was observed in DLB and PDD, we still view the change of 9.5% between these groups, an almost 50% reduction, as being very clinically meaningful.

107. Analysts at Stifel similarly wrote:

> If there's one (small) thing to nitpick in this trial it's that success at the interim may have been helped by the Parkinson's/Dementia-Lewy Bodies subset (12 relapses placebo, 1 drug), whereas evidence of efficacy in Alzheimer's is clearly there, but comes down to a meaningful but smaller event difference (14 relapses placebo, 8 drug).
>
> . . . .
>
> As we noted above, ***this trial wasn't just favorable for pimavanserin because of its design, but also because ACAD was able to include patients with Parkinson's, where the drug is already approved.*** And while the numbers are small, the relapse reduction in POD and DLB (closely related to Parkinson's) look superior to that in Alzheimer's, which ultimately represents the major population of interest, and is where bulls generally model multi-billions in revenue.

108. Nevertheless, given the misimpression that Acadia, Davis, and Stankovic had created in the market – that the FDA would be evaluating the results from the Harmony Study as a whole and not considering the data from any individual dementia subgroup – investors believed that the FDA would approve the pimavanserin sNDA.

109. For example, analysts at Goldman Sachs wrote:

> ***While not powered to detect statistical significance (and acknowledging the small numbers of patients within each subtype)***, exploratory secondary endpoints suggest similar

> effect of psychosis reduction (73.1% to 83.3%) due to Nuplazid treatment in the open-label portion across the dementia subtypes and relapse rates were tightly clustered. In comparison, patients in the placebo arm exhibited a wider and more variable relapse rate across subtypes.

110. Analysts at Leerink likewise commented:

> In the open-label period, Nuplazid had clinically meaningful reduction of psychosis across all 5 dementia subtypes (73.1%-83.3% range) with 61.8% of patients meeting pre-specified response criteria at both week 8 and week 12 and continuing to the double-blind period (placebo relapse rate in the 0-67% range across subtypes, Nuplazid in the 0-17% range) – this should support a broad DRP label for Nuplazid and increase physician comfort using Nuplazid in all types of dementia. ***That said, one caveat is that the study was not powered for statistical analysis in different dementia types given the small numbers of patients per group.***

## IX. Defendants and Stankovic Double-down on Their Misrepresentations to Investors and File An sNDA That Is Doomed to Fail

111. A few months later, on February 26, 2020, Acadia held a conference call to discuss its financial results for the fourth quarter and fiscal year 2019 (the "4Q2019 Earnings Call"). During the conference call, Cowen analyst Ritu Baral asked "[t]he sNDA for DRP what's left to do before the summer submission?" Stankovic responded:

> We have all of the data that will constitute our supplemental NDA. The pivotal HARMONY study results will be the basis of the sNDA submission which was previously agreed upon at the end of Phase 2 meeting. And in addition, we will have supportive efficacy results from our previous short-term studies which provided evidence of acute efficacy of pimavanserin in Alzheimer disease and in Parkinson's disease psychosis for patients – with patients with dementia.
>
> And finally, we plan to submit our extensive safety data from completed an ongoing study. So what is left for us is to essentially put that altogether in the format required for the supplemental NDA, all the study reports and summary documents and once we agree with FDA on that to submit.

112. Baral then asked, "so you've generated all the safety data and safety analysis used for that NDA, sNDA?" Stankovic responded: "[y]es, we generated all the – both efficacy and safety data that we will be submitting with that supplemental NDA."

113. Stifel analyst Alexander Thompson then asked, "[j]ust a quick question on your upcoming sNDA meeting. Just wondering if you could sort of give us a sense of what your goals are for the meeting, what you expect to discuss with the FDA just generally and if you'll provide us with an update once that occurred?"

114. Stankovic responded:

> As I mentioned earlier, we're meeting with FDA primarily to review the content and format of our application, meaning, we will be discussing with them the totality of the data we are bringing both efficacy and safety data. We're bringing to the sNDA as well as the different ways of analyses and pooling of the data in order to present better and enable reviewers to do their review both on the efficacy and the safety side. So discussing that content and the format of that data presentation is our main objectives in the discussion with FDA.

115. A few months after that, on May 7, 2020, Acadia issued a press release announcing its financial results for the first quarter of 2020. In the press release, Acadia disclosed that it had "completed a pre-sNDA meeting with the U.S. Food and Drug Administration and is on-track to submit a supplemental NDA this summer for pimavanserin as a potential breakthrough therapy for DRP."

116. During a conference call that day (the "1Q2020 Earnings Call"), Stankovic explained:

> As planned, we successfully completed a pre-sNDA meeting with the FDA and confirm that the pivotal data from our harmony study together with a confirmatory and supportive results from our Alzheimer disease psychosis Phase II study and our Parkinson disease psychosis Phase III study will also support the submission of an sNDA for pimavanserin in dementia related psychosis.

> In addition, we discuss the overall safety database and analysis plan. Our sNDA preparation remains firmly on track. As previously announced, we plan to submit the sNDA this summer. We expect the priority review with a potential approval for DRP around year-end.

117. A few days later, on May 12, 2020, Davis presented at the virtual Bank of America Merrill Lynch Healthcare Conference on behalf of Acadia. During the presentation, Bank of America Merrill Lynch analyst Ahmad asked:

> So maybe we can talk a little bit about DRP, Steve, as one of your next indications. Can you review what you discussed with the FDA perhaps at the pre-sNDA meeting? Can you provide a little bit of expectations on timelines for submission and approval? I know you've talked about this in general and whether or not you still expect to have an AdCom, if you believe that there will be any kind of modifications of the current box warning?

118. Davis responded:

> Yes, absolutely. So as I mentioned, we had our pre-sNDA meeting in the first quarter. The feedback there was very consistent with what we heard with our – in the Phase II meeting. The FDA confirmed that the studies conducted can support an sNDA submission with HARMONY as the pivotal study, and our Phase II Alzheimer's disease study and Phase III Parkinson's. The psychosis study has supportive efficacy studies.

119. On June 15, 2020, Acadia issued a press release announcing that it had "submitted a supplemental New Drug Application (sNDA) to the U.S. Food and Drug Administration (FDA) to support a potential new indication for NUPLAZID® (pimavanserin) for the treatment of hallucinations and delusions associated with dementia-related psychosis (DRP)." The press release further explained that the sNDA was based on the results from the Harmony Study as well as on the results from the -019 Study and -20 Study:

> The sNDA is supported by results from the pivotal Phase 3 HARMONY study, which met its primary endpoint, demonstrating that pimavanserin significantly reduced the

> risk of relapse of psychosis by 2.8 fold compared to placebo (hazard ratio = 0.353; one-sided p=0.0023). The sNDA also includes positive efficacy results from two additional placebo-controlled studies, both of which met their respective primary endpoints: The Phase 2 (-019) study in patients with Alzheimer's disease psychosis and the Phase 3 (-020) study in patients with Parkinson's disease psychosis. The sNDA includes a large safety and tolerability database from completed and ongoing studies representing over 1500 patients with neurodegenerative disease.

120. On July 10, 2020, the FDA privately informed Acadia that the pimavanserin sNDA had been assigned to standard – rather than priority – review, even though pimavanserin had previously been granted a Breakthrough Therapy Designation. According to documents publicly filed in the Class Action – yet unbeknownst to investors during the relevant period – the FDA explained that:

> As noted in the Guidance for Industry: *Expedited Programs for Serious Conditions – Drugs and Biologics* (May 2014), a product receiving breakthrough therapy designation <u>could</u> be eligible for priority review <u>if supported by clinical data</u> at the time of BLA, NDA, or efficacy supplement submission (emphasis added). The guidance notes a qualifying criterion for priority review designation is demonstrating the potential to be a *significant improvement* in safety or effectiveness (e.g., evidence of safety and effectiveness in a new subpopulation). ***Based on a preliminary review of your submission, it is unclear if the clinical data demonstrate this potential.***

121. Acadia pressed the FDA for more information and whether it would be holding an Advisory Committee Meeting to discuss the pimavanserin sNDA in further detail. Acadia also offered to have a telephone conference with the FDA so that it could provide additional information about the Harmony Study and understand why the pimavanserin sNDA was not assigned to priority review. The FDA refused on all counts and reiterated that the pimavanserin sNDA "did not receive priority review designation because, based on our initial review, [the] application does not

appear to include adequate evidence to indicate that pimavanserin would provide a significant improvement in safety or effectiveness in the treatment of dementia-related psychosis."

122. On July 20, 2020, Acadia issued a press release announcing that the FDA had accepted the pimavanserin sNDA for filing:

> "We are pleased that the FDA has accepted our sNDA for filing and we will be working closely with the FDA to facilitate completion of the review in a timely manner," said Steve Davis, ACADIA's Chief Executive Officer. "If approved, NUPLAZID would be the first therapy indicated for the treatment of hallucinations and delusions associated with dementia-related psychosis. We look forward to potentially bringing this important treatment advancement to patients, caregivers and physicians."
>
> . . . .
>
> The sNDA is supported by results from the pivotal Phase 3 HARMONY study, which met its primary endpoint, demonstrating that pimavanserin significantly reduced the risk of relapse of psychosis by 2.8 fold compared to placebo (hazard ratio = 0.353; one-sided p=0.0023). The sNDA also includes positive efficacy results from two additional placebo-controlled studies, both of which met their respective primary endpoints: the Phase 2 (-019) study in patients with Alzheimer's disease psychosis and the Phase 3 (-020) study in patients with Parkinson's disease psychosis. The sNDA includes a large safety database from completed and ongoing studies representing over 1500 patients with neurodegenerative disease.

123. The press release further explained that the FDA had assigned the pimavanserin to a standard review track and, accordingly, a PDUFA date of April 3, 2021. However, and despite being told by the FDA just days earlier that the pimavanserin sNDA did not appear to provide a "*significant improvement* in safety or effectiveness (e.g., evidence of safety and effectiveness in a new subpopulation)," Acadia told investors that the FDA "has not identified any potential review issues at

///

this point in their evaluation and at this time they are not planning to hold an Advisory Committee meeting."

## X. <u>Defendants and Stankovic Continue to String Investors Along as the FDA Reviews the Pimavanserin sNDA</u>

124. Over the next seven-and-a-half months, Acadia, Davis, and Stankovic continued to string investors along by misleading them that the pimavanserin sNDA would be approved by the FDA. Acadia, Davis, and Stankovic repeatedly referenced the End of Phase II Meeting and Acadia's purported agreement with the FDA while omitting that the FDA would be specifically analyzing the "actual composition and response of patients" in ***each*** dementia subgroup in determining whether to approve pimavanserin for a broad indication for dementia-related psychosis, rather than the overall results of the Harmony Study. At the same time, Acadia, Davis, and Stankovic trumpeted the overall results of the Harmony Study and -019 Study while omitting the negative subgroup results from the Harmony Study and the fact that both were poorly designed and therefore unlikely to serve as a basis to approve the pimavanserin sNDA.

125. On August 5, 2020, for example, Acadia issued a press release announcing its financial results for the second quarter of 2020. The press release stated:

> "In the first half of 2020 we drove robust growth of NUPLAZID®. With the FDA filing of our sNDA for dementia-related psychosis we are one step closer to potentially delivering the first and only approved treatment for this devastating condition," said Steve Davis, ACADIA's Chief Executive Officer. "Building upon the successful development of our PDP and DRP programs, our clinical team is focused on advancing our innovative early- and late-stage pipeline."

126. The next day, August 6, 2020, Acadia filed the 2Q2020 10-Q. The 2Q2020 10-Q stated, in relevant part:

> We believe that pimavanserin has the potential to address important unmet medical needs in neurological and psychiatric disorders in addition to PD Psychosis and we plan to continue to study the use of pimavanserin in multiple disease states. For example, we believe dementia-related psychosis (DRP), represents one of our most important opportunities for further exploration. In June 2020, we submitted a supplemental New Drug Application (sNDA) for NUPLAZID for the treatment of hallucinations and delusions associated with DRP. In July 2020 the FDA notified us of acceptance of our sNDA with a PDUFA date of April 3, 2021. The FDA advised us that it has not identified any potential review issues at this point in their evaluation and at this time they are not planning to hold an Advisory Committee meeting. The sNDA is supported by results from the pivotal Phase 3 HARMONY study, which met its primary endpoint, demonstrating that pimavanserin significantly reduced the risk of relapse of psychosis by 2.8 fold compared to placebo (hazard ratio = 0.353; one-sided p=0.0023). The sNDA also includes positive efficacy results from two additional placebo-controlled studies, both of which met their respective primary endpoints: the Phase 2 (-019) study in patients with Alzheimer's disease psychosis and the Phase 3 (-020) study in patients with Parkinson's disease psychosis. The sNDA includes a large safety database from completed and ongoing studies representing over 1,500 patients with neurodegenerative disease. An estimated 8.0 million people in the United States are living with dementia, and studies suggest that approximately 30% of dementia patients, or 2.4 million people, have psychosis, commonly consisting of delusions and hallucinations. Approximately 1.2 million patients in the United States are currently treated for DRP and, of those treated, approximately two-thirds are treated with off-label anti-psychotics. In the fourth quarter of 2017, the FDA granted Breakthrough Therapy Designation for pimavanserin for the treatment of DRP.

127. A few weeks later, on August 19, 2020, Davis presented at the virtual JMP Securities CNS Forum on behalf of Acadia. During the presentation, JMP Securities analyst Jason Nicholas Butler asked:

> Just one more question on the market dynamics here. So DRP does involve a number of different patient populations, obviously, the largest of which being

> Alzheimer's patients. Just from the work you've done with physicians, do they view those different patient populations and underlying dementia differently in terms of how they would treat the psychosis symptoms? Or again, who they would view as appropriate and when for initiating therapy?

128. Davis responded:

> I'll just -- just to echo Michael's thoughts, one of the things we hear very consistently among KOLs, just physicians generally is the -- and as we've said before, the "subtypes" of dementia are very difficult to diagnose. They overlap many times. And so it's a little bit of an artificial distinction to say someone has Alzheimer, dementia with Lewy bodies or vascular dementia, et cetera.
>
> ***And so -- and one of the advantages, of course, pursuing dementia-related psychosis broadly, which is just, as a reminder, we got a clear agreement from -- with the FDA at our end of Phase II meeting, and we executed the plan that we agreed to with them.*** One of the advantage is it picks up what's referred to as dementia not otherwise specified, that's quoted as not otherwise specified. And that's a big chunk of patients. And that -- the fact that so many patients are not specified other than beyond just saying dementia, is again, a reflection of the fact that these categories are very difficult to diagnose. So as Michael mentioned, the good news is physicians understand that. They operate in that world. And with the indication that we are seeking, it won't matter. They won't have to try to make a determination, whether it's Alzheimer's or vasco dementia or something else.

129. Butler further asked:

> And that's a really good point. And so let me just ask one more question about the FDA there. ***You obviously have this very broad patient population under the DRP umbrella. How do you think about more broadly the label indication statement based on the Phase III trial design, specifically the relapse prevention relative to PDP, where you had an initiation kind of trial design?***

130. Davis responded:

> Yes. Well, let me take it in from 2 perspectives. Let me take it from a regulatory perspective and then from a medical perspective. From a regulatory perspective, I just want to remind everyone that the sNDA that we've submitted includes the HARMONY study, the relapse

> prevention study but also includes -- or the kind of study that we did in Parkinson's disease psychosis. It includes acute -- we'll call it acute data as well over a much shorter time frame and it showed positive results, both in an Alzheimer's population as well as our -- of course, our Parkinson's disease psychosis population. So we have both in the submission.
>
> ***More importantly, we agreed with the FDA on that approach at our end of Phase II meeting and agreed on the plan for Phase III, and then we've executed that plan.*** From a medical perspective, it's also important because physicians -- and they think -- again, when they think about dementia-related psychosis, they'd oftentimes just think about it more broadly speaking. As they think about a relapse prevention study, what we hear over and over is it really resonates with them.
>
> Many times in neuropsychiatry, when you get approval on a drug, it's based upon -- we ran one arm with drug, one arm with placebo. We measured them on -- we measured progress on the scale. We compared those 2 and have indication of efficacy. But physicians don't do that in practice. They don't use those scales, and they're really just looking at the clinical manifestation of the disease and the patient that they're seeing in the examining room on. And they're thinking about things like will this impact their symptoms, and if so, will it have a durability of effect. So the relapse prevention study really resonates with the medical community because it aligns with a clinical outcome and the kinds of things that they think about.

131. Davis and Stankovic made similar representations to investors at the virtual Morgan Stanley Global Healthcare Conference on September 14, 2020. During their presentation, Morgan Stanley analyst Jeff Hung asked, "what is your view on the recent string of complete response letters? Is there any reason to believe that there are any changes at the agency that might add risk to approval in DRP?" Stankovic responded:

> Well, I would say that we generally avoid to comment on other applications because we are not familiar with the details of the review or details of the data and all that. We do not see -- each situation is different, and we do not see any particular policy arising from that attitude from these decisions, the different decision made. It may have to do with the timing, with resources, ability to be able to

> complete those things and asking for additional data. ***We continue to be very confident, as I said, in our data. It's very consistent with what we've been finding as we have been adding the new information, both in terms of efficacy and safety. We have a strong package and are currently focusing on facilitating review toward approval.***

132. Hung then asked:

> And then multiple neurodegenerative disorders have patients with dementia-related psychosis, such as Alzheimer's. Which disorders do you think are more likely to have faster adoption? Do you think there will be certain ones that contribute more early on in the launch? And then, I guess, on the other hand, what kinds of things do you need to work on for the disorders that may not ramp up as quickly or early on in the launch such as patient or physician education?

133. Davis responded:

> Yes. Let me take just a little bit of running start at it. ***So in dementia-related psychosis, sometimes people think about various subtypes. And of course, we've talked about that as well. But just one, just as a background reminder that we received agreement with the FDA that we would pursue dementia-related psychosis broadly in order to treat the symptoms of psychosis, regardless of their clinically diagnosed subtype.*** And I just want to be clear here, that subtype diagnosis is very subjective. It's difficult to diagnose. Many times, physicians don't know what the underlying etiology is. You sometimes going to look -- only find it out through autopsy. And these patients are, in terms of the kind of subtype that is assigned to them, many times it's wrong. And it's confirmed through autopsy.
>
> And so for that reason, many times, physicians don't even assign a subtype. They diagnose the patient and code them as dementia NOS or dementia not otherwise specified. In fact, if that group of patients, not otherwise specified, were a subtype itself, it would be the largest subtype behind Alzheimer's disease. And so we have felt all along that these patients respond in the same way. They -- the symptoms emerge in very similar fashion. ***And so they should be looked at as a group, and that's the way we've approached this from a clinical and regulatory perspective and the FDA has been in lockstep with us on that. In fact, it was a very short discussion in our -- in the Phase II meeting getting to that point.***

> And so because it's difficult to subtype patients -- and I should have also mentioned, many times they have mixed disease and so they may have more than one underlying etiology. ***We think the appropriate thing to do is to think of them in terms of the broader class of dementia-related psychosis patients.*** So as a consequence, we don't anticipate that any particular type of patient would lead or lag other types of patients. And in fact, one of the benefits that we have here when we think about physicians that write these drugs is there's a real commonality between the prescriber population in PDP and DRP. The mix changes a little bit, but the same components are there.

134. A few months later, on November 4, 2020, Acadia held a conference call to discuss its financial results for the third quarter of 2020 (the "3Q2020 Earnings Call"). During the conference call, Davis stated:

> We are well prepared to achieve the long-term market opportunity for NUPLAZID in PDP and look forward to the addition of the DRP indication.
>
> . . . .
>
> We are excited that pimavanserin could be the first and only FDA-approved medicine for the treatment of dementia-related psychosis.
>
> . . . .
>
> We are confident in both the efficacy and safety data supporting our supplemental NDA. And we'll continue to work with the FDA to facilitate their review with a PDUFA date of April 3, 2021.
>
> We continue to make important progress in our late-stage development pipeline, as shown on Slide 8, with ongoing Phase III studies with pimavanserin for the treatment of negative symptoms of schizophrenia and with trofinetide for the treatment of Rett syndrome.

135. On November 17, 2020, Davis presented at the virtual Stifel 2020 Healthcare Conference on behalf of Acadia. During the presentation, Stifel analyst Paul Andrew Matteis asked Davis:

> I guess as you've had continued engagement with the FDA, is there any interpretation you have on the lack of priority review? Investors and analysts love to read these tea leaves. And I've been misled by priority review and no panel, resulting in a CRL. So I won't overdo it, but what did you think internally then? And how do you guys feel about the intent?

136. Davis responded:

> Yes. Thanks much for the question***. So let me just start by saying we remain highly confident in both the efficacy and safety data supporting our submission. And of course, at this point, we're focused on facilitating the FDA's review, which, as I mentioned, remains on track. And just as a brief reminder, our sNDA submission included an efficacy package, which was agreed upon with the FDA at the end of Phase II meetings before we conducted the pivotal HARMONY study. And based upon the robust and meaningful results from HARMONY and the additional supporting data from other efficacy studies in Alzheimer's and Parkinson's patients, and then just the overall safety profile of pimavanserin, we remain very confident in the potential approval for DRP***.
>
> ***So again, just as I put it -- with that backdrop, at our end of Phase II meeting, we went to the FDA. We said we think we have demonstrated sufficient efficacy in the acute setting. We'd like you to agree to 3 things: one, that we studied DRP generally. They agreed to that. That was actually a very short discussion. Two, that we run a relapse-prevention study now to demonstrate the -- not only that we can stabilize patient symptoms, but that we get a durable effect over time. And then three, that we -- that a single relapse prevention study serve as the basis of approval, together with the other supporting acute studies we've done. And they've agreed to all 3 of those. That's documented in our minutes. So fast forward to today, we then executed the exact plan that we laid out for them. And again, that underlines the confidence we have in the potential for approval in DRP.***

137. Matteis then asked:

> Got it. Okay. Great, Steve. What were your discussions with the FDA and what you need to show for safety? I mean, there's this whole -- we had Alzheimer's panel here at this conference yesterday and one of the panelists walked through the whole back history, going back to the 2000s with atypicals in the elderly and the original black box and changes in policy and things like that. What did FDA -- did

> they ever articulate to you what they wanted to see, right? It's obviously very hard to disprove a negative. And I guess, were they going to rely more on just your DRP clinical data? Or how much of the PDP post-marketing data goes into this?

138. Davis responded:

> Yes. They're both important. ***One thing that I didn't mention is that in the Phase II meeting we had setting up our Phase III program that we then executed, is in addition to those 3 points, we also just asked FDA very specifically. We said we just want to make certain that you are on board with approving a drug to treat dementia-related psychosis***. Because today, there's a class warning for all antipsychotics, basically contraindicating that patient population. ***We want to make certain that you are on board with the concept of doing this if we followed the plan that we've agreed to.***
>
> ***And they said, absolutely, we wouldn't agree to your Phase III plan if we weren't in that -- if we weren't of that mind***. So again, fast forward to today, we've been on the market for 4 years. We've continued to run placebo controlled studies. If you look at the totality of the data that we have today on -- just on safety, if anything, the safety profile and tolerability profile of the drug looks even better than it did when we got our PDP approval.
>
> Most recently, or as a component of that PDP approval, we agreed to a post-marketing commitment to run a substantial number of patients in placebo-controlled study for elderly patients, evaluating them over -- against placebo over a period of at least 8 weeks. And we -- that commitment is due to be completed in the next year or 2. But any time you follow an sNDA, you need to collect all the safety data that you've generated since your prior NDA approval. We've done that, including the most recent cut from that safety study. ***And like I said before, every cut of data that we've had continues to support, if not look even better than the original basis for approval in PDP. So we've submitted that data and that all looks very consistent with what we know about the drug.***

139. Finally, Matteis asked:

> Got it. That's great. All right. Last here of the regulatory question, I promise, because I don't want to belabor it. Between what you do, Steve, are there any 3 like inflection

> points during the review from your seat that can be articulated and continue to convey comfort to investors?

140. Davis responded:

> We're following the same path that we did in the PDP review and that most companies do when they're in registration, that is, we're not going to comment on the specific back and forth that we're having with FDA. I just don't think that will be productive. ***But what I will say is, we remain on track. We remain just as confident as we've ever been in the potential for approval and just eager to get to the PDUFA date.***

141. On January 12, 2021, Davis presented at the virtual J.P. Morgan Healthcare Conference on behalf of Acadia. During the presentation, Davis stated:

> [P]imavanserin has the potential to be the first treatment approved for DRP. ***And I'm pleased to report that our sNDA submission is progressing well and as we would expect at this point in the review cycle.*** Pimavanserin selective serotonergic mechanism is highly differentiated. It's unlike any other anti-psychotic on the market. And as I mentioned, the DRP market opportunity is very large, and approximately two-thirds of the 1.2 million patients treated for DRP today are treated with off-label atypical antipsychotics, which as I mentioned, carry significant disease burden or side effect burden.
>
> ***Our sNDA is supported by strong and robust efficacy data. Pimavanserin demonstrated an almost three-fold reduction in risk of relapse of psychosis in our pivotal HARMONY study. Our sNDA also includes positive results from two supportive efficacy studies, a positive Phase 2 study in Alzheimer's disease psychosis and positive data from our pivotal Phase 3 study in Parkinson's disease psychosis in patients with dementia.***
>
> Our sNDA is also supported by strong safety data. Pimavanserin is well tolerated and notably exhibited no worsening of cognition, no worsening of motor function, and no increase in sedation. As we prepare for the DRP launch, we are well-positioned to leverage our established capabilities and expertise.

///

142. J.P. Morgan analyst Cory William Kasimov then asked:

> So just to kick things off, though, obviously, everybody's really focused, as I'm sure you are on your pending PDUFA date for NUPLAZID for DRP. Can you just kind of frame expectations for what you would maybe expect or hope a label would look like and the importance that will play in the commercialization of the product for the indication?

143. Davis responded:

> Yes, thanks much Cory. I'll start and then I'll – and Serge may want to add some additional color as well. So the indication we'll be seeking is NUPLAZID is indicated for the treatment of dementia-related psychosis. And there are probably two key elements that we should touch on here.
>
> ***One is the – as I mentioned, we're seeking the treatment of dementia-related psychosis. So we're not looking at individual subtypes, as they're often referred to of dementia.*** The psychosis that we see is very similar between -- irrespective of the underlying etiology and it responds in a similar way. So we're seeking that broad indication. ***That's supported by very close alignment we established with the FDA at our end of Phase 2 meeting and then again at their pre-sNDA meeting when we submitted our application.***
>
> ***The efficacy and safety data that we have that underpins that indication is very strong.*** We've got a well-established safety and tolerability profile of the drug. Anytime you file an sNDA, you need to collect all of the safety data you have from either prior or ongoing studies. We've done that. All that data continues to look very positive. If anything, the profile of the drug might look even a little bit cleaner than the very, very clean profile that we observed when we submitted in PDP.

144. On February 24, 2021, Acadia issued a press release announcing its financial results for the fourth quarter and full year 2020. The press release stated:

> "Acadia delivered strong financial results in the fourth quarter and full year 2020, driven by robust sales of NUPLAZID in Parkinson's disease psychosis. Additionally, we made significant advancements in two Phase 3 programs and further expanded our pipeline in pain and neuropsychiatry through strategic business development," said Steve Davis, Chief Executive Officer.

> "In 2021, we are focused on delivering continued growth of NUPLAZID, the upcoming potential approval and launch of pimavanserin for dementia-related psychosis and advancing our business development strategy."

145. That same day, Acadia held a conference call to discuss its financial results (the "4Q2020 Earnings Call"). During the conference call, Davis stated:

> ***Additional highlights from 2020 include our submission of an sNDA for DRP. The FDA review is progressing as expected, and we look forward to the potential of NUPLAZID becoming the first and only approved treatment for this indication and the first new treatment in the dementia space in over 15 years***.
>
> . . . .
>
> The significant potential of pimavanserin, combined with our clinical pipeline, will drive meaningful long-term growth. We continue to grow NUPLAZID sales and based on our 2020 performance and current outlook, we are providing net sales guidance for PDP in fiscal year 2021 of $510 million to $550 million. ***We're on the cusp of the potential approval in DRP, a significantly larger market opportunity, for which our teams have been preparing for approximately 2 years. We will be ready to execute on day 1***.

146. The next day, February 25, 2021, Acadia filed the 2020 10-K, which was signed by Davis. The 2020 10-K stated, in relevant part:

> We believe that pimavanserin has the potential to address important unmet medical needs in neurological and psychiatric disorders in addition to PDP and we plan to continue to study the use of pimavanserin in multiple disease states. Beyond PDP, we believe dementia-related psychosis (DRP), represents one of our most important opportunities for further development. In June 2020, we submitted to the FDA a supplemental New Drug Application (sNDA) for NUPLAZID for the treatment of hallucinations and delusions associated with DRP. In July 2020 the FDA notified us of their filing of our sNDA with a Prescription Drug User Fee Act (PDUFA) target action date of April 3, 2021.

147. The 2020 10-K went on to explain that a "key element" of Acadia's strategy was to:

> ***Deliver pimavanserin to the market for the treatment of patients with dementia-related psychosis. In June 2020, we submitted an sNDA for NUPLAZID for the treatment of hallucinations and delusions associated with DRP. Our PDUFA target action date is April 3, 2021. In preparation for a potential U.S. launch, we plan to increase the U.S. sales force, including expansion of additional commercial, medical affairs and general and administrative support functions prior to obtaining regulatory approval for NUPLAZID in DRP.*** If approved, NUPLAZID will be the first and only FDA-approved treatment for DRP.

## XI. The Truth Begins to Emerge as the FDA Expresses Doubt Regarding, and Eventually Denies, the Pimavanserin sNDA

148. The market began to learn the truth about the Harmony Study, the terms and full extent of Acadia's agreement with the FDA about the pimavanserin sNDA, and the effectiveness of Acadia's internal disclosure controls and procedures on March 8, 2021. After the market closed, Acadia issued a press release providing an update on the pimavanserin sNDA. The press release revealed that, as part of its ongoing review of the sNDA, the FDA had "identified deficiencies that preclude discussion of labeling and post-marketing requirements/commitments at this time." The press release explained that the FDA's notification "does not specify the deficiencies identified by the FDA and there has been no clarification from the FDA at this time." However, Acadia reassured investors that it "plan[ned] to work with the FDA to learn the nature of the deficiencies and seek to resolve them" and that the FDA's notification "does not reflect a final decision on the information under review."

149. During a conference call that day, Stankovic reiterated that, despite the news from the FDA, Acadia "remain[ed] highly confident as we have since day 1, of

our submission that we have a complete and robust data package to support the approval of pimavanserin for the treatment of DRP."

150. In response to a question from Citigroup analyst Neena Marie Bitritto-Garg about whether there was "any indication from the FDA potentially around extending the PDUFA date," Davis responded that "[a]t this juncture, they have not given us any reason to think or any indication that the April 3 PDUFA date would not be met."

151. Acadia's stock ***plummeted more than 45%*** in response to the news from the FDA, from a closing price of $45.78 per share on March 8, 2021, to a closing price of $25.02 on March 9, 2021.

152. Analysts and investors were shocked by the news. Analysts at J.P. Morgan described the FDA's feedback as "a major surprise and a disappointment to say the least" as "[n]early all prevailing discussion on ACAD was around anticipate launch trajectory and not approval." Analysts at Mizuho similarly wrote that Acadia's announcement was "clearly a surprise for us and the Street."

153. *Bloomberg* directly linked the fall in Acadia's stock price to the Company's announcement of the FDA's notification, writing "Acadia Pharmaceuticals Inc. tumbled 40% in postmarket trading after reporting that the FDA identified deficiencies that preclude discussion of labeling and post-marketing requirements-commitments for Pimavanserin, a treatment for hallucinations and delusions associated with dementia-related psychosis." Another *Bloomberg* article was titled "Acadia Pharmaceuticals Crashes on FDA Setback for Psychosis Treatment." *Trefis* likewise wrote that the drop in the price of Acadia common stock "can be attributed to the U.S. FDA finding deficiencies in [the Company's] application for its psychosis drug – Nuplazid."

154. Given Acadia's representation that the FDA's interim feedback was not a "final decision" and that there was no "reason to think or any indication that the April 3 PDUFA date would not be met," the market was still hopeful that the pimavanserin sNDA would be approved on time.

155. Investors were therefore surprised when, a few weeks later, on April 5, 2021, Acadia issued a press release announcing that it had received a CRL from the FDA indicating that the pimavanserin sNDA "cannot be approved in its present form." The press release explained:

> Despite prior agreements with the Division of Psychiatry regarding the pivotal Phase 3 HARMONY study design targeting a broad DRP patient population analyzed as a single group, ***the Division, in the CRL, cited a lack of statistical significance in some of the subgroups of dementia, and insufficient numbers of patients with certain less common dementia subtypes as lack of substantial evidence of effectiveness to support approval***.
>
> ***The DRP pivotal HARMONY study met its prespecified primary and secondary endpoints with robust and persuasive clinical and statistical superiority of pimavanserin over placebo, which was a prospectively agreed prerequisite for the DRP indication. Statistical separation by dementia subgroups and certain minimum numbers of patients with specific subtypes were not among the prespecified requirements.***
>
> ***"Acadia stands behind the robustly positive results from the pivotal Phase 3 HARMONY study and the prospectively agreed trial design and criteria for establishing efficacy in DRP. Over the entire course of the review, the Division did not raise any concerns regarding the agreed upon study design, including the issues raised in the CRL," said Steve Davis, Chief Executive Officer of Acadia.*** "We will immediately request a Type A meeting to work with the FDA to address the CRL and determine an expeditious path forward for the approval of pimavanserin in DRP."
>
> ***The Division also stated in the CRL that it considers the Phase 2 Alzheimer's disease psychosis study -019, a supportive study in the sNDA filing, to not be adequate and well controlled, citing that it was a single center study with no type I error control of secondary endpoints in***

> ***which certain protocol deviations occurred.*** The Company believes these observations impact neither the positive results on the study's primary endpoint, nor the study's overall conclusions of efficacy.

156. Acadia's stock ***plunged a further 17%*** in response to the news of the CRL, from a closing price of $25.59 per share on April 1, 2021, to a closing price of $21.18 per share on April 5, 2021. As investors continued to process the news about the CRL, Acadia's stock price slid even lower, bottoming out at a closing price of $20.64 per share on April 6, 2021. All told, Acadia's stock declined ***more than 19%*** between April 1, 2021, and April 6, 2021.

157. *Bloomberg* directly linked the fall in the price of Acadia common stock to the Company's announcement of the CRL, writing "Acadia Pharma (ACAD -17%) tumbled after FDA rejection of a filing for Nuplazid to be approved as a treatment of hallucinations and delusions associated with dementia-related psychosis was seen as far worse than many on Wall Street had expected, analysts from Mizuho and Stifel agreed." Another *Bloomberg* article was titled "Acadia Pharma Drops as FDA Concern Worse Than Street Anticipated." *The Street* similarly wrote that "Acadia Pharmaceuticals tumbled Monday after the biopharma said the Food and Drug Administration had rejected its application to expand the use of pimavanserin."

158. Significantly, Acadia did not publicly release a copy of the CRL and, in doing so, misled investors that the pimavanserin sNDA could still be approved for a broad indication for dementia-related psychosis. Unbeknownst to the market, however, the CRL made clear that neither the Harmony Study nor the -019 Study could possibly serve as a basis to approve a re-submitted sNDA.

159. Specifically, the CRL explained that, "[a]lthough [the Harmony Study] was not powered to demonstrate an effect in the subgroups of dementia included, we

had advised you during development that labeling would reflect the actual composition and response of the subjects enrolled in the trial." After examining the results for each of the dementia subgroups, the FDA concluded:

- ***The intent-to-treat population included only nine subjects with dementia with Lewy bodies and three subjects with frontotemporal dementia, which is too few subjects to be an adequate representation of the response to pimavanserin for either dementia subtype.***

- ***There was no numeric difference on time-to-relapse between pimavanserin and placebo in subjects with vascular dementia (this subgroup also included a relatively small group of 24 subjects).***

- There were 123 subjects with Alzheimer's disease (AD), a large enough number to expect a nominally statistically significant result for the AD subgroup. ***However, the results for the AD subgroup were not nominally significant.***

- Despite having fewer subjects (35) than the AD subgroup, ***the effect of pimavanserin on time-to-relapse in the Parkinson's disease dementia (PDD) subgroup was highly nominally statistically significant. It appears that the finding in this subgroup is driving the overall study results.*** The drug effect in this subgroup supports the effectiveness of pimavanserin in the treatment of hallucinations and delusions associated with Parkinson's disease psychosis; pimavanserin is already labeled for that indication (the PDD subpopulation is subsumed in the current indication).

160. Additionally, the FDA informed Acadia that "[a]s conducted, we do not consider Study 019 to be an adequate and well-controlled study; therefore, it cannot contribute to a finding of substantial evidence of effectiveness for pimavanserin in the treatment of hallucinations and delusions associated with AD psychosis." The CRL explained:

> The study was conducted by a single researcher in the United Kingdom. There was no type I error control for any of the secondary endpoints. Approximately 25% of the enrolled subjects did not meet the study's eligibility criteria. Approximately 20% of the study subjects took prohibited

> concomitant medications during the study. There were also problems with obtaining informed consent from legally authorized representatives before subjects were enrolled in the study that, although not directly influencing the results of the study, indicate that the study was not well-conducted.

161. Even worse, given the "differential response to pimavanserin across dementia subtypes," the FDA questioned whether "'dementia-related psychosis' is a useful construct for a potential indication for pimavanserin."

## XII. The FDA Maintains Its Position on the Harmony Study and Acadia Is Forced to File A Substantially Narrowed sNDA

162. A few months later, on August 4, 2021, after the market closed, Acadia issued a press release announcing its financial results for the second quarter of 2021 and providing additional information about the CRL. The press release stated in a section titled "Company Updates":

> Completed a Type A End of Review meeting regarding the FDA's complete response letter (CRL) for the sNDA for pimavanserin for the treatment of hallucinations and delusions associated with dementia-related psychosis (DRP). ***At the meeting, the FDA reiterated their stated position in the CRL, that pimavanserin should be studied by individual subgroups of dementia, and advised that the best path forward is to conduct an additional clinical study in each of the subgroups for which we seek approval.*** However, the FDA also indicated that they are open to having another meeting to discuss additional analyses from the HARMONY and -019 studies in support of a potential resubmission without an additional clinical study.

163. During a conference call that day, Davis elaborated on Acadia's Type A End of Review Meeting (the "End-of-Review Meeting") with the FDA:

> We recently completed a Type A end-of-review meeting with the FDA to discuss the issues raised in the Complete Response Letter that we received in April. Today, we'd like to share the key takeaways from that meeting.
>
> ***First, the FDA reaffirmed their stated position in the CRL that pimavanserin should be studied by individual subgroups of dementia and advised us that the best path forward to conduct an additional clinical study in each of***

> ***the subgroups for which we seek approval.*** In the meeting, we highlighted the consistent and clinically meaningful efficacy observed in the DRP population overall, as well as across individual dementia subtypes [ph] Alzheimer's disease, dementia with Lewy bodies, Parkinson's disease dementia and patients with mixed pathologies.
>
> As a result of these discussions, the FDA indicated that they are open to discuss additional analyses from the HARMONY study and the -019 study that may support a potential resubmission without conducting an additional study. We're planning to additional discuss analyses with the FDA at a meeting later this year. In parallel with preparations for this meeting, we will also prepare for all potential outcomes that may come from this discussion.

164. In response to a question from Citi analyst Bitritto-Garg about Acadia's intention to re-submit the pimavanserin sNDA, Stankovic stated:

> ***When we look at the discussions that we have and the potential part, they essentially boils down to three pathways that we can pursue. One is that additional analysis and the discussion and review of the data, results with the alignment that the data - existing data is sufficient for approval of the broad DRP indication***.
>
> ***The other option is that the data that we have for the subtypes, particularly for some of the larger subtypes*** that we have like Alzheimer's disease psychosis along with the study in Alzheimer's disease psychosis that we have with the analysis and data would we present, we aligned that that data is sufficient to - for the approval of individual indications, sub individual subtype without additional clinical work.
>
> ***And finally, the third part would be that if FDA remains steadfast with their position that they would want to see additional clinical data then additional work in an individual indication would be required to move forward***. So that's how we see [it]. Obviously, our position is for the first or the second option. And I think the data that we have presented received some traction, and we're continuing discussion and we are happy to have that opportunity.

165. Acadia's stock ***declined a further 8.5%*** in response to the news from the FDA, from a closing price of $21.05 per share on August 4, 2021, to a closing price

of $19.25 per share on August 5, 2021. The market was shocked by the news that the FDA's recommended "best path forward" was to conduct additional clinical studies – each of which could span several years – in each of the dementia subgroups for which Acadia was seeking an indication to treat. This news was directly contrary to what Acadia, Davis, and Stankovic had been telling investors for years and completely undercut the utility of the Harmony Study. Nevertheless, the market remained hopeful that the FDA would allow Acadia to proceed with "Option 1" and re-submit the pimavanserin sNDA for a broad indication of dementia-related psychosis after conducting additional analyses of the data and results from the Harmony Study.

166. The market was thus surprised when, on December 20, 2021, after the market closed, Acadia issued a press release announcing that it was planning to resubmit its sNDA for pimavanserin "for the treatment of hallucinations and delusions associated with dementia focused on Alzheimer's disease psychosis (ADP)," rather than for the broad treatment of dementia-related psychosis. The press release explained:

> "Following our recent meetings with the FDA, we plan to resubmit our sNDA for pimavanserin, narrowing the proposed indication from dementia-related psychosis to Alzheimer's disease psychosis," said Steve Davis, Chief Executive Officer. "Our resubmission will include new analyses of existing clinical study data supporting the treatment of hallucinations and delusions associated with Alzheimer's disease. We are aware there are challenges to overcoming our complete response letter, but are pleased with the high level of engagement from the FDA over the last three meetings and their willingness to review our resubmission, allowing us to make our case that pimavanserin should be the first drug approved to treat Alzheimer's disease psychosis."

167. Acadia's stock ***declined more than 20%*** on the news of the narrowed pimavanserin sNDA, from a closing price of $27.09 per share on December 20, 2021,

to a closing price of $21.45 per share on December 21, 2021. *Investor's Business Daily* directly linked the fall in the price of Acadia common stock to the Company's announcement of the narrowed pimavanserin sNDA, publishing an article titled "Why This Acadia Pharmaceuticals Move Has Analysts Split – And Shares Down 20%." The article explained that "Acadia Pharmaceuticals will ask the Food and Drug Administration to approve a once-rejected psychosis drug, but ACAD stock plunged on Tuesday." An article from *MT Newswires* was similarly titled "Acadia Pharmaceuticals to Resubmit Supplemental New Drug Application for Pimavanserin; Shares Decline Midday."

## XIII. <u>Additional Facts About Defendants' and Stankovic's Fraud Are Still Being Revealed</u>

168. Since December 2021, more facts about Defendants' and Stankovic's fraud have been publicly disclosed. For example, on February 16, 2022, Acadia issued a press release announcing that it had "resubmitted its supplemental New Drug Application (sNDA) for pimavanserin for the treatment of hallucinations and delusions associated with Alzheimer's disease psychosis (ADP) to the U.S. Food and Drug Administration (FDA)."

169. The resubmitted pimavanserin sNDA was not based on the results from any new studies – as the FDA had strongly advised – but merely provided "additional analyses" from the Harmony Study and -019 Study "to support a proposed indication for the treatment of [Alzheimer's disease psychosis] and is intended to address the issues raised in the FDA's CRL."

170. A few months later, Acadia issued a press release announcing that it had been assigned a PDUFA date of August 4, 2022, and that the FDA would be holding

///

an Advisory Committee Meeting with its Psychopharmacologic Drugs Advisory Committee ("PDAC") to discuss the resubmitted pimavanserin sNDA.

171. On June 17, 2022, Acadia issued a press release announcing that the PDAC had voted 9 to 3 that "the evidence presented does not support a conclusion that pimavanserin is effective for the treatment of hallucinations and delusions in the ADP population." Though the FDA was not bound by the PDAC's recommendations, the price of Acadia common stock declined a further 33% on the news of the PDAC vote.

172. Unsurprisingly, Acadia issued a press release on August 4, 2022, announcing that it had "received a Complete Response Letter (CRL) from the U.S. Food and Drug Administration (FDA) regarding its supplemental New Drug Application (sNDA) for NUPLAZID® (pimavanserin) for the treatment of hallucinations and delusions associated with Alzheimer's disease psychosis (ADP)." Acadia further explained that "the FDA has completed review of the application, determining that it could not approve the sNDA in its present form, and recommended that Acadia conduct an additional trial in ADP." With respect to the Harmony Study, the FDA indicated – as it did in the original CRL – that "the positive treatment effect of pimavanserin on dementia-related psychosis" appears "to be driven by the robustly positive results in the Parkinson's disease dementia subgroup, a condition they stated is subsumed within the currently approved NUPLAZID Parkinson's disease psychosis (PDP) indication."

///

///

///

///

# FALSE AND MISLEADING STATEMENTS

## I. False and Misleading Statements and Omissions About the Harmony Study and Acadia's Agreement with the FDA

173. On September 9, 2019, Acadia issued a press release announcing that the Harmony Study had been stopped early after it "met its primary endpoint, demonstrating a highly statistically significant longer time to relapse of psychosis compared to placebo in a planned interim efficacy analysis." Acadia further explained that it was "planning to meet with the FDA regarding a supplemental NDA submission in 2020 and the results from the HARMONY study will be submitted for presentation at upcoming medical meetings." The press release went on:

> "***We are very excited that today's results bring us one step closer to the potential of offering patients with dementia-related psychosis a critically needed treatment option***." said Serge Stankovic, M.D., M.S.P.H., ACADIA's President. "We look forward to speaking with the FDA about a supplemental new drug application to support pimavanserin for the treatment of dementia-related psychosis. I want to thank all of the patients, their families, and the investigators for their participation in this important study."

174. During a call that day, Stankovic explained to investors that:

> As Steve mentioned, pimavanserin was previously granted Breakthrough Therapy Designation for dementia-related psychosis. This was based on the seriousness of the disease with unmet need and the clinical results we have already observed, ***including our positive Alzheimer's disease psychosis study, which showed statistically significant reduction in psychotic symptoms in patients with Alzheimer's disease versus placebo without a negative impact on measure of cognitive function***. And our positive Phase III pivotal study showing improvement in severity and frequency of hallucinations and delusions in patients with Parkinson's disease psychosis. This study included a prespecified subgroup analysis of dementia patients who, when treated with pimavanserin, also showed a statistically significant improvement in psychosis compared to placebo.

> ***I would also like to remind you that at the end of Phase II meeting with FDA, we confirm that for our supplemental NDA submission in DRP, we could rely on a single, well-controlled study whose results were both statistically and clinically very persuasive.***
>
> ***In addition to the pivotal HARMONY study, we plan to submit in the supplemental NDA positive data in patients with dementia from the 2 previous efficacy studies*** as well as additional safety data from our ongoing placebo-controlled postmarketing commitment safety study of pimavanserin in elderly frail patients with neuropsychiatric symptoms related to neurodegenerative disease.

175. When asked by an analyst about the composition of the patients in the Harmony Study, *i.e.*, the number of patients suffering from each form of dementia, Stankovic refused to provide a number, but explained:

> ***The distribution of different dementia subtypes in our open-label stage as well as in the randomized population are similar and match roughly the epidemiology of the disease. Approximately 2/3 of patients were Alzheimer patients, about 15% of patients were with Parkinson's dementia, approximately 10% were with vascular dementia, and somewhat less than 10% patients with Lewy body dementia and with dementia with Lewy bodies, and the rest was frontotemporal dementia.***

176. As the Court has already found in denying Defendants' motions to dismiss and for reconsideration in the Class Action, these statements were materially false and misleading and failed to state material facts. It was materially misleading for Stankovic to discuss the End of Phase II Meeting and Acadia's agreement with the FDA while omitting a material term of that agreement: that the FDA would be specifically analyzing the "actual composition and response of patients" in each dementia subgroup in determining whether to approve pimavanserin for a broad indication for dementia-related psychosis. As the Court found in denying Defendants' motion to dismiss in the Class Action, Stankovic's statements "plausibly connote to a reasonable investor that the Harmony Study's design had been

prospectively approved by the FDA," "would not represent a further barrier to approval," and "suggest that the FDA would base its decision on the overall results of the Harmony Study rather than on the data for individual subgroups." It was also materially misleading for Acadia and Stankovic to discuss the Harmony Study and -019 Study while omitting the negative subgroup results from the Harmony Study and that the Harmony Study and -019 Study were poorly designed and therefore unlikely to serve as a basis to approve the pimavanserin sNDA. As the Court found in denying Defendants' motion to dismiss in the Class Action, "a failure to disclose that the [Harmony Study and -019 Study] were not properly designed and that the Harmony Study had disappointing subgroup data rendered Defendants' positive statements regarding the results of the studies materially misleading." In other words, "Defendants' statements touting the results of the Harmony Study and -019 Study . . . misled investors by omitting the adverse information the FDA later cited in denying approval of the sNDA."

177. On October 30, 2019, Acadia held the 3Q2019 Earnings Call. During the conference call, Bank of America Merrill Lynch analyst Ahmad asked the following question:

> We're looking forward to seeing your data set presented at CTAD on the 4th of December. And ahead of that, I'm just wondering if you could give us an idea of what additional details from the study you plan on showing? So should we expect to see a breakout of the different subsets of patients that were studied as part of the DRP indication?
>
> And I guess related to that, is your expectation that you would get a label just simply saying DRP? Or would it be specific to maybe the subgroups that seem to be most responsive if there were subgroups that were more responsive than others?

178. Stankovic responded:

> Let me first tackle the -- what data we will plan to present at CTAD. We will be sharing all material top line results from

> the study, meaning efficacy data from the open-label portion of the trial, primary and key secondary endpoint details in the trial particularly, obviously in the randomized withdrawal portion as well as overall safety data. ***So as part of that to specifically to your question, we will be presenting the data related to different subtypes of dementia as well.***
>
> To your second question, ***all discussions that we had with the FDA and our initial intention were related to us pursuing indication of the treatment of hallucinations and delusions in dementia-related psychosis. So, yes, indeed that is what we are pursuing and that is what we had discussed with the FDA***.

179. As the Court has already found in denying Defendants' motions to dismiss and for reconsideration in the Class Action, these statements were materially false and misleading and failed to state material facts. It was materially misleading for Stankovic to discuss Acadia's agreement with the FDA while omitting a material term of that agreement: that the FDA would be specifically analyzing the "actual composition and response of patients" in each dementia subgroup in determining whether to approve pimavanserin for a broad indication for dementia-related psychosis. As the Court found in denying Defendants' motion to dismiss in the Class Action, Stankovic's statements "plausibly connote to a reasonable investor that the Harmony Study's design had been prospectively approved by the FDA," "would not represent a further barrier to approval," and "suggest that the FDA would base its decision on the overall results of the Harmony Study rather than on the data for individual subgroups." It was also materially misleading for Stankovic to discuss the Harmony Study while omitting its negative subgroup results and that the Harmony Study was poorly designed and therefore unlikely to serve as a basis to approve the pimavanserin sNDA. As the Court found in denying Defendants' motion to dismiss in the Class Action, "a failure to disclose that the [Harmony Study and -019 Study] were not properly designed and that the Harmony Study had disappointing subgroup

data rendered Defendants' positive statements regarding the results of the studies materially misleading." In other words, "Defendants' statements touting the results of the Harmony Study and -019 Study . . . misled investors by omitting the adverse information the FDA later cited in denying approval of the sNDA."

180. On February 26, 2020, Acadia held the 4Q2019 Earnings Call. During the conference call, Cowen analyst Baral asked "[t]he sNDA for DRP what's left to do before the summer submission?" Stankovic responded:

> We have all of the data that will constitute our supplemental NDA. ***The pivotal HARMONY study results will be the basis of the sNDA submission which was previously agreed upon at the end of Phase 2 meeting***. ***And in addition, we will have supportive efficacy results from our previous short-term studies which provided evidence of acute efficacy of pimavanserin in Alzheimer disease and in Parkinson's disease psychosis for patients - with patients with dementia.***
>
> And finally, we plan to submit our extensive safety data from completed an ongoing study. So what is left for us is to essentially put that altogether in the format required for the supplemental NDA, all the study reports and summary documents and once we agree with FDA on that to submit.

181. Baral then asked, "so you've generated all the safety data and safety analysis used for that NDA, sNDA?" Stankovic responded: "[y]es, we generated all the - both efficacy and safety data that we will be submitting with that supplemental NDA."

182. Stifel analyst Thompson then asked, "[j]ust a quick question on your upcoming sNDA meeting. Just wondering if you could sort of give us a sense of what your goals are for the meeting, what you expect to discuss with the FDA just generally and if you'll provide us with an update once that occurred?"

183. Stankovic responded:

> ***As I mentioned earlier, we're meeting with FDA primarily to review the content and format of our application***, meaning, we will be discussing with them the totality of the

> data we are bringing both efficacy and safety data. We're bringing to the sNDA as well as the different ways of analyses and pooling of the data in order to present better and enable reviewers to do their review both on the efficacy and the safety side. So discussing that content and the format of that data presentation is our main objectives in the discussion with FDA.

184. As the Court has already found in denying Defendants' motions to dismiss and for reconsideration in the Class Action, these statements were materially false and misleading and failed to state material facts. It was materially misleading for Stankovic to discuss the End of Phase II Meeting and Acadia's agreement with the FDA while omitting a material term of that agreement: that the FDA would be specifically analyzing the "actual composition and response of patients" in each dementia subgroup in determining whether to approve pimavanserin for a broad indication for dementia-related psychosis. As the Court found in denying Defendants' motion to dismiss in the Class Action, Stankovic's statements "plausibly connote to a reasonable investor that the Harmony Study's design had been prospectively approved by the FDA," "would not represent a further barrier to approval," and "suggest that the FDA would base its decision on the overall results of the Harmony Study rather than on the data for individual subgroups." It was also materially misleading for Stankovic to discuss the Harmony Study and -019 Study while omitting the negative subgroup results from the Harmony Study and that the Harmony Study and -019 Study were poorly designed and therefore unlikely to serve as a basis to approve the pimavanserin sNDA. As the Court found in denying Defendants' motion to dismiss in the Class Action, "a failure to disclose that the [Harmony Study and -019 Study] were not properly designed and that the Harmony Study had disappointing subgroup data rendered Defendants' positive statements regarding the results of the studies materially misleading." In other words,

"Defendants' statements touting the results of the Harmony Study and -019 Study . . . misled investors by omitting the adverse information the FDA later cited in denying approval of the sNDA." It was also materially misleading for Stankovic to discuss the pimavanserin sNDA while omitting that, because of the reasons set forth above, it was unlikely to be approved by the FDA.

185. On May 7, 2020, Acadia held the 1Q2020 Earnings Call. During the conference call, Stankovic stated:

> As planned, ***we successfully completed a pre-sNDA meeting with the FDA and confirm[ed] that the pivotal data from our harmony study together with a confirmatory and supportive results from our Alzheimer disease psychosis Phase II study and our Parkinson disease psychosis Phase III study will also support the submission of an sNDA for pimavanserin in dementia related psychosis.***
>
> In addition, we discuss the overall safety database and analysis plan. ***Our sNDA preparation remains firmly on track.*** As previously announced, we plan to submit the sNDA this summer. ***We expect the priority review with a potential approval for DRP around year-end.***

186. As the Court has already found in denying Defendants' motions to dismiss and for reconsideration in the Class Action, these statements were materially false and misleading and failed to state material facts. It was materially misleading for Stankovic to discuss the Harmony Study and -019 Study while omitting the negative subgroup results from the Harmony Study and that the Harmony Study and -019 Study were poorly designed and therefore unlikely to serve as a basis to approve the pimavanserin sNDA. As the Court found in denying Defendants' motion to dismiss in the Class Action, "a failure to disclose that the [Harmony Study and -019 Study] were not properly designed and that the Harmony Study had disappointing subgroup data rendered Defendants' positive statements regarding the results of the

studies materially misleading." In other words, "Defendants' statements touting the results of the Harmony Study and -019 Study . . . misled investors by omitting the adverse information the FDA later cited in denying approval of the sNDA." It was also materially misleading for Stankovic to discuss the pimavanserin sNDA while omitting that, because of the reasons set forth above, it was unlikely to be approved by the FDA.

187. A few days later, on May 12, 2020, Davis presented at the virtual Bank of America Merrill Lynch Healthcare Conference on behalf of Acadia. During the presentation, Bank of America Merrill Lynch analyst Ahmad asked:

> So maybe we can talk a little bit about DRP, Steve, as one of your next indications. Can you review what you discussed with the FDA perhaps at the pre-sNDA meeting? Can you provide a little bit of expectations on timelines for submission and approval? I know you've talked about this in general and whether or not you still expect to have an AdCom, if you believe that there will be any kind of modifications of the current box warning?

188. Davis responded:

> Yes, absolutely. ***So as I mentioned, we had our pre-sNDA meeting in the first quarter. The feedback there was very consistent with what we heard with our -- in the Phase II meeting. The FDA confirmed that the studies conducted can support an sNDA submission with HARMONY as the pivotal study, and our Phase II Alzheimer's disease study and Phase III Parkinson's. The psychosis study has supportive efficacy studies.***

189. As the Court has already found in denying Defendants' motions to dismiss and for reconsideration in the Class Action, these statements were materially false and misleading and failed to state material facts. It was materially misleading for Davis to discuss the End of Phase II Meeting and Acadia's agreement with the FDA while omitting a material term of that agreement: that the FDA would be

specifically analyzing the "actual composition and response of patients" in each dementia subgroup in determining whether to approve pimavanserin for a broad indication for dementia-related psychosis. As the Court found in denying Defendants' motion to dismiss in the Class Action, Davis's statements "plausibly connote to a reasonable investor that the Harmony Study's design had been prospectively approved by the FDA," "would not represent a further barrier to approval," and "suggest that the FDA would base its decision on the overall results of the Harmony Study rather than on the data for individual subgroups." It was also materially misleading for Davis to discuss the Harmony Study and -019 Study while omitting the negative subgroup results from the Harmony Study and that the Harmony Study and -019 Study were poorly designed and therefore unlikely to serve as a basis to approve the pimavanserin sNDA. As the Court found in denying Defendants' motion to dismiss in the Class Action, "a failure to disclose that the [Harmony Study and -019 Study] were not properly designed and that the Harmony Study had disappointing subgroup data rendered Defendants' positive statements regarding the results of the studies materially misleading." In other words, "Defendants' statements touting the results of the Harmony Study and -019 Study . . . misled investors by omitting the adverse information the FDA later cited in denying approval of the sNDA." It was also materially misleading for Davis to discuss the pimavanserin sNDA while omitting that, because of the reasons set forth above, it was unlikely to be approved by the FDA.

190. On June 15, 2020, Acadia issued a press release announcing that it had submitted the pimavanserin sNDA to the FDA. The press release stated:

> ACADIA Pharmaceuticals Inc. (Nasdaq: ACAD) announced today that the company submitted a supplemental New Drug Application (sNDA) to the U.S. Food and Drug Administration (FDA) to support a potential new indication for NUPLAZID® (pimavanserin) for the

> treatment of hallucinations and delusions associated with dementia-related psychosis (DRP). The FDA previously granted Breakthrough Therapy Designation for pimavanserin for the treatment of hallucinations and delusions associated with DRP.
>
> "This is an important step forward for the approximately 2.4 million people in the U.S. who suffer from dementia-related hallucinations and delusions, representing a large unmet need with currently no approved treatment options," said Steve Davis, ACADIA's Chief Executive Officer. ***"Our pivotal HARMONY study showed a meaningful reduction of the symptoms and stabilization of psychosis and a nearly three-fold reduction in the risk of relapse of psychosis for patients continuing treatment on pimavanserin compared to placebo.*** We look forward to working with the FDA as it reviews our submission."
>
> ***The sNDA is supported by results from the pivotal Phase 3 HARMONY study, which met its primary endpoint, demonstrating that pimavanserin significantly reduced the risk of relapse of psychosis by 2.8 fold compared to placebo (hazard ratio = 0.353; one-sided p=0.0023). The sNDA also includes positive efficacy results from two additional placebo-controlled studies, both of which met their respective primary endpoints: The Phase 2 (-019) study in patients with Alzheimer's disease psychosis and the Phase 3 (-020) study in patients with Parkinson's disease psychosis.*** The sNDA includes a large safety and tolerability database from completed and ongoing studies representing over 1500 patients with neurodegenerative disease.

191. As the Court has already found in denying Defendants' motions to dismiss and for reconsideration in the Class Action, these statements were materially false and misleading and failed to state material facts. It was materially misleading for Acadia to discuss the Harmony Study and -019 Study while omitting the negative subgroup results from the Harmony Study and that the Harmony Study and -019 Study were poorly designed and therefore unlikely to serve as a basis to approve the pimavanserin sNDA. As the Court found in denying Defendants' motion to dismiss in the Class Action, "a failure to disclose that the [Harmony Study and -019 Study]

were not properly designed and that the Harmony Study had disappointing subgroup data rendered Defendants' positive statements regarding the results of the studies materially misleading." In other words, "Defendants' statements touting the results of the Harmony Study and -019 Study . . . misled investors by omitting the adverse information the FDA later cited in denying approval of the sNDA." It was also materially misleading for Acadia to discuss the pimavanserin sNDA while omitting that, because of the reasons set forth above, it was unlikely to be approved by the FDA.

192. On July 20, 2020, Acadia issued a press release announcing that the FDA had accepted the pimavanserin sNDA for filing. The press release stated:

> ACADIA Pharmaceuticals Inc. (Nasdaq: ACAD) today announced that the U.S. Food and Drug Administration (FDA) has accepted for filing its supplemental New Drug Application (sNDA) for NUPLAZID® (pimavanserin) for the treatment of hallucinations and delusions associated with dementia-related psychosis (DRP).
>
> ***"We are pleased that the FDA has accepted our sNDA for filing and we will be working closely with the FDA to facilitate completion of the review in a timely manner."*** said Steve Davis, ACADIA's Chief Executive Officer. "If approved, NUPLAZID would be the first therapy indicated for the treatment of hallucinations and delusions associated with dementia-related psychosis. ***We look forward to potentially bringing this important treatment advancement to patients, caregivers and physicians.***"

193. As the Court has already found in denying Defendants' motions to dismiss and for reconsideration in the Class Action, these statements were materially false and misleading and failed to state material facts. It was materially misleading for Acadia to discuss the pimavanserin sNDA while omitting that, because of the negative subgroup results from the Harmony Study and the poor design of the Harmony Study and -019 Study, it was unlikely to be approved by the FDA. Indeed,

the FDA had already informed Acadia that the pimavanserin sNDA "does not appear to include adequate evidence to indicate that pimavanserin would provide a significant improvement in safety or effectiveness in the treatment of dementia-related psychosis."

194. On August 5, 2020, Acadia issued a press release announcing its financial results for the second quarter of 2020. The press release stated:

> "In the first half of 2020 we drove robust growth of NUPLAZID®. ***With the FDA filing of our sNDA for dementia-related psychosis we are one step closer to potentially delivering the first and only approved treatment for this devastating condition***," said Steve Davis, ACADIA's Chief Executive Officer. "***Building upon the successful development of our PDP and DRP programs***, our clinical team is focused on advancing our innovative early- and late-stage pipeline."

195. As the Court has already found in denying Defendants' motions to dismiss and for reconsideration in the Class Action, these statements were materially false and misleading and failed to state material facts. It was materially misleading for Acadia to discuss the Harmony Study and -019 Study while omitting the negative subgroup results from the Harmony Study and that the Harmony Study and -019 Study were poorly designed and therefore unlikely to serve as a basis to approve the pimavanserin sNDA. As the Court found in denying Defendants' motion to dismiss in the Class Action, "a failure to disclose that the [Harmony Study and -019 Study] were not properly designed and that the Harmony Study had disappointing subgroup data rendered Defendants' positive statements regarding the results of the studies materially misleading." In other words, "Defendants' statements touting the results of the Harmony Study and -019 Study . . . misled investors by omitting the adverse information the FDA later cited in denying approval of the sNDA." It was also materially misleading for Acadia to discuss the pimavanserin sNDA while omitting

that, because of the reasons set forth above, it was unlikely to be approved by the FDA. Indeed, the FDA had already informed Acadia that the pimavanserin sNDA "does not appear to include adequate evidence to indicate that pimavanserin would provide a significant improvement in safety or effectiveness in the treatment of dementia-related psychosis."

196. The next day, August 6, 2020, Acadia filed the 2Q2020 10-Q. The 2Q2020 10-Q stated, in relevant part:

> We believe that pimavanserin has the potential to address important unmet medical needs in neurological and psychiatric disorders in addition to PD Psychosis and we plan to continue to study the use of pimavanserin in multiple disease states. For example, we believe dementia-related psychosis (DRP), represents one of our most important opportunities for further exploration. ***In June 2020, we submitted a supplemental New Drug Application (sNDA) for NUPLAZID for the treatment of hallucinations and delusions associated with DRP. In July 2020 the FDA notified us of acceptance of our sNDA with a PDUFA date of April 3, 2021. The FDA advised us that it has not identified any potential review issues at this point in their evaluation and at this time they are not planning to hold an Advisory Committee meeting. The sNDA is supported by results from the pivotal Phase 3 HARMONY study, which met its primary endpoint, demonstrating that pimavanserin significantly reduced the risk of relapse of psychosis by 2.8 fold compared to placebo (hazard ratio = 0.353; one-sided p=0.0023). The sNDA also includes positive efficacy results from two additional placebo-controlled studies, both of which met their respective primary endpoints: the Phase 2 (-019) study in patients with Alzheimer's disease psychosis*** and the Phase 3 (-020) study in patients with Parkinson's disease psychosis. The sNDA includes a large safety database from completed and ongoing studies representing over 1,500 patients with neurodegenerative disease. An estimated 8.0 million people in the United States are living with dementia, and studies suggest that approximately 30% of dementia patients, or 2.4 million people, have psychosis, commonly consisting of delusions and hallucinations. Approximately 1.2 million patients in the United States are currently treated for DRP and, of those treated, approximately two-thirds are treated with off-label anti-psychotics. In the fourth quarter of 2017, the FDA granted

> Breakthrough Therapy Designation for pimavanserin for the treatment of DRP.

197. As the Court has already found in denying Defendants' motions to dismiss and for reconsideration in the Class Action, these statements were materially false and misleading and failed to state material facts. It was materially misleading for Acadia to discuss the Harmony Study and -019 Study while omitting the negative subgroup results from the Harmony Study and that the Harmony Study and -019 Study were poorly designed and therefore unlikely to serve as a basis to approve the pimavanserin sNDA. As the Court found in denying Defendants' motion to dismiss in the Class Action, "a failure to disclose that the [Harmony Study and -019 Study] were not properly designed and that the Harmony Study had disappointing subgroup data rendered Defendants' positive statements regarding the results of the studies materially misleading." In other words, "Defendants' statements touting the results of the Harmony Study and -019 Study . . . misled investors by omitting the adverse information the FDA later cited in denying approval of the sNDA." It was also materially misleading for Acadia to discuss the pimavanserin sNDA while omitting that, because of the reasons set forth above, it was unlikely to be approved by the FDA. Indeed, the FDA had already informed Acadia that the pimavanserin sNDA "does not appear to include adequate evidence to indicate that pimavanserin would provide a significant improvement in safety or effectiveness in the treatment of dementia-related psychosis."

198. On August 19, 2020, Davis presented at the virtual JMP Securities CNS Forum on behalf of Acadia. During the presentation, JMP Securities analyst Butler asked:

> Just one more question on the market dynamics here. So DRP does involve a number of different patient populations, obviously, the largest of which being

Alzheimer's patients. Just from the work you've done with physicians, do they view those different patient populations and underlying dementia differently in terms of how they would treat the psychosis symptoms? Or again, who they would view as appropriate and when for initiating therapy?

199. Davis responded:

I'll just -- just to echo Michael's thoughts, one of the things we hear very consistently among KOLs, just physicians generally is the -- and as we've said before, the "subtypes" of dementia are very difficult to diagnose. They overlap many times. And so it's a little bit of an artificial distinction to say someone has Alzheimer, dementia with Lewy bodies or vascular dementia, et cetera.

***And so -- and one of the advantages, of course, pursuing dementia-related psychosis broadly, which is just, as a reminder, we got a clear agreement from -- with the FDA at our end of Phase II meeting, and we executed the plan that we agreed to with them. One of the advantage is it picks up what's referred to as dementia not otherwise specified, that's quoted as not otherwise specified.*** And that's a big chunk of patients. And that -- the fact that so many patients are not specified other than beyond just saying dementia, is again, a reflection of the fact that these categories are very difficult to diagnose. So as Michael mentioned, the good news is physicians understand that. They operate in that world. ***And with the indication that we are seeking, it won't matter.*** They won't have to try to make a determination, whether it's Alzheimer's or vasco dementia or something else.

200. Butler further asked:

And that's a really good point. And so let me just ask one more question about the FDA there. You obviously have this very broad patient population under the DRP umbrella. How do you think about more broadly the label indication statement based on the Phase III trial design, specifically the relapse prevention relative to PDP, where you had an initiation kind of trial design?

201. Davis responded:

Yes. Well, let me take it in from 2 perspectives. Let me take it from a regulatory perspective and then from a medical perspective. ***From a regulatory perspective, I just want to remind everyone that the sNDA that we've submitted includes the HARMONY study, the relapse***

> ***prevention study but also includes -- or the kind of study that we did in Parkinson's disease psychosis. It includes acute -- we'll call it acute data as well over a much shorter time frame and it showed positive results, both in an Alzheimer's population as well as our -- of course, our Parkinson's disease psychosis population. So we have both in the submission.***
>
> ***More importantly, we agreed with the FDA on that approach at our end of Phase II meeting and agreed on the plan for Phase III, and then we've executed that plan.*** From a medical perspective, it's also important because physicians -- and they think -- again, when they think about dementia-related psychosis, they'd oftentimes just think about it more broadly speaking. As they think about a relapse prevention study, what we hear over and over is it really resonates with them.
>
> Many times in neuropsychiatry, when you get approval on a drug, it's based upon -- we ran one arm with drug, one arm with placebo. ***We measured them on -- we measured progress on the scale. We compared those 2 and have indication of efficacy.*** But physicians don't do that in practice. They don't use those scales, and they're really just looking at the clinical manifestation of the disease and the patient that they're seeing in the examining room on. And they're thinking about things like will this impact their symptoms, and if so, will it have a durability of effect. So the relapse prevention study really resonates with the medical community because it aligns with a clinical outcome and the kinds of things that they think about.

202. As the Court has already found in denying Defendants' motions to dismiss and for reconsideration in the Class Action, these statements were materially false and misleading and failed to state material facts. It was materially misleading for Davis to discuss the End of Phase II Meeting and Acadia's agreement with the FDA while omitting a material term of that agreement: that the FDA would be specifically analyzing the "actual composition and response of patients" in each dementia subgroup in determining whether to approve pimavanserin for a broad indication for dementia-related psychosis. As the Court found in denying Defendants' motion to dismiss in the Class Action, Davis's statements "plausibly

connote to a reasonable investor that the Harmony Study's design had been prospectively approved by the FDA," "would not represent a further barrier to approval," and "suggest that the FDA would base its decision on the overall results of the Harmony Study rather than on the data for individual subgroups." It was also materially misleading for Davis to discuss the Harmony Study and -019 Study while omitting the negative subgroup results from the Harmony Study and that the Harmony Study and -019 Study were poorly designed and therefore unlikely to serve as a basis to approve the pimavanserin sNDA. As the Court found in denying Defendants' motion to dismiss in the Class Action, "a failure to disclose that the [Harmony Study and -019 Study] were not properly designed and that the Harmony Study had disappointing subgroup data rendered Defendants' positive statements regarding the results of the studies materially misleading." In other words, "Defendants' statements touting the results of the Harmony Study and -019 Study . . . misled investors by omitting the adverse information the FDA later cited in denying approval of the sNDA." It was also materially misleading for Davis to discuss the pimavanserin sNDA while omitting that, because of the reasons set forth above, it was unlikely to be approved by the FDA. Indeed, the FDA had already informed Acadia that the pimavanserin sNDA "does not appear to include adequate evidence to indicate that pimavanserin would provide a significant improvement in safety or effectiveness in the treatment of dementia-related psychosis."

203. On September 14, 2020, Davis and Stankovic presented at the virtual Morgan Stanley Global Healthcare Conference on behalf of Acadia. During the presentation, Morgan Stanley analyst Hung asked, "what is your view on the recent string of complete response letters? Is there any reason to believe that there are any

///

changes at the agency that might add risk to approval in DRP?" Stankovic responded:

> Well, I would say that we generally avoid to comment on other applications because we are not familiar with the details of the review or details of the data and all that. We do not see -- each situation is different, and we do not see any particular policy arising from that attitude from these decisions, the different decision made. It may have to do with the timing, with resources, ability to be able to complete those things and asking for additional data. ***We continue to be very confident, as I said, in our data. It's very consistent with what we've been finding as we have been adding the new information, both in terms of efficacy and safety. We have a strong package and are currently focusing on facilitating review toward approval.***

204. Hung then asked:

> And then multiple neurodegenerative disorders have patients with dementia-related psychosis, such as Alzheimer's. Which disorders do you think are more likely to have faster adoption? Do you think there will be certain ones that contribute more early on in the launch? And then, I guess, on the other hand, what kinds of things do you need to work on for the disorders that may not ramp up as quickly or early on in the launch such as patient or physician education?

205. Davis responded:

> Yes. Let me take just a little bit of running start at it. So in dementia-related psychosis, sometimes people think about various subtypes. And of course, we've talked about that as well. ***But just one, just as a background reminder that we received agreement with the FDA that we would pursue dementia-related psychosis broadly in order to treat the symptoms of psychosis, regardless of their clinically diagnosed subtype.*** And I just want to be clear here, that subtype diagnosis is very subjective. It's difficult to diagnose. Many times, physicians don't know what the underlying etiology is. You sometimes going to look -- only find it out through autopsy. And these patients are, in terms of the kind of subtype that is assigned to them, many times it's wrong. And it's confirmed through autopsy.
>
> And so for that reason, many times, physicians don't even assign a subtype. They diagnose the patient and code them as dementia NOS or dementia not otherwise specified. In fact, if that group of patients, not otherwise specified, were

> a subtype itself, it would be the largest subtype behind Alzheimer's disease. ***And so we have felt all along that these patients respond in the same way. They -- the symptoms emerge in very similar fashion. And so they should be looked at as a group, and that's the way we've approached this from a clinical and regulatory perspective and the FDA has been in lockstep with us on that. In fact, it was a very short discussion in our -- in the Phase II meeting getting to that point.***
>
> And so because it's difficult to subtype patients -- and I should have also mentioned, many times they have mixed disease and so they may have more than one underlying etiology. ***We think the appropriate thing to do is to think of them in terms of the broader class of dementia-related psychosis patients. So as a consequence, we don't anticipate that any particular type of patient would lead or lag other types of patients.*** And in fact, one of the benefits that we have here when we think about physicians that write these drugs is there's a real commonality between the prescriber population in PDP and DRP. The mix changes a little bit, but the same components are there.

206. As the Court has already found in denying Defendants' motions to dismiss and for reconsideration in the Class Action, these statements were materially false and misleading and failed to state material facts. It was materially misleading for Davis to discuss the End of Phase II Meeting and Acadia's agreement with the FDA while omitting a material term of that agreement: that the FDA would be specifically analyzing the "actual composition and response of patients" in each dementia subgroup in determining whether to approve pimavanserin for a broad indication for dementia-related psychosis. As the Court found in denying Defendants' motion to dismiss in the Class Action, Davis's statements "plausibly connote to a reasonable investor that the Harmony Study's design had been prospectively approved by the FDA," "would not represent a further barrier to approval," and "suggest that the FDA would base its decision on the overall results of the Harmony Study rather than on the data for individual subgroups." It was also

materially misleading for Stankovic and Davis to discuss the Harmony Study and -019 Study while omitting the negative subgroup results from the Harmony Study and that the Harmony Study and -019 Study were poorly designed and therefore unlikely to serve as a basis to approve the pimavanserin sNDA. As the Court found in denying Defendants' motion to dismiss in the Class Action, "a failure to disclose that the [Harmony Study and -019 Study] were not properly designed and that the Harmony Study had disappointing subgroup data rendered Defendants' positive statements regarding the results of the studies materially misleading." In other words, "Defendants' statements touting the results of the Harmony Study and -019 Study . . . misled investors by omitting the adverse information the FDA later cited in denying approval of the sNDA."

207. On November 4, 2020, Acadia held the 3Q2020 Earnings Call. During the conference call, Davis stated:

> We are well prepared to achieve the long-term market opportunity for NUPLAZID in PDP and ***look forward to the addition of the DRP indication.***
>
> . . . .
>
> ***We are excited that pimavanserin could be the first and only FDA-approved medicine for the treatment of dementia-related psychosis.***
>
> . . . .
>
> ***We are confident in both the efficacy and safety data supporting our supplemental NDA.*** And we'll continue to work with the FDA to facilitate their review with a PDUFA date of April 3, 2021.

208. As the Court has already found in denying Defendants' motions to dismiss and for reconsideration in the Class Action, these statements were materially false and misleading and failed to state material facts. It was materially misleading

for Davis to discuss the Harmony Study and -019 Study while omitting the negative subgroup results from the Harmony Study and that the Harmony Study and -019 Study were poorly designed and therefore unlikely to serve as a basis to approve the pimavanserin sNDA. As the Court found in denying Defendants' motion to dismiss in the Class Action, "a failure to disclose that the [Harmony Study and -019 Study] were not properly designed and that the Harmony Study had disappointing subgroup data rendered Defendants' positive statements regarding the results of the studies materially misleading." In other words, "Defendants' statements touting the results of the Harmony Study and -019 Study . . . misled investors by omitting the adverse information the FDA later cited in denying approval of the sNDA." It was also materially misleading for Davis to discuss the pimavanserin sNDA while omitting that, because of the reasons set forth above, it was unlikely to be approved by the FDA. Indeed, the FDA had already informed Acadia that the pimavanserin sNDA "does not appear to include adequate evidence to indicate that pimavanserin would provide a significant improvement in safety or effectiveness in the treatment of dementia-related psychosis."

209. On November 17, 2020, Davis presented at the virtual Stifel 2020 Healthcare Conference on behalf of Acadia. During the presentation, Stifel analyst Matteis asked Davis:

> I guess as you've had continued engagement with the FDA, is there any interpretation you have on the lack of priority review? Investors and analysts love to read these tea leaves. And I've been misled by priority review and no panel, resulting in a CRL. So I won't overdo it, but what did you think internally then? And how do you guys feel about the intent?

210. Davis responded:

> Yes. Thanks much for the question. ***So let me just start by saying we remain highly confident in both the efficacy and safety data supporting our submission.*** ***And of***

> ***course, at this point, we're focused on facilitating the FDA's review, which, as I mentioned, remains on track. And just as a brief reminder, our sNDA submission included an efficacy package, which was agreed upon with the FDA at the end of Phase II meetings before we conducted the pivotal HARMONY study. And based upon the robust and meaningful results from HARMONY and the additional supporting data from other efficacy studies in Alzheimer's and Parkinson's patients, and then just the overall safety profile of pimavanserin, we remain very confident in the potential approval for DRP.***
>
> ***So again, just as I put it -- with that backdrop, at our end of Phase II meeting, we went to the FDA. We said we think we have demonstrated sufficient efficacy in the acute setting. We'd like you to agree to 3 things: one, that we studied DRP generally. They agreed to that. That was actually a very short discussion. Two, that we run a relapse-prevention study now to demonstrate the -- not only that we can stabilize patient symptoms, but that we get a durable effect over time. And then three, that we -- that a single relapse prevention study serve as the basis of approval, together with the other supporting acute studies we've done. And they've agreed to all 3 of those. That's documented in our minutes. So fast forward to today, we then executed the exact plan that we laid out for them. And again, that underlines the confidence we have in the potential for approval in DRP.***

211. Matteis then asked:

> Got it. Okay. Great, Steve. What were your discussions with the FDA and what you need to show for safety? I mean, there's this whole -- we had Alzheimer's panel here at this conference yesterday and one of the panelists walked through the whole back history, going back to the 2000s with atypicals in the elderly and the original black box and changes in policy and things like that. What did FDA -- did they ever articulate to you what they wanted to see, right? It's obviously very hard to disprove a negative. And I guess, were they going to rely more on just your DRP clinical data? Or how much of the PDP post-marketing data goes into this?

212. Davis responded:

> Yes. They're both important. ***One thing that I didn't mention is that in the Phase II meeting we had setting up our Phase III program that we then executed, is in***

***addition to those 3 points, we also just asked FDA very specifically. We said we just want to make certain that you are on board with approving a drug to treat dementia-related psychosis.*** Because today, there's a class warning for all antipsychotics, basically contraindicating that patient population. ***We want to make certain that you are on board with the concept of doing this if we followed the plan that we've agreed to.***

***And they said, absolutely, we wouldn't agree to your Phase III plan if we weren't in that -- if we weren't of that mind.*** So again, fast forward to today, we've been on the market for 4 years. We've continued to run placebo controlled studies. If you look at the totality of the data that we have today on -- just on safety, if anything, the safety profile and tolerability profile of the drug looks even better than it did when we got our PDP approval.

Most recently, or as a component of that PDP approval, we agreed to a post-marketing commitment to run a substantial number of patients in placebo-controlled study for elderly patients, evaluating them over -- against placebo over a period of at least 8 weeks. And we -- that commitment is due to be completed in the next year or 2. But any time you follow an sNDA, you need to collect all the safety data that you've generated since your prior NDA approval. We've done that, including the most recent cut from that safety study. ***And like I said before, every cut of data that we've had continues to support, if not look even better than the original basis for approval in PDP. So we've submitted that data and that all looks very consistent with what we know about the drug.***

213. Finally, Matteis asked:

Got it. That's great. All right. Last here of the regulatory question, I promise, because I don't want to belabor it. Between what you do, Steve, are there any 3 like inflection points during the review from your seat that can be articulated and continue to convey comfort to investors?

214. Davis responded:

We're following the same path that we did in the PDP review and that most companies do when they're in registration, that is, we're not going to comment on the specific back and forth that we're having with FDA. I just don't think that will be productive. ***But what I will say is, we remain on track. We remain just as confident as we've***

> ***ever been in the potential for approval and just eager to get to the PDUFA date.***

215. As the Court has already found in denying Defendants' motions to dismiss and for reconsideration in the Class Action, these statements were materially false and misleading and failed to state material facts. It was materially misleading for Davis to discuss the End of Phase II Meeting and Acadia's agreement with the FDA while omitting a material term of that agreement: that the FDA would be specifically analyzing the "actual composition and response of patients" in each dementia subgroup in determining whether to approve pimavanserin for a broad indication for dementia-related psychosis. As the Court found in denying Defendants' motion to dismiss in the Class Action, Davis's statements "plausibly connote to a reasonable investor that the Harmony Study's design had been prospectively approved by the FDA," "would not represent a further barrier to approval," and "suggest that the FDA would base its decision on the overall results of the Harmony Study rather than on the data for individual subgroups." It was also materially misleading for Davis to discuss the Harmony Study and -019 Study while omitting the negative subgroup results from the Harmony Study and that the Harmony Study and -019 Study were poorly designed and therefore unlikely to serve as a basis to approve the pimavanserin sNDA. As the Court found in denying Defendants' motion to dismiss in the Class Action, "a failure to disclose that the [Harmony Study and -019 Study] were not properly designed and that the Harmony Study had disappointing subgroup data rendered Defendants' positive statements regarding the results of the studies materially misleading." In other words, "Defendants' statements touting the results of the Harmony Study and -019 Study . . . misled investors by omitting the adverse information the FDA later cited in denying

approval of the sNDA." It was also materially misleading for Davis to discuss the pimavanserin sNDA while omitting that, because of the reasons set forth above, it was unlikely to be approved by the FDA. Indeed, the FDA had already informed Acadia that the pimavanserin sNDA "does not appear to include adequate evidence to indicate that pimavanserin would provide a significant improvement in safety or effectiveness in the treatment of dementia-related psychosis."

216. On January 12, 2021, Davis presented at the virtual J.P. Morgan Healthcare Conference on behalf of Acadia. During the presentation, Davis stated:

> ***[P]imavanserin has the potential to be the first treatment approved for DRP. And I'm pleased to report that our sNDA submission is progressing well and as we would expect at this point in the review cycle.*** Pimavanserin selective serotonergic mechanism is highly differentiated. It's unlike any other anti-psychotic on the market. And as I mentioned, the DRP market opportunity is very large, and approximately two-thirds of the 1.2 million patients treated for DRP today are treated with off-label atypical antipsychotics, which as I mentioned, carry significant disease burden or side effect burden.
>
> ***Our sNDA is supported by strong and robust efficacy data. Pimavanserin demonstrated an almost three-fold reduction in risk of relapse of psychosis in our pivotal HARMONY study. Our sNDA also includes positive results from two supportive efficacy studies, a positive Phase 2 study in Alzheimer's disease psychosis and positive data from our pivotal Phase 3 study in Parkinson's disease psychosis in patients with dementia.***
>
> Our sNDA is also supported by strong safety data. Pimavanserin is well tolerated and notably exhibited no worsening of cognition, no worsening of motor function, and no increase in sedation. ***As we prepare for the DRP launch, we are well-positioned to leverage our established capabilities and expertise.***

217. J.P. Morgan analyst Kasimov then asked:

> So just to kick things off, though, obviously, everybody's really focused, as I'm sure you are on your pending PDUFA date for NUPLAZID for DRP. Can you just kind of frame expectations for what you would maybe expect or hope a

> label would look like and the importance that will play in the commercialization of the product for the indication?

218. Davis responded:

> Yes, thanks much Cory. I'll start and then I'll – and Serge may want to add some additional color as well. So the indication we'll be seeking is NUPLAZID is indicated for the treatment of dementia-related psychosis. And there are probably two key elements that we should touch on here.
>
> ***One is the – as I mentioned, we're seeking the treatment of dementia-related psychosis. So we're not looking at individual subtypes, as they're often referred to of dementia.*** The psychosis that we see is very similar between -- irrespective of the underlying etiology and it responds in a similar way. ***So we're seeking that broad indication. That's supported by very close alignment we established with the FDA at our end of Phase 2 meeting and then again at their pre-sNDA meeting when we submitted our application.***
>
> ***The efficacy and safety data that we have that underpins that indication is very strong.*** We've got a well-established safety and tolerability profile of the drug. Anytime you file an sNDA, you need to collect all of the safety data you have from either prior or ongoing studies. We've done that. All that data continues to look very positive. If anything, the profile of the drug might look even a little bit cleaner than the very, very clean profile that we observed when we submitted in PDP.

219. As the Court has already found in denying Defendants' motions to dismiss and for reconsideration in the Class Action, these statements were materially false and misleading and failed to state material facts. It was materially misleading for Davis to discuss the End of Phase II Meeting and Acadia's agreement with the FDA while omitting a material term of that agreement: that the FDA would be specifically analyzing the "actual composition and response of patients" in each dementia subgroup in determining whether to approve pimavanserin for a broad indication for dementia-related psychosis. As the Court found in denying

Defendants' motion to dismiss in the Class Action, Davis's statements "plausibly connote to a reasonable investor that the Harmony Study's design had been prospectively approved by the FDA," "would not represent a further barrier to approval," and "suggest that the FDA would base its decision on the overall results of the Harmony Study rather than on the data for individual subgroups." It was also materially misleading for Davis to discuss the Harmony Study and -019 Study while omitting the negative subgroup results from the Harmony Study and that the Harmony Study and -019 Study were poorly designed and therefore unlikely to serve as a basis to approve the pimavanserin sNDA. As the Court found in denying Defendants' motion to dismiss in the Class Action, "a failure to disclose that the [Harmony Study and -019 Study] were not properly designed and that the Harmony Study had disappointing subgroup data rendered Defendants' positive statements regarding the results of the studies materially misleading." In other words, "Defendants' statements touting the results of the Harmony Study and -019 Study . . . misled investors by omitting the adverse information the FDA later cited in denying approval of the sNDA." It was also materially misleading for Davis to discuss the pimavanserin sNDA while omitting that, because of the reasons set forth above, it was unlikely to be approved by the FDA. Indeed, the FDA had already informed Acadia that the pimavanserin sNDA "does not appear to include adequate evidence to indicate that pimavanserin would provide a significant improvement in safety or effectiveness in the treatment of dementia-related psychosis."

220. On February 24, 2021, Acadia issued a press release announcing its financial results for the fourth quarter and full year 2020. The press release stated:

> "Acadia delivered strong financial results in the fourth quarter and full year 2020, driven by robust sales of NUPLAZID in Parkinson's disease psychosis. Additionally, we made significant advancements in two Phase 3 programs and further expanded our pipeline in pain

> and neuropsychiatry through strategic business development," said Steve Davis, Chief Executive Officer. ***"In 2021, we are focused on delivering continued growth of NUPLAZID, the upcoming potential approval and launch of pimavanserin for dementia-related psychosis and advancing our business development strategy."***

221. That same day, Acadia held the 4Q2020 Earnings Call. During the conference call, Davis stated:

> ***Additional highlights from 2020 include our submission of an sNDA for DRP. The FDA review is progressing as expected, and we look forward to the potential of NUPLAZID becoming the first and only approved treatment for this indication and the first new treatment in the dementia space in over 15 years.***
>
> . . . .
>
> ***The significant potential of pimavanserin, combined with our clinical pipeline, will drive meaningful long-term growth.*** We continue to grow NUPLAZID sales and based on our 2020 performance and current outlook, we are providing net sales guidance for PDP in fiscal year 2021 of $510 million to $550 million. ***We're on the cusp of the potential approval in DRP, a significantly larger market opportunity, for which our teams have been preparing for approximately 2 years. We will be ready to execute on day 1.***

222. As the Court has already found in denying Defendants' motions to dismiss and for reconsideration in the Class Action, these statements were materially false and misleading and failed to state material facts. It was materially misleading for Acadia and Davis to discuss the pimavanserin sNDA while omitting that, because of the negative subgroup results from the Harmony Study and the poor design of the Harmony Study and -019 Study, it was unlikely to be approved by the FDA. Indeed, the FDA had already informed Acadia that the pimavanserin sNDA "does not appear to include adequate evidence to indicate that pimavanserin would provide a

///

significant improvement in safety or effectiveness in the treatment of dementia-related psychosis."

223. On February 25, 2021, Acadia filed the 2020 10-K, which was signed by Davis. The 2020 10-K stated, in relevant part:

> We believe that pimavanserin has the potential to address important unmet medical needs in neurological and psychiatric disorders in addition to PDP and we plan to continue to study the use of pimavanserin in multiple disease states. Beyond PDP, we believe dementia-related psychosis (DRP), represents one of our most important opportunities for further development. ***In June 2020, we submitted to the FDA a supplemental New Drug Application (sNDA) for NUPLAZID for the treatment of hallucinations and delusions associated with DRP. In July 2020 the FDA notified us of their filing of our sNDA with a Prescription Drug User Fee Act (PDUFA) target action date of April 3, 2021.***

224. The 2020 10-K went on to explain that a "key element" of Acadia's strategy was to:

> ***Deliver pimavanserin to the market for the treatment of patients with dementia-related psychosis. In June 2020, we submitted an sNDA for NUPLAZID for the treatment of hallucinations and delusions associated with DRP. Our PDUFA target action date is April 3, 2021. In preparation for a potential U.S. launch, we plan to increase the U.S. sales force, including expansion of additional commercial, medical affairs and general and administrative support functions prior to obtaining regulatory approval for NUPLAZID in DRP.*** If approved, NUPLAZID will be the first and only FDA-approved treatment for DRP.

225. As the Court has already found in denying Defendants' motions to dismiss and for reconsideration in the Class Action, these statements were materially false and misleading and failed to state material facts. It was materially misleading for Acadia and Davis to discuss the pimavanserin sNDA while omitting that, because of the negative subgroup results from the Harmony Study and the poor design of the Harmony Study and -019 Study, it was unlikely to be approved by the FDA. Indeed,

the FDA had already informed Acadia that the pimavanserin sNDA "does not appear to include adequate evidence to indicate that pimavanserin would provide a significant improvement in safety or effectiveness in the treatment of dementia-related psychosis."

## II. False and Misleading Statements About the Effectiveness of Acadia's Internal Disclosure Controls and Procedures

226. Throughout the relevant period, Acadia and Davis repeatedly and falsely certified to investors that the Company had effective internal disclosure controls and procedures.

227. In the 3Q2019 10-Q, for example, Acadia stated:

> As of September 30, 2019, we carried out an evaluation, under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of our disclosure controls and procedures, as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended. Based on this evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective at the reasonable assurance level as of September 30, 2019.
>
> An evaluation was also performed under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, of any change in our internal control over financial reporting that occurred during our last fiscal quarter and that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting. That evaluation did not identify any changes in our internal control over financial reporting that occurred during our latest fiscal quarter that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

228. Acadia made substantively identical disclosures in the 2019 10-K, 1Q2020 10-Q, 2Q2020 10-Q, 3Q2020 10-Q, and 2020 10-K.

229. Along with each of Acadia's filings with the SEC, Davis provided a certification concerning the Company's internal disclosure controls and procedures pursuant to Section 302 of SOX. In his certification with the 3Q2019 10-Q, for example, Davis stated:

> 1. I have reviewed this quarterly report on Form 10-Q of ACADIA Pharmaceuticals Inc.
>
> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> . . . .
>
> 4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
>
> > a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
> >
> > . . . .
> >
> > c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
> >
> > d) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting . . . .

230. Davis provided substantively identical disclosures in the 2019 10-K, 1Q2020 10-Q, 2Q2020 10-Q, 3Q2020 10-Q, and 2020 10-K.

231. These statements were materially false and misleading and failed to state material facts. It was materially misleading for Acadia and Davis to represent that Acadia's internal disclosure controls and procedures were effective during the relevant period when that was not the case and Davis and Stankovic repeatedly and successfully evaded those controls to perpetrate their fraud. Among other things, Acadia, Davis, and Stankovic knew that the FDA would specifically be analyzing the "actual composition and response of patients" in each dementia subgroup in determining whether to approve the pimavanserin sNDA, yet omitted this material information when discussing the Phase II Meeting and Acadia's agreement with the FDA. Acadia, Davis, and Stankovic also knew that, because of the negative subgroup results from the Harmony Study and the poor design of the Harmony Study and the -019 Study, the pimavanserin sNDA was unlikely to be approved by the FDA. Yet Acadia, Davis, and Stankovic concealed or downplayed this information to investors and, in doing so, created a misimpression in the market that the pimavanserin sNDA would be approved by the FDA.

## **SUMMARY OF DEFENDANTS' SCIENTER**

232. Plaintiffs repeat and re-allege each and every allegation contained in each of the foregoing paragraphs as if fully set forth herein.

233. Defendants Acadia and Davis and non-party Stankovic acted with scienter with respect to the materially false and misleading misstatements and omissions of material fact set forth above because they knew, or at the very least recklessly disregarded, that those statements were false or misleading when made.

///

As Acadia's senior executives during the relevant period, Davis's and Stankovic's scienter is imputable to Acadia.

234. As the Court found in denying Defendants' motion to dismiss in the Class Action, Defendants Acadia's and Davis's and non-party Stankovic's misrepresentations "concerning the agreement with the FDA support an inference that Defendants knew that the studies' shortcomings would materially increase the risk that the sNDA would not be approved." Accordingly, Defendants Acadia's and Davis's and non-party Stankovic's affirmative misrepresentations about the "terms of the purported agreement with the FDA support an inference that Defendants acted with intent or deliberate recklessness."

235. Additionally, as the Court found in denying Defendants' motion to dismiss in the Class Action, Acadia's April 5, 2021 press release announcing that it had received a CRL from the FDA provides further evidence of Defendants Acadia's and Davis's and non-party Stankovic's scienter. The "press release asserts that the FDA agreed to the Harmony Study's design, agreed to analyze DRP as a single group, and did not require statistical separation by subgroup, but that the FDA denied approval 'despite' these prior agreements. These assertions support an inference that Defendants intended that their earlier statements be understood by investors as suggesting that Acadia and the FDA had reached agreements concerning test design and analysis that were ultimately not consistent with the FDA's rationale for denying approval." As the Court further found in denying Defendants' motion for reconsideration in the Class Action, "the FDA's denial of Defendants' application in a manner plausibly inconsistent with Defendants' prior description of their agreement with the FDA adequately supports . . . allegations that Defendants' statements were not consistent with the terms of [the] agreement."

236. Moreover, as the Court found in denying Defendants' motion to dismiss in the Class Action, the fact that Defendant Davis and non-party Stankovic were high-level corporate officers with access to material information available to them but not to the market "supports an inference . . . that Defendants were aware of the shortcomings of the Harmony and -019 Studies. Despite allegedly possessing information that the studies were not properly designed and that the Harmony Study had disappointing subgroup data, Defendants touted the studies' results." As the Court further found in denying Defendants' motion for reconsideration in the Class Action, "Defendants' awareness of the design and sub-group level results of the supporting studies based on their access to material information is supported by their public statements, which repeatedly reference these aspects of the studies. In addition, the plausible allegations that Defendants intentionally or recklessly misrepresented the terms of an agreement with the FDA buttress the allegation that Defendants acted with scienter in shielding negative information about the studies from the public."

237. The importance of the pimavanserin sNDA to Acadia's core operations provides a motive to commit fraud and is further evidence of Defendants Acadia's and Davis's and non-party Stankovic's scienter. During the relevant period, NUPLAZID was Acadia's only commercial product and, accordingly, the sole driver of its product sales. Acadia holds the worldwide commercialization rights to pimavanserin and expanding its indication beyond just the treatment of Parkinson's disease psychosis would have been transformative for the Company. Indeed, analysts predicted that, if broadly approved to treat dementia-related psychosis, pimavanserin could generate Acadia over $1 billion in sales in the United States in the near-term and more than $3 billion in sales worldwide over the next decade. NUPLAZID, on

the other hand, generated Acadia only $339.1 million in product sales in 2019, $441.8 million in 2020, and $484.1 million in 2021.

238. Given the importance of the pimavanserin sNDA to Acadia's core operations, Defendants Acadia's and Davis's and non-party Stankovic's statements regarding the Harmony Study, the terms and full extent of Acadia's agreement with the FDA about the pimavanserin sNDA, and the effectiveness of Acadia's internal disclosure controls and procedures were so important and dramatically false and/or misleading that there is a strong inference that at least some corporate officials knew of the false and misleading nature of such statements upon their issuance, filing, and/or publication.

239. Acadia's follow-on stock offering provides an additional motive for Defendants Acadia and Davis and non-party Stankovic to commit fraud and is further evidence of their scienter. Defendant Acadia's and non-party Stankovic's misstatements to investors about the Harmony Study on September 9, 2019, caused the price of Acadia's stock to surge by more than 50%, from a closing price of $23.77 on September 6, 2019, to a closing price of $36.62 on September 9, 2019. Defendants Acadia and Davis and non-party Stankovic capitalized on Acadia's increased stock price to hold a follow-on public offering just 11 days later, on September 20, 2019. The public offering was fully sold at $40 per share and generated Acadia $287.5 million in gross proceeds. A public offering on such favorable terms would have been impossible but for Defendant Acadia's and non-party Stankovic's statements on September 9, 2019, as Acadia's stock had never traded at such high levels before.

240. Finally, and as the Court found in denying Defendants' motion to dismiss in the Class Action, Defendant Davis's and non-party Stankovic's stock sales

provide an additional motive to commit fraud and is further evidence of their scienter. "[T]he amount of Acadia stock sold by the individual Defendants during the [relevant] period is substantial. Although . . . many of these sales were made pursuant to Rule 10b5-1 trading plans, the trading plans in question were not adopted until after the motive and opportunity to mislead investors allegedly arose. Further, the absence of any sales of stock prior to the [relevant] period supports an inference that [Davis's and Stankovic's] sales were unusual or suspicious and weigh in favor of an inference of scienter."

241. In sum, and as the Court found in denying Defendants' motion to dismiss in the Class Action, "Defendants' actions plausibly demonstrate that that they misled investors into overestimating the likelihood of approval, not that Defendants knew from the start that the sNDA would not be approved. Further, [Davis's and Stankovic's] substantial stock sales provide a motive for Defendants to temporarily prop up Acadia's stock price, despite the risk that the company's stock price would fall when the truth was uncovered."

## PLAINTIFFS' ACTUAL RELIANCE

242. Plaintiffs are managed by Alger, a New York and Boston-based investment adviser.

243. Plaintiffs, through Alger, actually read or heard, reviewed, and justifiably relied on the representations set forth above prior to purchasing Acadia common stock on the dates set forth in Exhibits A-G to the extent each such statement had been made at the time of purchase.

244. Prior to purchasing Acadia common stock on behalf of Plaintiffs, an analyst at Alger actually read or heard, reviewed, and justifiably relied on Acadia's SEC filings as well as Acadia's other public disclosures, press releases, and investor

presentations including, as applicable, Defendants' and non-party Stankovic's statements regarding the Harmony Study, the terms and full extent of Acadia's agreement with the FDA about the pimavanserin sNDA, and the effectiveness of Acadia's internal disclosure controls and procedures.

245. As Alger continued to purchase Acadia common stock on behalf of Plaintiffs, an analyst at Alger kept abreast of publicly disclosed developments concerning Acadia and, prior to purchasing Acadia stock, actually read or heard, reviewed, and justifiably relied on Acadia's SEC filings as well as Acadia's other public disclosures, press releases, and investor presentations including, as appliable, Defendants' and non-party Stankovic's statements regarding the Harmony Study, the terms and full extent of Acadia's agreement with the FDA about the pimavanserin sNDA, and the effectiveness of Acadia's internal disclosure controls and procedures.

246. Each of Defendants' and non-party Stankovic's statements was material to Alger's decision to purchase Acadia common stock on behalf of Plaintiffs.

247. Defendants' and non-party Stankovic's statements regarding the Harmony Study and the terms and full extent of Acadia's agreement with the FDA about the pimavanserin sNDA were material to Alger's decision to purchase Acadia common stock on behalf of Plaintiffs. Expanding pimavanserin's indication to dementia-related psychosis would have been transformative for Acadia. Indeed, analysts predicted that, if broadly approved to treat dementia-related psychosis, pimavanserin could generate Acadia over $1 billion in sales in the United States in the near-term and more than $3 billion in sales worldwide over the next decade. Accordingly, Acadia was laser-focused on the Harmony Study and what it meant for the pimavanserin sNDA, and it was regularly discussed by Davis and Stankovic on conference calls and during presentations during the relevant period. Davis and

Stankovic were also routinely asked by investors and analysts about the Harmony Study and the pimavanserin sNDA and thus knew that expanding pimavanserin's indication to dementia-related psychosis was hugely significant to the market as well as to Acadia.

248. As the Court found in denying Defendants' motion to dismiss in the Class Action, the "FDA's subsequent citation of the shortcomings of the Harmony and -019 Studies in denying approval of the sNDA supports a plausible inference that this same information would have been material to a reasonable investor at the time the statements were made."

249. Defendants' statements regarding the effectiveness of Acadia's internal disclosure controls and procedures were also material because they assured investors that material information about Acadia would be disclosed to investors and that Acadia was complying with disclosure laws.

250. To the extent that each statement had been made at the time of purchase, Alger actually and justifiably relied on Defendants' and non-party Stankovic's statements regarding the Harmony Study, the terms and full extent of Acadia's agreement with the FDA about the pimavanserin sNDA, and the effectiveness of Acadia's internal disclosure controls and procedures in making each purchase of Acadia common stock on behalf of Plaintiffs, as set forth in Exhibits A-G.

251. Plaintiffs' reliance on these statements of material fact was reasonable and justifiable. Plaintiffs were open-market purchasers of Acadia common stock that did so based on Defendants' and non-party Stankovic's representations.

252. Had Alger known the truth, it would not have caused Plaintiffs to purchase Acadia common stock or, if it had done so, would not have caused Plaintiffs to purchase at the prices they did.

## PRESUMPTION OF RELIANCE

253. Plaintiffs also intend to rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things: (1) Defendants and non-party Stankovic made public misrepresentations or failed to disclose material facts during the relevant time period; (2) the omissions and misrepresentations were material; (3) Acadia common stock traded in an open and efficient market; (4) the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of Acadia common stock; and (5) Plaintiffs purchased or acquired Acadia common stock between the time when Defendants and non-party Stankovic misrepresented or failed to disclose material facts and the time when the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

254. The market for Acadia common stock was open, well-developed and efficient at all relevant times. As a result of the aforementioned materially false and misleading statements, Acadia common stock traded at artificially inflated prices during the relevant period. The artificial inflation dissipated as the market learned of the nature and extent of Defendants' and non-party Stankovic's misrepresentations regarding the Harmony Study, the terms and full extent of Acadia's agreement with the FDA about the pimavanserin sNDA, and the effectiveness of Acadia's internal disclosure controls and procedures.

255. At all relevant times, the market for Acadia common stock was efficient for the following reasons, among others: (1) Acadia filed periodic reports with the SEC; (2) Acadia common stock met the requirements for listing, was listed and actively and highly traded on the NASDAQ, a highly efficient market, during the time that Plaintiffs purchased or acquired Acadia common stock; (3) numerous analysts followed Acadia, each of which wrote reports that were publicly available

and entered the public marketplace; and (4) Acadia regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services. As a result, the market for Acadia common stock promptly digested current information regarding Acadia from all publicly available sources and such information was reflected in Acadia's stock price.

256. Plaintiffs relied on the market price of Acadia common stock, which reflected all the information in the market, including the misstatements by Defendants and non-party Stankovic.

257. In addition, or in the alternative, Plaintiffs are entitled to a presumption of reliance pursuant to *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), and its progeny, because the claims asserted herein are predicated in part upon omissions of material fact that Defendants and non-party Stankovic had a duty to disclose.

## LOSS CAUSATION

258. As the truth about Defendants' and non-party Stankovic's fraud was gradually but only partially revealed to the market, the price of Acadia common stock plummeted, and Plaintiffs suffered significant investment losses.

259. Defendants' and non-party Stankovic's wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs. During the time that Plaintiffs purchased Acadia common stock, as set forth in Exhibits A-G, the market price of that common stock was artificially inflated as a direct result of Defendants' and non-party Stankovic's materially false and

misleading statements. Specifically, Defendants' and non-party Stankovic's statements regarding the Harmony Study, the terms and full extent of Acadia's agreement with the FDA about the pimavanserin sNDA, and the effectiveness of Acadia's internal disclosure controls and procedures caused the price of Acadia common stock to be artificially inflated.

260. As a series of partial but inadequate disclosures were issued partially revealing the false and misleading nature of Defendants' and non-party Stankovic's statements regarding the Harmony Study, the terms and full extent of Acadia's agreement with the FDA about the pimavanserin sNDA, and the effectiveness of Acadia's internal disclosure controls and procedures, and as the foreseeable risks previously concealed by Defendants' and non-party Stankovic's material misrepresentations and omissions partially materialized, the price of Acadia common stock plummeted and Plaintiffs were damaged.

261. On March 8, 2021, after the market closed, Acadia issued a press release providing an update on the pimavanserin sNDA. The press release revealed that, as part of its ongoing review of the sNDA, "the FDA has identified deficiencies that preclude discussion of labeling and post-marketing requirements/commitments at this time." The press release explained that the FDA's notification "does not specify the deficiencies identified by the FDA and there has been no clarification from the FDA at this time." Acadia reassured investors that it "plan[ned] to work with the FDA to learn the nature of the deficiencies and seek to resolve them" and that the FDA's notification "does not reflect a final decision on the information under review."

262. As the Court found in denying Defendants' motion to dismiss in the Class Action, the FDA's notification was a partial disclosure and partial materialization of the foreseeable risk that Defendants and non-party Stankovic had

previously concealed from the investing public. The FDA's notification revealed to the market that there was an issue with the pimavanserin sNDA – although the scope and severity of that issue was unknown – that prevented the FDA from completing its review. Accordingly, the FDA's notification called into question whether the pimavanserin sNDA would be approved by the April 3, 2021 PDUFA date and partially revealed that Acadia's, Davis's, and Stankovic's prior representations were false or materially misleading. As the Court explained, "[a] reasonable investor could plausibly infer from Acadia's March and April 2021 press releases that they had previously been misled by Defendants' alleged misrepresentations and omissions. Further, the FDA's denial of approval of the sNDA represented the materialization of the risk about which investors had allegedly been misled." Throughout the relevant period, Acadia, Davis, and Stankovic created a misimpression in the market that, because the FDA had agreed to evaluate pimavanserin based on the results from the Harmony Study as a whole, the Agency would not be taking into account the composition of, or response in, any particular dementia subgroup. These statements were intended to allay investors' concerns about the small sample size and/or poor results in the dementia subgroups after Acadia and Davis presented certain results from the Harmony Study at the 12th Annual CTAD Meeting. Acadia's, Davis's, and Stankovic's later positive updates about the status of the pimavanserin sNDA were likewise intended to create a false impression in the market that the Harmony Study and -019 Study were properly designed and could therefore serve as a basis to approve the pimavanserin sNDA. The FDA's notification was a materialization of the previously concealed risk that the FDA was in fact taking into account the "actual composition and response of patients" in each dementia subgroup in deciding whether to approve pimavanserin for a broad indication for dementia-related

psychosis – just as it explicitly told Acadia and Stankovic it would during the End of Phase II Meeting. It was also a materialization of the previously concealed risk that the Harmony Study and -019 Study were not in fact properly designed and, accordingly, could not provide a basis for approval of the pimavanserin sNDA. And, clearly, Acadia's internal disclosure controls and procedures were ineffective given that Acadia, Davis, and Stankovic were able to conceal this information from investors while repeatedly assuring them that Acadia had an agreement with the FDA about the pimavanserin sNDA and that the Harmony Study and -019 Study demonstrated efficacy and could serve as a basis to approve the pimavanserin sNDA for a broad indication of dementia-related psychosis.

263. Acadia's stock ***plummeted more than 45%*** in response to the news regarding the FDA's notification, from a closing price of $45.78 per share on March 8, 2021, to a closing price of $25.02 on March 9, 2021. *Bloomberg* directly linked the fall in Acadia's stock price to the Company's announcement of the FDA notification, writing "Acadia Pharmaceuticals Inc. tumbled 40% in postmarket trading after reporting that the FDA identified deficiencies that preclude discussion of labeling and post-marketing requirements-commitments for Pimavanserin, a treatment for hallucinations and delusions associated with dementia-related psychosis." Another *Bloomberg* article was titled "Acadia Pharmaceuticals Crashes on FDA Setback for Psychosis Treatment." *Trefis* likewise wrote that the drop in the price of Acadia common stock "can be attributed to the U.S. FDA finding deficiencies in [the Company's] application for its psychosis drug – Nuplazid."

264. On April 5, 2021, before the market opened, Acadia issued a press release announcing that it had received a CRL from the FDA indicating that the

///

pimavanserin sNDA "cannot be approved in its present form." The press release stated:

> Despite prior agreements with the Division of Psychiatry regarding the pivotal Phase 3 HARMONY study design targeting a broad DRP patient population analyzed as a single group, the Division, in the CRL, cited a lack of statistical significance in some of the subgroups of dementia, and insufficient numbers of patients with certain less common dementia subtypes as lack of substantial evidence of effectiveness to support approval.
>
> The DRP pivotal HARMONY study met its prespecified primary and secondary endpoints with robust and persuasive clinical and statistical superiority of pimavanserin over placebo, which was a prospectively agreed prerequisite for the DRP indication. Statistical separation by dementia subgroups and certain minimum numbers of patients with specific subtypes were not among the prespecified requirements.
>
> "Acadia stands behind the robustly positive results from the pivotal Phase 3 HARMONY study and the prospectively agreed trial design and criteria for establishing efficacy in DRP. Over the entire course of the review, the Division did not raise any concerns regarding the agreed upon study design, including the issues raised in the CRL," said Steve Davis, Chief Executive Officer of Acadia. "We will immediately request a Type A meeting to work with the FDA to address the CRL and determine an expeditious path forward for the approval of pimavanserin in DRP."
>
> The Division also stated in the CRL that it considers the Phase 2 Alzheimer's disease psychosis study -019, a supportive study in the sNDA filing, to not be adequate and well controlled, citing that it was a single center study with no type I error control of secondary endpoints in which certain protocol deviations occurred. The Company believes these observations impact neither the positive results on the study's primary endpoint, nor the study's overall conclusions of efficacy.

265. As the Court found in denying Defendants' motion to dismiss in the Class Action, the CRL was a partial disclosure and partial materialization of the foreseeable risk that Defendants and non-party Stankovic had previously concealed

from the investing public. Far beyond the "deficiencies" that precluded the FDA from discussing labeling and post-marketing commitments with Acadia in March, the CRL revealed that the pimavanserin sNDA was fundamentally flawed and incapable of being approved in its current form and, accordingly, that Acadia's, Davis's, and Stankovic's prior representations were false or materially misleading. As the Court explained, "[a] reasonable investor could plausibly infer from Acadia's March and April 2021 press releases that they had previously been misled by Defendants' alleged misrepresentations and omissions. Further, the FDA's denial of approval of the sNDA represented the materialization of the risk about which investors had allegedly been misled." Throughout the relevant period, Acadia, Davis, and Stankovic created a misimpression in the market that, because the FDA had agreed to evaluate pimavanserin based on the results from the Harmony Study as a whole, the Agency would not be taking into account the composition of, or response in, any particular dementia subgroup. These statements were intended to allay investors' concerns about the small sample size and/or poor results in the dementia subgroups after Acadia and Davis presented certain results from the Harmony Study at the 12th Annual CTAD Meeting. Acadia's, Davis's, and Stankovic's later positive updates about the status of the pimavanserin sNDA were likewise intended to create a false impression in the market that the Harmony Study and -019 Study were properly designed and could therefore serve as a basis to approve the pimavanserin sNDA. The CRL was a materialization of the previously concealed risk that the FDA was in fact taking into account the "actual composition and response of patients" in each dementia subgroup in deciding whether to approve pimavanserin for a broad indication for dementia-related psychosis – just as it explicitly told Acadia and Stankovic it would during the End of Phase II Meeting. It was also a materialization

of the previously concealed risk that the Harmony Study and -019 Study were not in fact properly designed and, accordingly, could not provide a basis for approval of the pimavanserin sNDA. And, clearly, Acadia's internal disclosure controls and procedures were ineffective given that Acadia, Davis, and Stankovic were able to conceal this information from investors while repeatedly assuring them that Acadia had an agreement with the FDA about the pimavanserin sNDA and that the Harmony Study and -019 Study demonstrated efficacy and could serve as a basis to approve the pimavanserin sNDA for a broad indication of dementia-related psychosis.

266. Acadia's stock ***plunged more than 17%*** in response to the news of the CRL, from a closing price of $25.59 per share on April 1, 2021, to a closing price of $21.18 per share on April 5, 2021. As investors continued to process the news about the CRL, Acadia's stock price slid even lower, bottoming out at a closing price of $20.64 per share on April 6, 2021. All told, Acadia's stock declined ***more than 19%*** between April 1, 2021, and April 6, 2021. *Bloomberg* directly linked the fall in the price of Acadia common stock to the Company's announcement of the CRL, writing "Acadia Pharma (ACAD -17%) tumbled after FDA rejection of a filing for Nuplazid to be approved as a treatment of hallucinations and delusions associated with dementia-related psychosis was seen as far worse than many on Wall Street had expected, analysts from Mizuho and Stifel agreed." Another *Bloomberg* article was titled "Acadia Pharma Drops as FDA Concern Worse Than Street Anticipated." *The Street* similarly wrote that "Acadia Pharmaceuticals tumbled Monday after the biopharma said the Food and Drug Administration had rejected its application to expand the use of pimavanserin."

267. On August 4, 2021, after the market closed, Acadia issued a press release announcing its financial results for the second quarter of 2021 and providing

additional information about the CRL. The press release stated in a section titled "Company Updates":

> Completed a Type A End of Review meeting regarding the FDA's complete response letter (CRL) for the sNDA for pimavanserin for the treatment of hallucinations and delusions associated with dementia-related psychosis (DRP). At the meeting, the FDA reiterated their stated position in the CRL, that pimavanserin should be studied by individual subgroups of dementia, and advised that the best path forward is to conduct an additional clinical study in each of the subgroups for which we seek approval. However, the FDA also indicated that they are open to having another meeting to discuss additional analyses from the HARMONY and -019 studies in support of a potential resubmission without an additional clinical study.

268. During a conference call that day, Davis elaborated on Acadia's End-of-Review Meeting with the FDA:

> We recently completed a Type A end-of-review meeting with the FDA to discuss the issues raised in the Complete Response Letter that we received in April. Today, we'd like to share the key takeaways from that meeting.
>
> First, the FDA reaffirmed their stated position in the CRL that pimavanserin should be studied by individual subgroups of dementia and advised us that the best path forward to conduct an additional clinical study in each of the subgroups for which we seek approval. In the meeting, we highlighted the consistent and clinically meaningful efficacy observed in the DRP population overall, as well as across individual dementia subtypes [ph] Alzheimer's disease, dementia with Lewy bodies, Parkinson's disease dementia and patients with mixed pathologies.
>
> As a result of these discussions, the FDA indicated that they are open to discuss additional analyses from the HARMONY study and the -019 study that may support a potential resubmission without conducting an additional study. We're planning to additional discuss analyses with the FDA at a meeting later this year. In parallel with preparations for this meeting, we will also prepare for all potential outcomes that may come from this discussion.

269. In response to a question from Citi analyst Bitritto-Garg about Acadia's intention to re-submit the pimavanserin sNDA, Stankovic stated:

> When we look at the discussions that we have and the potential part, they essentially boils down to three pathways that we can pursue. One is that additional analysis and the discussion and review of the data, results with the alignment that the data - existing data is sufficient for approval of the broad DRP indication.
>
> The other option is that the data that we have for the subtypes, particularly for some of the larger subtypes that we have like Alzheimer's disease psychosis along with the study in Alzheimer's disease psychosis that we have with the analysis and data would we present, we aligned that that data is sufficient to - for the approval of individual indications, sub individual subtype without additional clinical work.
>
> And finally, the third part would be that if FDA remains steadfast with their position that they would want to see additional clinical data then additional work in an individual indication would be required to move forward. So that's how we see [it]. Obviously, our position is for the first or the second option. And I think the data that we have presented received some traction, and we're continuing discussion and we are happy to have that opportunity.

270. The FDA's recommended "best path forward" – that Acadia analyze each subgroup of dementia separately and through additional clinical studies – was a partial disclosure and partial materialization of the foreseeable risk that Defendants and non-party Stankovic had previously concealed from the investing public. The FDA's recommended "best path forward" revealed that the Harmony Study – even together with the -20 and -19 Studies – was highly unlikely provide a basis for approval of a resubmitted pimavanserin sNDA for the broad indication of dementia-related psychosis and, accordingly, revealed that Acadia's, Davis's, and Stankovic's prior representations were false or materially misleading. Throughout the relevant period, Acadia, Davis, and Stankovic created a misimpression in the market that,

because the FDA had agreed to evaluate pimavanserin based on the results from the Harmony Study as a whole, the Agency would not be taking into account the composition of, or response in, any particular dementia subgroup. These statements were intended to allay investors' concerns about the small sample size and/or poor results in the dementia subgroups after Acadia and Davis presented certain results from the Harmony Study at the 12th Annual CTAD Meeting. Acadia's, Davis's, and Stankovic's later positive updates about the status of the pimavanserin sNDA were likewise intended to create a false impression in the market that the Harmony Study and -019 Study were properly designed and could therefore serve as a basis to approve the pimavanserin sNDA. The FDA's recommended "best path forward" was a materialization of the previously concealed risk that the FDA was in fact taking into account the "actual composition and response of patients" in each dementia subgroup in deciding whether to approve pimavanserin for a broad indication for dementia-related psychosis – just as it explicitly told Acadia and Stankovic it would during the End of Phase II Meeting. It was also a materialization of the previously concealed risk that the Harmony Study and -019 Study were not in fact properly designed and, accordingly, could not provide a basis for approval of the pimavanserin sNDA. And, clearly, Acadia's internal disclosure controls and procedures were ineffective given that Acadia, Davis, and Stankovic were able to conceal this information from investors while repeatedly assuring them that Acadia had an agreement with the FDA about the pimavanserin sNDA and that the Harmony Study and -019 Study demonstrated efficacy and could serve as a basis to approve the pimavanserin sNDA for a broad indication of dementia-related psychosis.

///

///

271. Acadia's stock ***declined a further 8.5%*** in response to the news from the FDA, from a closing price of $21.05 per share on August 4, 2021, to a closing price of $19.25 per share on August 5, 2021.

272. On December 20, 2021, after the market closed, Acadia issued a press release announcing that it was planning to resubmit its sNDA for pimavanserin "for the treatment of hallucinations and delusions associated with dementia focused on Alzheimer's disease psychosis (ADP)," rather than for the broad treatment of dementia-related psychosis. The press release explained:

> "Following our recent meetings with the FDA, we plan to resubmit our sNDA for pimavanserin, narrowing the proposed indication from dementia-related psychosis to Alzheimer's disease psychosis," said Steve Davis, Chief Executive Officer. "Our resubmission will include new analyses of existing clinical study data supporting the treatment of hallucinations and delusions associated with Alzheimer's disease. We are aware there are challenges to overcoming our complete response letter, but are pleased with the high level of engagement from the FDA over the last three meetings and their willingness to review our resubmission, allowing us to make our case that pimavanserin should be the first drug approved to treat Alzheimer's disease psychosis."

273. Acadia's narrowing of the pimavanserin sNDA to treat only Alzheimer's disease psychosis was a partial disclosure and partial materialization of the foreseeable risk that Defendants and non-party Stankovic had previously concealed from the investing public. Acadia's decision to seek an indication for the treatment of Alzheimer's disease psychosis only revealed that the Harmony Study could not provide a basis for approval of an sNDA for the treatment of dementia-related psychosis broadly and, accordingly, revealed that Acadia's, Davis's, and Stankovic's prior representations were false or materially misleading. Throughout the relevant period, Acadia, Davis, and Stankovic created a misimpression in the market that,

because the FDA had agreed to evaluate pimavanserin based on the results from the Harmony Study as a whole, the Agency would not be taking into account the composition of, or response in, any particular dementia subgroup. These statements were intended to allay investors' concerns about the small sample size and/or poor results in the dementia subgroups after Acadia and Davis presented certain results from the Harmony Study at the 12th Annual CTAD Meeting. Acadia's, Davis's, and Stankovic's later positive updates about the status of the pimavanserin sNDA were likewise intended to create a false impression in the market that the Harmony Study and -019 Study were properly designed and could therefore serve as a basis to approve the pimavanserin sNDA. The FDA's recommended "best path forward" was a materialization of the previously concealed risk that the FDA was in fact taking into account the "actual composition and response of patients" in each dementia subgroup in deciding whether to approve pimavanserin for a broad indication for dementia-related psychosis – just as it explicitly told Acadia and Stankovic it would during the End of Phase II Meeting. It was also a materialization of the previously concealed risk that the Harmony Study and -019 Study were not in fact properly designed and, accordingly, could not provide a basis for approval of the pimavanserin sNDA. And, clearly, Acadia's internal disclosure controls and procedures were ineffective given that Acadia, Davis, and Stankovic were able to conceal this information from investors while repeatedly assuring them that Acadia had an agreement with the FDA about the pimavanserin sNDA and that the Harmony Study and -019 Study demonstrated efficacy and could serve as a basis to approve the pimavanserin sNDA for a broad indication of dementia-related psychosis.

274. Acadia's stock ***declined more than 20%*** on the news of the narrowed pimavanserin sNDA, from a closing price of $27.09 per share on December 20, 2021,

to a closing price of $21.45 per share on December 21, 2021. *Investor's Business Daily* directly linked the fall in the price of Acadia common stock to the Company's announcement of the narrowed pimavanserin sNDA, publishing an article titled "Why This Acadia Pharmaceuticals Move Has Analysts Split – And Shares Down 20%." The article explained that "Acadia Pharmaceuticals will ask the Food and Drug Administration to approve a once-rejected psychosis drug, but ACAD stock plunged on Tuesday." An article from *MT Newswires* was similarly titled "Acadia Pharmaceuticals to Resubmit Supplemental New Drug Application for Pimavanserin; Shares Decline Midday."

## NO SAFE HARBOR

275. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The specific statements pleaded herein were not "forward-looking statements" nor were they identified as "forward-looking statements" when made. Nor was it stated with respect to any of the statements forming the basis of this Complaint that actual results "could differ materially from those projected." To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Acadia who knew that those statements were false when made.

276. Indeed, in denying Defendants' motions to dismiss and for reconsideration in the Class Action, the Court rejected Defendants' argument that their misstatements were inactionable because they were forward-looking and accompanied by meaningful cautionary language.

## FIRST CAUSE OF ACTION

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b) Against All Defendants

277. Plaintiffs repeat and re-allege each and every allegation contained in each of the foregoing paragraphs as if fully set forth herein.

278. This cause of action is brought against Defendants Acadia and Davis for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j, and Rule 10b-5(b) promulgated thereunder, 17 C.F.R. § 240.10b-5.

279. Defendants Acadia and Davis and non-party Stankovic both directly and indirectly used the means and instrumentalities of interstate commerce in the United States to make the materially false and misleading statements alleged herein to: (1) deceive the investing public, including Plaintiffs, as alleged herein; (2) artificially inflate and maintain the market price of Acadia common stock; and (3) cause Plaintiffs to purchase Acadia common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants Acadia and Davis and non-party Stankovic took the actions set forth above.

280. Defendants Acadia and Davis and non-party Stankovic both directly and indirectly: (1) employed devices, schemes, and artifices to defraud; (2) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (3) engaged in acts, practices, and a course of business that operated as a fraud and deceit on the purchasers of Acadia common

stock in an effort to artificially inflate and maintain the market prices for Acadia common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5(b).

281. By virtue of their high-level positions at Acadia, Defendant Davis and non-party Stankovic were authorized to make public statements, and made public statements, on Acadia's behalf. These senior executives were privy to and participated in the creation, development, and issuance of the materially false and misleading statements alleged herein, and/or were aware of Acadia's and their own dissemination of information to the investing public that they recklessly disregarded was materially false and misleading.

282. In addition, Defendants Acadia and Davis and non-party Stankovic had a duty to disclose truthful information necessary to render their affirmative statements not materially misleading so that the market price of Acadia common stock would be based on truthful, complete, and accurate information.

283. Defendants Acadia and Davis and non-party Stankovic acted with knowledge or reckless disregard for the truth of the misrepresented and omitted facts alleged herein, in that they failed to ascertain and disclose the facts, even though such facts were known or readily available to them. Defendants Acadia's and Davis's and non-party Stankovic's material misrepresentations and omissions were done knowingly and/or recklessly and had the effect of concealing the truth with respect to the Harmony Study, the terms and full extent of Acadia's agreement with the FDA about the pimavanserin sNDA, and the effectiveness of Acadia's internal disclosure controls and procedures. By concealing these material facts from investors, Defendants Acadia and Davis and non-party Stankovic supported the artificially inflated price of Acadia common stock.

///

284. The dissemination of the materially false and misleading information, as set forth above, artificially inflated the market price of Acadia common stock. In ignorance of the fact that the market prices were artificially inflated and relying directly or indirectly upon the materially false and misleading statements made by Defendants and non-party Stankovic, and upon the integrity of the market in which Acadia's common stock trades, or upon the absence of material adverse information that was recklessly disregarded by Defendants and non-party Stankovic but not disclosed in public statements by Defendants and non-party Stankovic, Plaintiffs purchased Acadia common stock at artificially inflated prices. As a series of partial but inadequate disclosures were issued and the foreseeable risks previously concealed by Defendants' and non-party Stankovic's material misstatements and omissions partially materialized, the price of Acadia common stock substantially declined.

285. At the time of the material misrepresentations alleged herein, Plaintiffs were ignorant of their falsity, and believed them to be true. Had Plaintiffs known the truth with respect to the Harmony Study, the terms and full extent of Acadia's agreement with the FDA about the pimavanserin sNDA, and the effectiveness of Acadia's internal disclosure controls and procedures, which were concealed by Defendants and non-party Stankovic, Plaintiffs would not have purchased Acadia common stock, or if they had purchased such common stock, they would not have done so at the artificially inflated prices that they paid.

286. By virtue of the foregoing, Defendants Acadia and Davis have violated Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder.

287. As a direct and proximate result of Defendants Acadia's and Davis's and non-party Stankovic's wrongful conduct, Plaintiffs have suffered damages in connection with their transactions in Acadia common stock.

288. Taking into account, *inter alia*, the tolling of the limitations period by the filing of the class action complaints against Defendants in the Class Action, Plaintiffs have brought this claim within two years of discovery of the violations alleged herein, and within five years of the violations alleged herein. Consequently, this action is timely.

## SECOND CAUSE OF ACTION

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) Against All Defendants

289. Plaintiffs repeat and re-allege each and every allegation contained in each of the foregoing paragraphs as if fully set forth herein.

290. This cause of action is brought against Defendants Acadia and Davis for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j, and Rule 10b-5(a) and (c) promulgated thereunder, 17 C.F.R. § 240.10b-5.

291. Defendants Acadia and Davis and non-party Stankovic carried out a common plan, scheme, and unlawful course of conduct that was intended to, and did: (i) deceive the investing public, including Plaintiffs; (ii) artificially inflate the price of Acadia common stock; and (iii) cause Plaintiffs to purchase Acadia common stock at artificially inflated prices.

292. In furtherance of this unlawful plan, scheme and course of conduct, Defendants Acadia and Davis and non-party Stankovic employed devices, schemes and artifices to defraud, and knowingly and/or recklessly engaged in acts, transactions, practices, and courses of business that operated as a fraud and deceit upon Plaintiffs in connection with their purchases of Acadia common stock, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder.

293. Defendants Acadia's and Davis's and non-party Stankovic's fraudulent devices, schemes, artifices, and deceptive acts, practices, and course of business included the knowing and/or reckless suppression and concealment of information regarding the Harmony Study, the terms and full extent of Acadia's agreement with the FDA about the pimavanserin sNDA, and the effectiveness of Acadia's internal disclosure controls and procedures.

294. Plaintiffs reasonably relied upon the integrity of the market in which Acadia's common stock traded.

295. At the time of Defendants Acadia's and Davis's and non-party Stankovic's fraudulent scheme and unlawful course of conduct alleged herein, Plaintiffs were unaware of the fraudulent scheme and unlawful course of conduct and/or the impact of the fraudulent scheme. Had Plaintiffs known the true extent of Defendants Acadia's and Davis's and non-party Stankovic's fraudulent scheme and unlawful course of conduct, they would not have purchased Acadia common stock, or if they had purchased such common stock, they would not have done so at the artificially inflated prices that they paid.

296. As a direct and proximate result of Defendants Acadia's and Davis's and non-party Stankovic's scheme to defraud and such unlawful course of conduct, Plaintiffs suffered damages in connection with their purchases of Acadia common stock.

297. By virtue of the foregoing, Defendants Acadia and Davis violated Section 10(b) of the Exchange Act and Rule 10-b5(a) and (c) promulgated thereunder, and are liable to Plaintiffs for damages suffered in connection with their purchases of Acadia common stock.

///

298. Taking into account, *inter alia*, the tolling of the limitations period by the filing of the class action complaints against Defendants in the Class Action, Plaintiffs have brought this claim within two years of discovery of the violations alleged herein, and within five years of the violations alleged herein. Consequently, this action is timely.

## THIRD CAUSE OF ACTION

### Violations of Section 20(a) of the Exchange Act

### Against Defendant Davis

299. Plaintiffs repeat and re-allege each and every allegation contained in each of the foregoing paragraphs as if fully set forth herein.

300. This cause of action is brought against Defendant Davis for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

301. Defendant Davis was a controlling person of Acadia within the meaning of Section 20(a) of the Exchange Act.

302. By virtue of his high level position, and his ownership and contractual rights, substantial participation in, and/or awareness of, Acadia's operations and/or knowledge or reckless disregard of the materially false and misleading statements filed with the SEC or disseminated to the investing public, Defendant Davis had the power to influence and control, and did in fact influence and control, directly or indirectly, the decision-making of Acadia.

303. Defendant Davis was provided with or had unlimited access to copies of Acadia's press releases, scripts, and other statements alleged herein to be materially false and misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected. Defendant Davis had direct and supervisory involvement in the day-to-day

operations of Acadia and therefore is presumed to have had the power to control or influence the particular false and misleading statements giving rise to the securities violations alleged herein.

304. Defendant Davis culpably participated in Acadia's violation of Section 10(b) and Rule 10b-5 with respect to the First and Second Causes of Action.

305. By reason of the conduct alleged in the First and Second Causes of Action, Acadia is liable for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and Defendant Davis is liable pursuant to Section 20(a) based on his control of Acadia.

306. Defendant Davis is liable for the aforesaid wrongful conduct and is liable to Plaintiffs for the substantial damages suffered in connection with their purchases of Acadia common stock.

307. Taking into account, *inter alia*, the tolling of the limitations period by the filing of the class action complaints against Defendants in the Class Action, Plaintiffs have brought this claim within two years of discovery of the violations alleged herein, and within five years of the violations alleged herein. Consequently, this action is timely.

## FOURTH CAUSE OF ACTION

### Violations of Section 18 of the Exchange Act

### Against All Defendants

308. Plaintiffs repeat and re-allege the allegations contained in paragraphs 1 through 172, 223 through 231, 242 through 252, and 258 through 276 as if fully set forth herein.

309. This cause of action is brought against Defendants Acadia and Davis for violations of Section 18 of the Exchange Act.

310. As alleged herein, Defendants Acadia and Davis caused statements to be made in Acadia's 2019 10-K and 2020 10-K, and the SOX certifications accompanying those reports, that were, at the time and in light of the circumstances under which they were made, false or misleading with respect to material facts.

311. As alleged herein, Defendants Acadia and Davis caused statements to be made in Item 4 of, and the SOX certifications filed with, Acadia's 3Q2019 10-Q, 1Q2020 10-Q, 2Q2020 10-Q, and 3Q2020 10-Q that were, at the time and in light of the circumstances under which they were made, false or misleading with respect to material facts.

312. In purchasing Acadia common stock, members of Plaintiffs' investment team actually and justifiably read, and had direct eyeball reliance on, Acadia's 3Q2019 10-Q, 2019 10-K, 1Q2020 10-Q, 2Q2020 10-Q, 3Q2020 10-Q, and 2020 10-K (to the extent such reports had been published at the time of purchase).

313. Specifically, an investment analyst at Alger read and actually relied upon the information contained in Acadia's 3Q2019 10-Q, 2019 10-K, 1Q2020 10-Q, 2Q2020 10-Q, 3Q2020 10-Q, and 2020 10-K (to the extent each such report had been filed with the SEC at the time) in making each purchase of Acadia common stock on behalf of Plaintiffs during the relevant period.

314. In ignorance of the falsity of Defendants Acadia's and Davis's statements, or of the true facts, Plaintiffs purchased Acadia common stock in actual, justifiable, eyeball reliance upon Defendants Acadia's and Davis's representations.

315. Defendants Acadia's and Davis's materially false and misleading statements and omissions of material fact artificially inflated the price of Acadia common stock.

///

316. Had Alger known the truth, it would not have caused Plaintiffs to purchase Acadia common stock or, if it had done so, would not have caused Plaintiffs to purchase at the artificially inflated prices that they paid.

317. Upon disclosure of the true facts, the price of Acadia common stock dropped, and Plaintiffs suffered damages in an amount to be proven at trial.

318. By reason of the foregoing, Defendants Acadia and Davis are liable to Plaintiffs for violations of Section 18 of the Exchange Act.

319. Taking into account, *inter alia*, the tolling of the limitations period by the filing of the class action complaints against Defendants in the Class Action, Plaintiffs have brought this claim within two years of discovery of the violations alleged herein, and within five years of the violations alleged herein. Consequently, this action is timely.

## FIFTH CAUSE OF ACTION

### Common Law Fraud

### Against All Defendants

320. Plaintiffs repeat and re-allege each and every allegation contained in each of the foregoing paragraphs as if fully set forth herein.

321. This cause of action is brought against Defendants Acadia and Davis for violations of the common law.

322. Defendants Acadia and Davis and non-party Stankovic made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading to induce Plaintiffs to purchase Acadia common stock. Specifically, Defendants Acadia and Davis and non-party Stankovic made numerous material misrepresentations or omitted material facts about the Harmony Study, the

///

terms and full extent of Acadia's agreement with the FDA about the pimavanserin sNDA, and the effectiveness of Acadia's internal disclosure controls and procedures.

323. Defendants Acadia and Davis and non-party Stankovic knew that their statements were false when made or omitted material facts or, at the very least, made the statements with reckless disregard for their truth. As high-level executives at Acadia, Defendant Davis's and non-party Stankovic's scienter is imputable to Acadia.

324. Defendants Acadia and Davis and non-party Stankovic knew that investors like Plaintiffs would review and rely on such misrepresentations and intended that their false and/or misleading statements and omissions would induce Plaintiffs to purchase Acadia common stock at inflated prices.

325. These statements were material to Plaintiffs and Plaintiffs actually, reasonably, and justifiably relied on them when purchasing Acadia common stock. At the time of the material misrepresentations alleged herein, Plaintiffs were ignorant of their falsity, and believed them to be true. Had Plaintiffs known the truth with respect to the Harmony Study, the terms and full extent of Acadia's agreement with the FDA about the pimavanserin sNDA, and the effectiveness of Acadia's internal disclosure controls and procedures, which were concealed by Defendants Acadia and Davis and non-party Stankovic, Plaintiffs would not have purchased Acadia common stock, or if they had purchased such common stock, they would not have done so at the artificially inflated prices that they paid.

326. As a direct and proximate result of Defendants Acadia's and Davis's and non-party Stankovic's wrongful conduct, Plaintiffs have suffered damages in connection with their transactions in Acadia common stock as described above and to be proven at the time of trial.

///

327. Defendant Acadia's and Davis's and non-party Stankovic's wrongful conduct, as described above, was fraudulent, malicious, reckless, willful, and was directed at the general investing public. Accordingly, punitive damages, in addition to compensatory damages, are appropriate to deter fraudulent conduct of this kind.

## SIXTH CAUSE OF ACTION

### Common Law Negligent Misrepresentation

### Against All Defendants

328. Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 231 and 242 through 276 as if fully set forth herein.

329. This cause of action is brought against Defendants Acadia and Davis for violations of the common law.

330. Defendants Acadia and Davis and non-party Stankovic authorized or caused the representations and/or omissions set forth above.

331. Defendants Acadia and Davis and non-party Stankovic intended to supply false information for Plaintiffs to use in making investment decisions and intended for the false information to be used by Plaintiffs when making investment decisions.

332. Defendants Acadia and Davis and non-party Stankovic had no reasonable grounds for believing their representations were true when made or, at the very least, knew that their representations were materially misleading.

333. Defendants Acadia and Davis and non-party Stankovic had a duty to exercise reasonable care and competence in providing information about Acadia to Plaintiffs.

///

334. Defendants Acadia and Davis and non-party Stankovic made misrepresentations that they knew, or should have known, to be false or misleading in order to induce investors, including Plaintiffs, to purchase Acadia common stock.

335. Defendants Acadia and Davis and non-party Stankovic breached their duty to exercise reasonable care in making these representations to Plaintiffs.

336. Plaintiffs reasonably and justifiably relied on such misrepresentations. But for Defendants Acadia's and Davis's and non-party Stankovic's misrepresentations, Plaintiffs would not have purchased Acadia common stock, or if they had purchased such common stock, they would not have done so at the artificially inflated prices that they paid.

337. As a direct and proximate result of Defendants Acadia's and Davis's and non-party Stankovic's wrongful conduct, Plaintiffs have suffered damages in connection with their transactions in Acadia common stock as described above and to be proven at the time of trial.

## SEVENTH CAUSE OF ACTION

### Violations of Cal. Civil Code § 1709

### Against All Defendants

338. Plaintiffs repeat and re-allege each and every allegation contained in each of the foregoing paragraphs as if fully set forth herein.

339. This cause of action is brought against Defendants Acadia and Davis for violations of California Civil Code § 1709.

340. During the relevant period, Defendants Acadia and Davis and non-party Stankovic, individually and in concert with others, participated in the fraudulent scheme set forth herein and made, or caused Acadia to make, statements which, at the time and in light of the circumstances in which they were made, were materially false

and misleading representations of fact, or omitted to state material facts which they had a duty to disclose to Plaintiffs and the investing public.

341. Defendants Acadia and Davis and non-party Stankovic had a duty to disclose the truth because where a person or entity voluntarily discloses information, it must disclose the whole truth; when a person or entity makes a representation and new information makes that earlier representation misleading or untrue, it must disclose the whole truth; and when a person or entity makes a partial disclosure and conveys a false impression, it must disclose the whole truth.

342. Defendants Acadia and Davis and non-party Stankovic voluntarily disclosed information concerning Acadia that disclosed only partial, deceptive information and half-truths. Accordingly, Defendants Acadia and Davis and non-party Stankovic had a duty to tell the whole truth.

343. When making the false and misleading representations set forth herein, Defendants Acadia and Davis and non-party Stankovic knew they were false or made them with reckless disregard for their truth.

344. Plaintiffs reasonably and justifiably relied on such misrepresentations. But for Defendants Acadia's and Davis's and non-party Stankovic's misrepresentations, Plaintiffs would not have purchased Acadia common stock, or if they had purchased such common stock, they would not have done so at the artificially inflated prices that they paid.

345. As a direct and proximate cause of Defendants Acadia's and Davis's and non-party Stankovic's conduct, Plaintiffs have suffered damages in connection with their transactions in Acadia common stock as described above and to be proven at the time of trial.

///

346. Defendant Acadia's and Davis's and non-party Stankovic's wrongful conduct, as described above, was fraudulent, malicious, reckless, willful, and was directed at the general investing public. Accordingly, punitive damages, in addition to compensatory damages, are appropriate to deter fraudulent conduct of this kind.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request relief and judgment, as follows:

a. Awarding compensatory damages against Defendants for all damages sustained as a result of Defendants' and non-party Stankovic's wrongdoing, in an amount to be proven at trial, including pre-judgment and post-judgment interest thereon;

b. Awarding Plaintiffs punitive damages for Defendants' and non-party Stankovic's intentional, malicious, willful, and wanton conduct as detailed above;

c. Awarding Plaintiffs their expenses, attorneys' fees, and costs; and

d. Such other and further relief as the Court may deem just and proper.

///

///

///

///

///

///

///

///

///

## JURY DEMAND

Plaintiffs hereby demand a trial by jury as to all issues so triable.

Dated: March 7, 2024

Respectfully submitted,

**ROLNICK KRAMER SADIGHI LLP**
Lawrence M. Rolnick
Marc B. Kramer
Michael J. Hampson
Nicole T. Castiglione

**DUCKOR METZGER & WYNNE,**
A Professional Law Corporation

By: */s/ John C. Wynne*

Attorneys for Plaintiffs
ALGER DYNAMIC OPPORTUNITIES FUND, ALGER SICAV – ALGER DYNAMIC OPPORTUNITIES FUND, ALGER SICAV – ALGER WEATHERBIE SPECIALIZED GROWTH FUND, ALGER WEATHERBIE SPECIALIZED GROWTH FUND, ALGER WEATHERBIE SPECIALIZED GROWTH PORTFOLIO, WEATHERBIE GROWTH FUND, L.P., and WEATHERBIE LONG/SHORT FUND, L.P.

JS 44 (Rev. 04/21)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Alger Dynamic Opportunities Fund, et al.

**(b)** County of Residence of First Listed Plaintiff: New York County, NY
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
John C. Wynne, Esq., Duckor Metzger & Wynne, 101 West Broadway, Suite 1700, San Diego, California, 92101

## DEFENDANTS

Acadia Pharmaceuticals Inc. and Stephen R. Davis

County of Residence of First Listed Defendant: San Diego County, CA
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question *(U.S. Government Not a Party)*
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)* *(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

**CONTRACT**
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability
- ☐ 196 Franchise

**REAL PROPERTY**
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**TORTS**

PERSONAL INJURY
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Personal Injury - Medical Malpractice

PERSONAL INJURY
- ☐ 365 Personal Injury - Product Liability
- ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
- ☒ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**CIVIL RIGHTS**
- ☐ 440 Other Civil Rights
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 445 Amer. w/Disabilities - Employment
- ☐ 446 Amer. w/Disabilities - Other
- ☐ 448 Education

**PRISONER PETITIONS**

Habeas Corpus:
- ☐ 463 Alien Detainee
- ☐ 510 Motions to Vacate Sentence
- ☐ 530 General
- ☐ 535 Death Penalty

Other:
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition
- ☐ 560 Civil Detainee - Conditions of Confinement

**FORFEITURE/PENALTY**
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 690 Other

**LABOR**
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Management Relations
- ☐ 740 Railway Labor Act
- ☐ 751 Family and Medical Leave Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Employee Retirement Income Security Act

**IMMIGRATION**
- ☐ 462 Naturalization Application
- ☐ 465 Other Immigration Actions

**BANKRUPTCY**
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

**INTELLECTUAL PROPERTY RIGHTS**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 835 Patent - Abbreviated New Drug Application
- ☐ 840 Trademark
- ☐ 880 Defend Trade Secrets Act of 2016

**SOCIAL SECURITY**
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
- ☐ 375 False Claims Act
- ☐ 376 Qui Tam (31 USC 3729(a))
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 480 Consumer Credit (15 USC 1681 or 1692)
- ☐ 485 Telephone Consumer Protection Act
- ☐ 490 Cable/Sat TV
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 890 Other Statutory Actions
- ☐ 891 Agricultural Acts
- ☐ 893 Environmental Matters
- ☐ 895 Freedom of Information Act
- ☐ 896 Arbitration
- ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- ☐ 950 Constitutionality of State Statutes

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing ***(Do not cite jurisdictional statutes unless diversity)***:
15 U.S.C. 78a et seq.

Brief description of cause:
Violations of the Securities Exchange Act of 1934, the common law, and California statutory law

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

**DEMAND $**

CHECK YES only if demanded in complaint:
**JURY DEMAND:** ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions)*: JUDGE William Q. Hayes DOCKET NUMBER 3:21-cv-00762-WQH-MSB

DATE: March 7, 2024

SIGNATURE OF ATTORNEY OF RECORD: /s/ John C. Wynne, Esq.

**FOR OFFICE USE ONLY**

RECEIPT # ____ AMOUNT ____ APPLYING IFP ____ JUDGE ____ MAG. JUDGE ____

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)** **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b)** **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c)** **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.** **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked**.** (See Section III below**; NOTE: federal question actions take precedence over diversity cases.**)

**III.** **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.** **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.** **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statute.

**VI.** **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

**VII.** **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.** **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.