UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALGER DYNAMIC OPPORTUNITIES FUND; ALGER SICAV - ALGER DYNAMIC OPPORTUNITIES FUND; ALGER SICAV - ALGER WEATHERBIE SPECIALIZED GROWTH FUND; ALGER WEATHERBIE SPECIALIZED GROWTH FUND; ALGER WEATHERBIE SPECIALIZED GROWTH PORTFOLIO; WEATHERBIE GROWTH FUND, L.P.; and WEATHERBIE LONG/SHORT FUND, L.P., | Case No.: 24-cv-451-WQH-MSB **ORDER** |

                                                    Plaintiffs,

v.

ACADIA PHARMACEUTICALS INC.; and STEPHEN R. DAVIS,

                                                    Defendants.

HAYES, Judge:

   The matter before the Court is the Motion to Dismiss the Complaint filed by Defendants Acadia Pharmaceuticals, Inc. and Stephen R. Davis. (ECF No. 26.)

1

## I.   PROCEDURAL BACKGROUND

On March 7, 2024, Alger Dynamic Opportunities Fund, Alger SICAV – Alger Dynamic Opportunities Fund, Alger SICAV – Alger Weatherbie Specialized Growth Fund, Alger Weatherbie Specialized Growth Fund, L.P., and Weatherbie Long/Short Fund, L.P., (collectively, "Plaintiffs") initiated this action by filing the Complaint (the "Complaint"). (ECF No. 1, Compl.) The Complaint alleges Defendants Acadia Pharmaceuticals, Inc. ("Acadia") and Stephen R. Davis ("Davis") (collectively, "Defendants") violated federal securities laws by misleading investors regarding the likelihood of Food & Drug Administration ("FDA") approval for a drug developed by Acadia to artificially inflate the market price of Acadia's securities.

On May 24, 2024, Defendants filed the Motion to Dismiss the Complaint. (ECF No. 26.) On July 10, 2024, Plaintiffs filed a Response in opposition to the Motion to Dismiss. (ECF No 29.) On August 7, 2024, Defendants filed a Reply. (ECF Nos. 30 & 31.)

## II.   JUDICIAL NOTICE AND INCORPORATION-BY-REFERENCE

Defendants request the Court take judicial notice and/or incorporate-by-reference thirty-eight documents attached as exhibits to Defendants' Motion to Dismiss. (ECF No. 26-41.) The exhibits include Acadia press releases and presentation transcripts, Defendants' U.S. Securities and Exchange Commission ("SEC") filings, FDA meeting minutes, email chains, and letters, and news articles and reports. Plaintiffs do not oppose Defendants' request for judicial notice of Exhibits 1–38. (ECF No. 29-1 at 3.) Thus, the unopposed request for judicial notice of documents that have been incorporated by reference (Exhibits 1, 2, 5, 17, 18, 20, 22, and 24–34) and documents that are "the types of documents the Court may take judicial notice of [(Exhibits 1–4, 6–25, 28–32, and 34–38)]" (*id.*) is granted. Defendants and Plaintiffs agree "the Court need not consider any Exhibit for the truth of its contents." (*See* ECF Nos. 31 at 2 & 29-1 at 3.)

## III.   ALLEGATIONS IN THE COMPLAINT

Acadia is a Delaware biopharmaceutical company with common stock trading on

the Nasdaq Global Selection Market under the ticker symbol "ACAD." (Compl. ¶ 28.) Davis has served as "Acadia's President, CEO, and a member of its Board of Directors" since 2014. *Id.* ¶ 29. Srdja R. Stankovic ("Stankovic") is a relevant non-party. *Id.* ¶ 30. "Stankovic joined Acadia in 2015 and was its President and Head of Research and Development during the relevant period. Stankovic retired from Acadia on December 31, 2022, and passed away on December 29, 2023." *Id.*

Pimavanserin—an antipsychotic approved for the treatment of Parkinson's disease psychosis by the FDA in April 2016"—is Acadia's "only commercial product." *Id.* ¶¶ 39–40. "Acadia believes pimavanserin could treat dementia-related psychosis ("DRP") more generally, including dementia from Alzheimer's disease, dementia from Lewy bodies, vascular dementia, and frontotemporal dementia" and has been "working to expand [pimavanserin's] label … for over a decade." *Id.* ¶¶ 42, 46. If pimavanserin were approved to treat DRP generally it "could generate Acadia over … $3 billion in sales worldwide over the next decade." *Id.* ¶ 45.

To expand a drug's usage by changing its "label," "a company must submit an efficacy supplement, known as a Supplemental New Drug Application ("sNDA"), to the FDA." *Id.* ¶ 47. If the sNDA concerns a drug deemed to treat "a serious condition" and "provide a significant improvement in the safety or effectiveness of the drug in treating, preventing, or diagnosing a particular condition," the application will receive priority review—requiring the FDA to "take official action within 6 months." *Id.* ¶ 48. If the sNDA is not granted priority review it will receive standard review—which requires the FDA to take official action within 10 months. *Id.*

The FDA meets with the applicants several times throughout the sNDA process, which culminates when the FDA prepares an official action letter and action package communicating its final decision. *Id.* ¶¶ 49–54. "If the FDA does not approve the drug, it sends the applicant a 'Complete Response Letter' or 'CRL,' which outlines the deficiencies found by the review team and any recommendations for corrective action." *Id.* ¶ 54.

In November 2013, Acadia initiated a Phase II medical study (the "-019 Study") to "examine the efficacy and safety of pimavanserin as a treatment for patients with Alzheimer's disease psychosis ('ADP')." *Id.* ¶ 55. In December 2016, "Acadia announced positive top-line results from the -019 Study." *Id.* ¶ 58. "Unbeknownst to the market however, the -019 Study was poorly designed and inadequately controlled, and therefore could never serve as a basis to expand pimavanserin's use." *Id.* ¶ 59. In fact, the FDA highlighted these design flaws when denying the pimavanserin sNDA on April 5, 2021, stating:

> There was no type I error control for any of the secondary endpoints. Approximately 25% of the enrolled subjects did not meet the study's eligibility criteria. Approximately 20% of the study subjects took prohibited concomitant medications during the study. There were also problems with obtaining informed consent from legally authorized representatives before subjects were enrolled in the study that, although not directly influencing the results of the study, indicate that the study was not well-conducted.

*Id.* "Acadia, Davis, and Stankovic withheld this information from the market and, by doing so, misled investors that Acadia was steadily laying the groundwork to expand pimavanserin's use." *Id.* ¶ 60.

In May of 2017, "[f]following completion of the -019 Study, Acadia had a private, 'End of Phase II Meeting' with the FDA." *Id.* ¶ 61. During this meeting, Acadia purportedly proposed a plan for a single-Phase III study—later dubbed the Harmony Study—to support approval for the expansion of pimavanserin's label "to include the treatment of dementia-related psychosis broadly." *Id.* ¶¶ 61, 63, 70. "At the meeting, the FDA agreed that 'the treatment of hallucinations and delusions in dementia-related psychosis [was] a potentially approvable indication'" but raised concerns regarding the "design and population" and the "timing and endpoints" of the Harmony Study. *Id.* ¶ 63. Specifically, "[w]ith respect to the population of the Harmony Study, the FDA agreed with Acadia's proposed population 'as long as subjects are stratified by their current clinical diagnosis (as proposed). Labeling will reflect the actual composition and

response of patients enrolled in the study.'" *Id.* ¶ 65. The FDA's meeting minutes thus showcase the FDA's warning to Acadia "that pimavanserin's approval to treat dementia-related psychosis was dependent not on the overall results of the Harmony Study, but the specific response in each stratified subgroup of dementia patients." *Id.* ¶ 66. The FDA also stated that, "if Acadia 'wish[es] to rely on a single well controlled study for [its] sNDA filing, the findings must be very persuasive. This means statistically significant with a very small probability of Type 1 error and a finding that is clinically meaningful.'" *Id.* ¶ 67.

In October of 2017, Acadia announced that "the FDA had granted pimavanserin a Breakthrough Therapy Designation, which is designed to facilitate and expedite the development and review of new drugs that address an unmet medical need in the treatment of a serious condition" and that it had initiated the Harmony Study to evaluate pimavanserin for the treatment of dementia-related psychosis. *Id.* ¶¶ 69–70. "The Harmony Study planned to enroll 360 patients" with symptoms of the five most common forms of DRP. *Id.* ¶¶ 71–72.

"On September 9, 2019, Acadia issued a press release announcing that the Harmony Study had 'met its primary endpoint, demonstrating a highly statistically significant longer time to relapse of psychosis compared to placebo in a planned interim efficacy analysis.'" *Id.* ¶ 74. That same day, on a call with investors, Stankovic stated "I would also like to remind you that at the end of Phase II meeting with [the] FDA, we confirmed that for our [sNDA] submission in DRP, we could rely on a single, well-controlled study whose results were both statistically and clinically very persuasive." *Id.* ¶ 76 (emphasis omitted).

"Defendants' and Stankovic's statements created a misimpression in the market that the FDA had agreed to evaluate pimavanserin based on the results from the Harmony Study as a whole and would not be taking into account the composition of, or response in, any particular dementia subgroup"—which was not the case. *Id.* ¶ 78 (emphasis omitted). The statements also left the false impression that "all the patients enrolled in the

Harmony Study responded similarly to pimavanserin, regardless of their particular type of dementia." *Id.* ¶ 79. In reports drafted after the press release and phone call, several analysts indicated this impression, making statements such as, "'mgmt. commentary suggests that efficacy was similar across all subtypes.'" *Id.* Defendants were, in fact, aware "that the Harmony Study was fundamentally flawed and could not possibly support a broad indication to treat dementia-related psychosis." *Id.* ¶ 80.

Because "[t]he market was not privy to the design of or results from the Harmony Study" "the price of Acadia common stock surged by more than 50%" between September 6 and September 9, 2019. *Id.* ¶ 83. "Defendants and Stankovic seized upon Acadia's inflated stock price to raise hundreds of millions of dollars in a follow-on stock offering while, at the same time, Davis and Stankovic offloaded tens of millions of dollars of their own stock for a huge profit." *Id.* ¶ 84. Specifically, the follow-on stock offering "generat[ed] Acadia $287.5 million in gross proceeds." *Id.* ¶ 86. And "[d]uring the relevant period, Davis sold" $24,771,568 worth of common stock, while Stankovic sold $19,095,304. *Id.* ¶¶ 87–88. These sales were highly unusual, as neither Davis nor Stankovic had sold "a single share of Acadia common stock before October 2019." *Id.*

On December 4, 2019, at the 12th Annual meeting on Clinical Trials on Alzheimer's Disease, "Acadia presented certain topline results from the Harmony Study" and Davis revealed that "Acadia was 'planning to meet with the FDA regarding an sNDA for pimavanserin as a treatment for [dementia-related psychosis] in the first half of 2020.'" *Id.* ¶¶ 90, 94, 104. During the presentation, Acadia's Senior Director of Clinical Research acknowledged that the Harmony Study was "'not powered to look at [the subcategories] in any meaningful way'" due to the "'extremely small numbers of patients'" in some categories. *Id.* ¶ 102.

Due to Acadia's framing, "the market viewed the results presented from the Harmony Study positively" and, as a result of the misimpression "that the FDA would be evaluating the results from the Harmony Study as a whole and not considering the data from any individual dementia subgroup," investors continued to believe the FDA would

approve the pimavanserin sNDA. *Id.* ¶¶ 105, 108.

Defendants and Stankovic continued to reinforce this misimpression after the December 4th presentation. In February 2020, Stankovic stated: "The pivotal [Harmony Study] results will be the basis of the sNDA submission, which was previously agreed upon at the end of Phase II meeting." *Id.* ¶ 111. On May 7, 2020, Stankovic stated:

> [W]e successfully completed a pre-sNDA meeting with the FDA and confirm that the pivotal data from our [Harmony Study], together with the confirmatory and supportive results from [the -020 Study and -019 Study] will all support the submission of an sNDA for pimavanserin in [DRP] …. Our sNDA preparation remains firmly on track. As previously announced, we plan to submit the sNDA this summer. We expect a priority review with a potential approval for DRP around year-end.

*Id.* ¶ 116. Shortly after, Stankovic explained:

> [W]e had our pre-sNDA meeting in the first quarter. The feedback there was very consistent with what we heard ... in the Phase II meeting. The FDA confirmed that the studies conducted can support an sNDA submission with HARMONY as the pivotal study, and our Phase II Alzheimer's disease study and Phase III Parkinson's.

*Id.* ¶ 118.

On July 20, 2020, Acadia issued a press release explaining that the FDA had accepted its sNDA filing and had "assigned the pimavanserin to a standard review track." *Id.* ¶ 123. "[D]espite being told by the FDA just days earlier that the pimavanserin sNDA did not appear to provide a 'significant improvement in safety or effectiveness (e.g., evidence of safety and effectiveness in a new subpopulation),' Acadia told investors that the FDA 'has not identified any potential review issues.'" *Id.*

From June 15, 2020, to February 25, 2021, Defendants and Stankovic "continued to string investors along by misleading them that the pimavanserin sNDA would be approved by the FDA." *Id.* ¶ 124. Specifically, Defendants and Stankovic made several statements referencing "Acadia's purported agreement with the FDA while omitting that the FDA would be specifically analyzing the 'actual composition and response of patients' in each dementia subgroup." *Id.* Additionally, in a series of public statements,

Defendants and Stankovic characterized the results of the three studies supporting the sNDA as "positive" and "strong," expressed "confiden[ce]" in the studies' data and in the potential for FDA approval and asserted that FDA review was progressing. *Id.* ¶¶ 125–26, 128, 130, 131, 133–34, 136, 138, 140–41, 143, 145. All the while, Defendants and Stankovic omitted "the negative subgroup results from the Harmony Study and the fact that [the studies] were poorly designed and therefore unlikely to serve as a basis to approve the pimavanserin sNDA." *Id.* ¶ 124.

For example, on August 19, 2020, when asked how practicing physicians view different patient groups when contemplating DRP treatment, Davis replied:

> [T]he "subtypes" of dementia are very difficult to diagnose. They overlap many times. And so it's a little bit of an artificial distinction to say someone has Alzheimer, dementia with Lewy bodies or vascular dementia, et cetera. ***And so -- and one of the advantages, of course, pursuing dementia-related psychosis broadly, which is just, as a reminder, we got a clear agreement from -- with the FDA at our end of Phase II meeting, and we executed the plan that we agreed to with them.*** One of the advantage[s] is it picks up what's referred to as dementia not otherwise specified, that's quoted as not otherwise specified.... [T]he fact that so many patients are not specified other than beyond just saying dementia, is again, a reflection of the fact that these categories are very difficult to diagnose.... And with the indication that we are seeking, it won't matter. They won't have to try to make a determination, whether it's Alzheimer's or vasco dementia or something else.

*Id.* ¶ 128. At a later presentation on September 14, 2020, Stankovic stated, "[w]e continue to be very confident, as I said, in our data. It's very consistent with what we've been finding as we have been adding the new information, both in terms of efficacy and safety. We have a strong package and are currently focusing on facilitating review toward approval." *Id.* ¶ 131 (emphasis omitted). Additionally, when asked what to make of the FDA's decision not to grant priority review, Davis responded:

> So let me just start by saying we remain highly confident in both the efficacy and safety data supporting our submission. **And of course, at this point, we're focused on facilitating the FDA's review, which, as I mentioned, remains on track…. at our end of Phase II meeting, we went to the FDA. We said we think we have demonstrated sufficient efficacy in the**

**acute setting. We'd like you to agree to 3 things: one, that we studied DRP generally. They agreed to that. That was actually a very short discussion.** Two, that we run a relapse-prevention study now to demonstrate the -- not only that we can stabilize patient symptoms, but that we get a durable effect over time. And then three, that we -- that a single relapse prevention study serve as the basis of approval, together with the other supporting acute studies we've done. And they've agreed to all 3 of those. That's documented in our minutes. **So fast forward to today, we then executed the exact plan that we laid out for them. And again, that underlines the confidence we have in the potential for approval in DRP.**

*Id.* ¶ 136 (emphasis addedd).

On March 8, 2021, "Acadia issued a press release providing an update on the pimavanserin sNDA" and "[t]he market began to learn the truth." *Id.* ¶ 148. "The press release revealed that ... the FDA had 'identified deficiencies that preclude discussion of labeling and post-marketing requirements/commitments at this time.'" *Id.* "Acadia reassured investors that it 'plan[ned] to work with the FDA to learn the nature of the deficiencies and seek to resolve them'" and reiterated their confidence in their data and the likelihood of FDA approval. *Id.* Analysts and investors were taken by surprise, with one analyst describing the FDA's feedback as "'a major surprise and a disappointment to say the least' as 'nearly all prevailing discussion on [Acadia] was around anticipate launch trajectory and not approval.'" *Id.* ¶ 152.

Then, "on April 5, 2021, Acadia issued a press release announcing that it had received a CRL from the FDA indicating that the pimavanserin sNDA 'cannot be approved in its present form.'" *Id.* ¶ 155. The press release went on to state:

Despite prior agreements with the Division of Psychiatry regarding the pivotal Phase 3 HARMONY study design targeting a broad DRP patient population analyzed as a single group, *the Division, in the CRL, cited a lack of statistical significance in some of the subgroups of dementia, and insufficient numbers of patients with certain less common dementia subtypes as lack of substantial evidence of effectiveness to support approval*.

*The Division also stated in the CRL that it considers the Phase 2 Alzheimer's disease psychosis study -019, a supportive study in the sNDA*

***filing, to not be adequate and well controlled, citing that it was a single center study with no type I error control of secondary endpoints in which certain protocol deviations occurred.*** The Company believes these observations impact neither the positive results on the study's primary endpoint, nor the study's overall conclusions of efficacy.

*Id.*

In response to the announcements, Acadia's common stock price fell $20.76 per share (45.35%) on March 9, 2021, and an additional $4.95 (19.34%) by April 6, 2021.

After receiving the FDA's feedback on April 5th, "Acadia did not publicly release a copy of the CRL," misleading "investors that the pimavanserin sNDA could still be approved for a broad indication for [DRP]." *Id.* ¶ 158. In fact, the CRL clearly stated that "neither the Harmony Study nor the -019 Study could" be used for sNDA approval, and the FDA had raised concerns regarding "whether 'dementia-related psychosis is a useful construct for a potential indication for pimavanserin.'" *Id.* ¶ 161.

On August 4, 2021, during a conference call, Davis stated that the FDA had "reaffirmed their stated position in the CRL that pimavanserin should be studied by individual subgroups of dementia" and "recommended [that the] 'best path forward' was to conduct additional clinical studies – each of which could span several years – in each of the dementia subgroups for which Acadia was seeking an indication to treat." *Id.* ¶¶ 163, 165. This shocked investors as it was "directly contrary to what Acadia, Davis, and Stankovic had been telling investors for years and completely undercut the utility of the Harmony Study." *Id.* ¶ 165. However, Stankovic also stated that the FDA had provided Acadia with another option to "re-submit the pimavanserin sNDA for a broad indication of dementia-related psychosis after conducting additional analyses of the data and results from the Harmony Study." *Id.* The "market remained hopeful" that Acadia would proceed with this option. *Id.*

On December 20, 2021, "Acadia issued a press release announcing that it was planning to resubmit its sNDA for pimavanserin 'for the treatment of hallucinations and delusions associated with dementia focused on Alzheimer's disease psychosis (ADP),'

rather than for the broad treatment of dementia-related psychosis." *Id.* ¶ 166. This news caused Acadia's stock to drop "more than 20%." *Id.* ¶ 167.

In sum, the Complaint alleges that from September 9, 2019, to April 5, 2022, and beyond, Acadia, Davis, and Stankovic made several false and misleading statements about the Harmony Study and Acadia's agreement with the FDA. *Id.* ¶ 173. Specifically,

> [i]t was materially misleading for Stankovic to discuss the End of Phase II Meeting and Acadia's agreement with the FDA while omitting a material term of that agreement: that the FDA would be specifically analyzing the "actual composition and response of patients" in each dementia subgroup in determining whether to approve pimavanserin for a broad indication for dementia-related psychosis.

*Id.* ¶ 176. The Complaint alleges it was also "materially misleading for [Defendants] to" (1) "discuss the Harmony Study and -019 Study while omitting the negative subgroup results from the Harmony Study;" and (2) fail to disclose that "the Harmony Study and -019 Study were poorly designed and therefore unlikely to serve as a basis to approve the pimavanserin sNDA." *Id.* Additionally, the Complaint alleges "Acadia and Davis repeatedly and falsely certified to investors that the Company had effective internal disclosure controls and procedures." *Id.* ¶ 226.

Plaintiffs are entities that purchased Acadia common stock "at a time when … [Defendants] were misrepresenting the Harmony Study, the terms and full extent of Acadia's agreement with the FDA about the pimavanserin sNDA, and the effectiveness of Acadia's internal disclosure controls and procedures." *Id.* ¶ 13. As a result, "Plaintiffs suffered significant losses." *Id.* ¶ 14. Plaintiffs bring six claims: (1) violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder against all Defendants; (2) violations of Section 20(a) of the Exchange Act against Defendant Davis; (3) violations of Section 18(a) of the Exchange Act against all Defendants; (4) common law fraud against all Defendants; (5) common law negligent misrepresentation against all Defendants; and (6) violations of Cal. Civil Code § 1709 against all Defendants. Plaintiffs request damages, interest, fees, and costs. *Id.* at p. 127.

24-cv-451-WQH-MSB

1    **IV.    MOTION TO DISMISS**

2      **A. Contentions**

3       Defendants contend that "Plaintiffs fail to state a claim under Section 10(b) of the

4    Exchange Act" and that "when a statement-by-statement analysis is conducted ... it's

5    clear that nothing Defendants said is rendered materially false or misleading by any

6    alleged omission." (ECF No. 26 at 9.) "Further Plaintiffs fail to plead other essential

7    elements of their Section 10(b) claim: scienter, and loss causation." *Id.* at 10. Defendants

8    contend that "[b]ecause Plaintiffs fail to plead a primary violation of Section 10(b), their

9    Section 20(a) claim also fails." *Id.* at 33. Defendants also contend that Plaintiffs' Section

10   18(a) claim (1) is barred by the applicable statute of limitations or (2) fails because

11   Plaintiffs do not appropriately allege essential elements of a Section 18(a) claim, such as

12   that "they 'actually relied' on any false or misleading statement in Acadia's SEC filings."

13   *Id.* at 9. Lastly, Defendants contend that "Plaintiffs' state and common law fraud claims

14   are pre-empted under the Securities Litigation Uniform Standards Act of 1933

15   ('SLUSA')." *Id.*

16       Plaintiffs contend that "this Court already has rejected nearly all of the arguments

17   that Defendants make in their Motion" after "having issued three comprehensive

18   decisions in a related class action, *City of Birmingham Relief & Retirement System v.*

19   *Acadia Pharmaceuticals, Inc. et al*, Case No. 3:21-cv-00762- WQH-MSB (S.D. Cal.) (the

20   'Class Action')." (ECF No. 29 at 8.) Plaintiffs contend that their Section 10(b) claims

21   should be permitted to proceed because the Complaint "allege[s] [the] same

22   misstatements were false and misleading for the same reasons this Court has found

23   already on three separate occasions," "pleads the same allegations of scienter that the

24   Court has already twice upheld in the Class Action," and "satisfies the Ninth Circuit's

25   permissive standards for pleading loss causation." *Id.* at 8–9, 26.

26       Additionally, Plaintiffs contend that, because "Defendants offer no independent

27   arguments for dismissal, ... if Plaintiffs' Section 10(b) claims are permitted to proceed ...

28   Plaintiffs' 20(a) claim should also proceed," *id.* at 28 n. 10; "Plaintiffs' claim under

Section 18 of the Exchange Act was filed in accordance with 28 U.S.C. [§] 1658(b), which extended the statute of limitations to two years and the statute of repose to five years," and "[t]he Complaint [ ] pleads actual reliance in spades," *id.* at 8–9; and the "California common law and statutory claims are not barred by [SLUSA] because that Act does not apply to an individual action, like this one, that is neither 'joined' nor 'consolidated' with the Class Action," *id.* at 10.

**B. Legal Standard**

Rule 12(b)(6) of the Federal Rules of Civil Procedure permits dismissal for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To state a claim for relief, a pleading "must contain ... a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Dismissal under Rule 12(b)(6) "is proper only where there is no cognizable legal theory or an absence of sufficient facts alleged to support a cognizable legal theory." *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* However, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (alteration in original) (quoting Fed. R. Civ. P. 8(a)). A court is not "required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001). "In sum, for a complaint to survive a motion to dismiss, the non-conclusory factual content, and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969

(9th Cir. 2009).

Where a plaintiff alleges fraud or misrepresentation in a private securities-fraud lawsuit, the complaint "must [also] satisfy the dual pleading requisites of Federal Rule of Civil Procedure 9(b) and the [Private Securities Litigation Reform Act ("PSLRA")]." *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 701 (9th Cir. 2012). Under Rule 9(b), a complaint "must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). The pleader must "identify the who, what, when, where, and how of the misconduct charged, as well as what is false or misleading about the purportedly fraudulent statement, and why it is false." *Davidson v. Kimberly-Clark Corp.*, 873 F.3d 1103, 1110 (9th Cir. 2017), *as corrected* (Mar. 12, 2018) (quoting *Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1055 (9th Cir. 2011)). "To comply with Rule 9(b), allegations of fraud must be specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *Bly-Magee v. California*, 236 F.3d 1014, 1019 (9th Cir. 2001) (citation omitted).

Under the PSLRA, a plaintiff must "state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, *i.e.*, the defendant's intention to deceive, manipulate, or defraud." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 313 (2007). To adequately allege scienter, a complaint's allegations must give "rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2)(A). To adequately allege loss causation, plaintiffs must show "that a misrepresentation that affected the integrity of the market price *also* caused a subsequent economic loss." *Erica P. John Fund v. Halliburton*, 563 U.S. 804, 812 (2011).

**C. Discussion**

### 1. Section 10(b) Claims

"To state a federal securities fraud claim, in violation of § 10(b), a plaintiff must show: '(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a

connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'" *ESG Cap. Partners, LP v. Stratos*, 828 F.3d 1023, 1032 (9th Cir. 2016) (quoting *Thompson v. Paul*, 547 F.3d 1055, 1061 (9th Cir. 2008)).

Defendants contend that Plaintiffs' Section 10(b) claim should be dismissed because Plaintiffs (1) challenge statements that are inactionable as a matter of law; (2) fail to plead with particularity a materially false or misleading statement; (3) fail to plead a strong inference of scienter; and (4) fail to adequately allege lose causation.

### i. <u>Material Misrepresentation or Omission</u>

"To prevail on a § 10(b) claim, a plaintiff must show the defendant made a statement that was '*misleading* as to a *material* fact.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988)). "Falsity is alleged when a plaintiff points to defendant's statements that directly contradict what the defendant knew at that time." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008 (9th Cir. 2018). "Even if a statement is not false, it may be misleading if it omits material information." *Id.* at 1008–09. "[A] misrepresentation or omission is material if there is a substantial likelihood that a reasonable investor would have acted differently if the misrepresentation had not been made or the truth had been disclosed." *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 946 (9th Cir. 2005).

"Pure omissions are not actionable under Rule 10b–5(b)." *Macquarie Infrastructure Corp. v. Moab Partners, L. P.*, 601 U.S. 257, 258 (2024). However, "'representations that state the truth only so far as it goes, while omitting critical qualifying information,'" or half-truths, are actionable. *Id.* (quoting *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 188 (1989)).

Defendants contend that "no challenged statement … was materially false or misleading when made." (ECF 26-1 at 12.) More specifically, Defendants contend that (1) they "concealed nothing about priority review"; (2) "[t]he Labeling Statement

omission d[id] not render any statement materially false or misleading when made"; and (3) "[t]he design and results of Harmony and 019 were disclosed" or otherwise did not render statements false or misleading.[1]

The Complaint alleges two categories of "false and misleading statements and omissions" by Defendants and non-party Stankovic:[2] statements and omissions concerning (1) Acadia's agreement with the FDA and (2) the effectiveness of Acadia's internal disclosure controls and procedures. (Compl. ¶¶ 173–231.)

Plaintiffs allege that the CRL the FDA sent Defendants on April 5, 2021, as described in Acadia's press release that day, suggests the FDA based its decision not to approve the sNDA in part on "a lack of statistical significance in some of the subgroups of dementia, and insufficient numbers of patients with certain less common dementia

---

[1] Defendants also contend that "when evaluating falsity, the Court 'must do a statement-by-statement analysis.'" (ECF No. 26-1 at 18 (citing *In re Eventbrite, Inc. Sec. Litig.*, No. 5:18-cv-02019-EJD, 2020 WL 2042078, at \*10 n.5 (N.D. Cal. Apr. 28, 2020)).) *In re Eventbrite*, relies solely on *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1061 (9th Cir. 2008) in making this assertion. *Metzler* found "[t]he PSLRA also requires that 'the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.'" 540 F.3d at 1061 (citing 15 U.S.C. § 78u–4(b)(1)). The Court does not read *Metzler* as requiring the Court to conduct a "statement-by-statement analysis" of each of the forty-seven allegedly false or misleading statements identified in the Complaint at this stage in the proceedings. Instead, as discussed below, it is sufficient for the Court to identify the statements it finds adequately allege a material misrepresentation or omission.

[2] Defendants contend that neither Acadia nor Davis can be liable under Section 10(b) for Stankovic's statements, citing *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135 (2011). (ECF No. 26-1 at 17 n.5.) Plaintiffs allege that "each and every misstatement or omission made or approved by Stankovic, as well as the facts supporting Stankovic's scienter, are attributable to Acadia, as Stankovic served as the Company's President and Head of Research and Development during the relevant period." (Compl. ¶ 30.) The Court finds that Plaintiffs do not allege Defendants were the "makers" of Stankovic's statements, as in *Janus*, but rather that Plaintiffs allege Defendants are responsible for Stankovic's statements under *respondeat superior*. "Under the doctrine of respondeat superior, 'the principal who acts through the agent ... is secondarily liable' for the agent's violation, 'assuming the agent is acting within the scope of his agency.'" *See Wang v. Zymergen Inc.*, No. 21-CV-06028-PCP, 2024 WL 3811844, at \*12 (N.D. Cal. Aug. 14, 2024) (quoting *Hollinger v. Titan Cap. Corp.*, 914 F.2d 1564, 1578 (9th Cir. 1990)). The Court finds that, at this stage in the proceedings, Plaintiffs have adequately alleged that Defendants are liable for Stankovic's misstatements and omissions under the doctrine of *respondeat superior*.

subtypes." *Id.* ¶ 155; ECF No. 26-35 at 2. The Complaint alleges that Defendants and non-party Stankovic repeatedly made statements asserting that the FDA "would not be taking into account the composition of, or response in, any particular dementia subgroup" when evaluating pimavanserin for a broad DRP indication.

For example, on August 19, 2020, Davis stated:

> [O]ne of the things we hear very consistently among … physicians generally is … [that] the "subtypes" of dementia are very difficult to diagnose. They overlap many times. And so it's a little bit of an artificial distinction to say someone has Alzheimers, dementia with Lewy bodies or vascular dementia, et cetera. ***And so -- and one of the advantages, of course, pursuing dementia-related psychosis broadly, which is just, as a reminder, we got a clear agreement from -- with the FDA at our end of Phase II meeting, and we executed the plan that we agreed to with them.*** One of the advantage is it picks up what's referred to as dementia not otherwise specified, that's quoted as not otherwise specified. ... [T]he fact that so many patients are not specified other than beyond just saying dementia, is again, a reflection of the fact that these categories are very difficult to diagnose. ... And with the indication that we are seeking, it won't matter. They won't have to try to make a determination, whether it's Alzheimer's or vasco dementia or something else.
>
> ….
>
> [T]he sNDA that we've submitted includes the [relapse prevention Harmony Study] … but also includes … acute data [from the -020 and -019 Studies] …. So we have both in the submission. …
>
> …. [W]e agreed with the FDA on that approach at the [end-of-Phase II] meeting and agreed on the plan for Phase III, and then we've executed that plan.

*Id.* ¶ 199. On November 17, 2020, Davis stated:

> [O]ur sNDA submission included an efficacy package, which was agreed upon with the FDA at the [end-of-Phase II meeting] ….
>
> …. [A]t our [end-of-Phase II] meeting, we went to the FDA. We said … [w]e'd like you to agree to 3 things: one, that we studied DRP generally. They agreed to that. That was actually a very short discussion. Two, that we run a relapse-prevention study now to demonstrate … a durable effect over

time. And then three, that … a single relapse prevention study serve as the basis of approval, together with the other supporting acute studies we've done. And they've agreed to all 3 of those …. So fast forward to today, we then executed the exact plan that we laid out for them.

….

…. One thing that I didn't mention is that in the [end-of-]Phase II meeting we had setting up our Phase III program that we then executed … we also just asked FDA[:] … we just want to make certain that you are on board with approving a drug to treat [DRP] …. We want to make certain that you are on board with the concept of doing this if we followed the plan that we've agreed to.

And they say, absolutely, we wouldn't agree to your Phase III plan if we weren't … of that mind.

*Id.* ¶ 210–12. On January 12, 2021, Davis responded to an analyst's question regarding "what [he] would maybe expect or hope a label would look like and the importance that will play in the commercialization of the product for the indication." Davis responded: "[W]e're seeking the treatment of [DRP]. So we're not looking at individual subtypes .... So we're seeking that broad indication. That's supported by a[n] … alignment we established with the FDA at our end of Phase 2 meeting." *Id.* ¶ 218.

The allegations that the FDA agreed that Acadia "studied DRP generally," that "a single relapse prevention study serve as the basis of approval," and that the FDA supported Acadia's decision to not "look[] at individual subtypes" suggest that the FDA had communicated that it would base its decision on whether to approve Acadia's sNDA on the overall results of the Harmony Study rather than on the data gathered for the individual subgroups. Plaintiffs further allege that Defendants were aware the FDA would base its decision on the data for individual subgroups because the FDA had warned Defendants that, "[l]abeling will reflect the actual composition and response of patients enrolled in the study." (ECF No. 26-7 at 5.)

Defendants contend that "Plaintiffs' interpretation of the Labeling Statement makes no sense" and that a drug's label "always includes details of the clinical study that

18

supported approval, regardless of whether those details were important for approval." However, in the FDA's CRL response, the FDA told Defendants, "[a]lthough Study 045 was not powered to demonstrate an effect in the subgroups of dementia included, *we had advised you during development that labeling would reflect the actual composition and response of the subjects enrolled in the trial.* Based on an examination of dementia subgroups. ..." (ECF No. 26-35 at 2 (emphasis added).) This statement supports Plaintiffs' allegation that the FDA's advisement that labeling would reflect the actual composition and response of subjects was more than just a reiteration of what a drug's label always does and should have put Defendants on notice that subgroup data would be an important factor in the FDA's decision.

The Complaint additionally alleges that Defendants made a series of statements that were misleading because they failed to disclose that the Harmony Study and -019 Study were not properly designed and had disappointing data, and that these shortcomings were overlooked by the market because Acadia had misrepresented the terms of their agreement with the FDA. Some of these statements include objective descriptions of the results of the Acadia studies, *see, e.g.*, Compl. ¶¶ 74, 141 (the Harmony Study "met its primary endpoint," "demonstrate[ed] a highly statistically significant longer time to relapse of psychosis," and showed a "nearly three-fold reduction in the risk of relapse"), as well as Defendants' interpretations of the data and results of the studies, *see, e.g.*, *id.* ¶¶ 130, 136, 141, 143 (the data and results of the studies were "meaningful," "positive," "pivotal," "robust," and "strong"). There are no adequately alleged facts from which the Court can infer that Defendants' objective descriptions of the Acadia studies were false. Further, Defendants' interpretation of the data and results of the studies were plainly expressions of opinion.

However, statements that are demonstrably true or expressions of opinion are nevertheless actionable if the statements omit additional material information whose absence makes the fact or opinion misleading to a reasonable person reading the statement fairly and in context. *See Khoja*, 899 F.3d at 1008–09 ("Even if a statement is

19

not false, it may be misleading if it omits material information."); *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 616 (9th Cir. 2017) (stating that a plaintiff can plead that an opinion statement is misleading based "on a theory of omission" by "alleg[ing] 'facts going to the basis for the issuers opinion … whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context.'" (quoting *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 194 (2015))).

The Complaint alleges that the Defendants presented the studies' results to the market in a misleading manner, intentionally omitting crucial negative information that contradicted the studies' favorable findings. Specifically, the Complaint alleges that analysts evaluating Defendants' statements relied on the "misimpression" "that the FDA would be evaluating the results from the Harmony Study as a whole and not considering the date from any individual dementia subgroup." Compl. ¶ 108. For example, the Complaint alleges that one analyst stated, "[a]s we noted above, this trial wasn't just favorable for pimavanserin because of its design, but also because ACAD was able to include patients with Parkinson's, where the drug is already approved." *Id.* ¶ 107. "'[O]nce defendants cho[o]se to tout' positive information to the market, 'they [are] bound to do so in a manner that wouldn't mislead investors,' including disclosing adverse information that cuts against the positive information." *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 705–06 (9th Cir. 2016) (quoting *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987 (9th Cir. 2008)) (alteration in original)). To the extent the Complaint alleges that by omitting the fact that the FDA would be considering subgroup data, Defendants misrepresented the strength of the studies' data and prompted investors to overlook the fact that "the overall positive results from the Harmony Study were driven almost entirely by the results of patients suffering from Parkinson's disease psychosis— an indication for which pimavanserin was already approved to treat" *(*Compl. ¶ 7) such allegations support the inference that investors relied on Defendants' omissions regarding the relevance of the Harmony and -019 Studies' shortcomings in making their investment

decisions.

Defendants contend that "allegations of improper study design cannot render statements false or misleading." (ECF 26-1 at 26 (citing *In re Rigel Pharmaceuticals, Inc. Sec. Litig.*, 697 F.3d 869, 877–78 (9th Cir. 2012)).) In *Rigel*, "Plaintiff's allegations of 'falsity' were based on its contention that Defendants should have used a particular statistical methodology." *Rigel*, 697 F.3d at 877. Here, Plaintiffs' allegations of falsity stem not from an assertion that Defendants "should have used a particular statistical methodology" but rather that Defendants' discussion of the "positive" study results omitted critical information regarding how the FDA would interpret the data—causing the statements to be false through omission.

Plaintiffs additionally allege that "[d]uring the relevant period, [Defendants] repeatedly and falsely certified to investors that the Company had effective internal disclosure controls and procedures." (Compl. ¶ 226.) Plaintiffs allege that "[i]t was materially misleading for Acadia and Davis to represent that Acadia's internal disclosure controls and procedures were effective during the relevant period when that was not the case and Davis and Stankovic repeatedly and successfully evaded those controls to perpetrate their fraud." *Id.* ¶ 231. Defendants contend that "[c]ourts have repeatedly held such allegations insufficient." (ECF No. 30 at 9.)

Defendants' allegedly false certifications were made pursuant to Rules 13a-15(e) and 15d-15(e) of the Securities Exchange Act of 1934. 7 C.F.R. §§ 240.13a-15(e), 240.15d-15(e). Both Rules define disclosure controls and procedures to mean "controls and other procedures of an issuer that are designed to ensure that information required to be disclosed by the issuer in the reports that it files or submits under the Act (15 U.S.C. 78a et seq.) is recorded, processed, summarized and reported, within the time periods specified in the Commission's rules and forms." Plaintiffs allege that these disclosure controls and procedures must have been ineffective because Defendants knew that (1) the FDA would be considering subgroup data in determining whether to approve the sNDA, and (2) the Harmony and -019 Study results and designs were poor and omitted this

21

material information. (Compl. ¶ 231.) Defendants' Sarbanes-Oxley certifications "are wholly untethered to Plaintiffs' described reasons for falsity." *Veal v. LendingClub Corp.*, 432 F. Supp. 3d 785, 808 (N.D. Cal. 2019). Plaintiffs do not allege that Defendants' financial reports contain any inaccuracies. Therefore, Plaintiffs' allegations that Defendants' certifications of their disclosure controls and procedures were materially misleading fail to meet the PSLRA and Rule 9(b) pleading standards for falsity.

The Court concludes that  the Complaint alleges sufficient facts to support the inference that Defendants' statements concerning an agreement with the FDA and the success of their Studies were actionable "half-truths" because they "state[d] the truth only so far as it goes, while omitting [the] critical qualifying information" that the FDA had advised Acadia "labeling would reflect the actual composition and response of the subjects enrolled in the trial." *Macquarie Infrastructure Corp.*, 601 U.S. at 258.

### ii.  <u>Actionability of Statements</u>

Defendants contend that Plaintiffs have challenged statements that are inactionable as a matter of law because they reflect corporate optimism or forward-looking statements that are protected by PSLRA's "safe harbor."

Courts have held that "[v]ague, generalized, and unspecific assertions of corporate optimism or statements of 'mere puffing' cannot state actionable material misstatements of fact under federal securities laws." *In re Cornerstone Propane Partners, L.P.*, 355 F. Supp. 2d 1069, 1087 (N.D. Cal. 2005) (citing *Glen Holly Ent., Inc. v. Tektronix, Inc.*, 352 F.3d 367, 379 (9th Cir. 2003)). Additionally, the PSLRA specifically creates a safe harbor for forward-looking statements. 15 U.S.C. § 78u–5. Thus, "any statement regarding (1) financial projections, (2) plans and objectives of management for future operations, (3) future economic performance, or (4) the assumptions 'underlying or related to' any of these issues" is not actionable under Section 10(b). *No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 925 (9th Cir. 2003) (citing 15 U.S.C. § 78u–5(i)). "[I]f a forward-looking statement is

24-cv-451-WQH-MSB

identified as such and accompanied by meaningful cautionary statements, then ... the statement is not actionable." *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1112 (9th Cir. 2010).

Defendants are correct that some of the statements identified by Plaintiffs are not legally actionable. (*See, e.g.*, Compl. ¶¶ 173, 192, 207, 214, 220, 221.) However, many statements identified by Plaintiffs are actionable. *See, e.g.*, *id.* ¶¶ 188, 190, 199, 201, 205, 212; *see also*, *supra* Part IV(C)(1)(i). Further, many statements identified by Plaintiffs contain a mix of actionable and inactionable language. *See, e.g.*, *id.* ¶¶ 185, 203, 210, 216. Thus, at this stage in the proceedings, Plaintiffs have identified actionable statements and met their burden.[3]

### iii. **Scienter**

When pleading scienter against a corporate defendant, plaintiffs must assert that the corporation, through the actions of its officers or agents, acted with scienter, to overcome the PSLRA pleading requirements. In a § 10(b) action, scienter refers to "a mental state that not only covers intent to deceive, manipulate, or defraud, but also deliberate recklessness." *Schueneman*, 840 F.3d at 705. "[D]eliberate recklessness is 'an extreme departure from the standards of ordinary care ... which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.'" *Id.* (quoting *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009)).

Under the PSLRA, the allegations of a complaint must give "rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2)(A). This requires a weighing of competing inferences from the underlying

---

[3] Defendants contend that Plaintiffs' arguments concerning the statements Defendants contend are inactionable "have been waived." (ECF No. 30 at 9.) Defendants are correct that Plaintiffs do not directly respond to Defendants' contention in their Opposition. However, at this stage, the Court considers the allegations of the Complaint and finds that Plaintiffs have adequately identified actionable statements.

allegations— "[a] complaint will survive, … only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324. "The inference that the defendant acted with scienter need not be irrefutable, *i.e.,* of the 'smoking-gun' genre, or even the 'most plausible of competing inferences,'" but it "must be more than merely 'reasonable.'" *Id.* (citations omitted).

With respect to omissions, "the plaintiff must plead 'a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.'" *Zucco Partners*, 552 F.3d at 991. To determine if the scienter requirement is satisfied, a "court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically." *Tellabs*, 551 U.S. at 326.

Plaintiffs allege that (1) Defendants and Stankovic knew or recklessly disregarded the fact that their statements "'concerning the agreement with the FDA'" were false or misleading; (2) Davis and Stankovic "were high-level corporate officers with access to material information available to them but not the market" and thus were "aware of the shortcomings of the Harmony and -019 Studies" but still "intentionally or recklessly misrepresented" the success of the studies; (3) the pimavanserin sNDA was important to "Acadia's core operations" providing Defendants and Stankovic motive to misrepresent or omit important information concerning the agreement with the FDA; and (4) Acadia's follow-on stock offering and Davis and Stankovic's stock sales provided motive for Defendants to commit fraud.

Defendants contend that "there are no facts suggesting that" Defendants had a "'conscious intent to deceive.'" (ECF No. 26-1 at 29 (quoting *Aramic v. Revance Therapeutics*, No. 21-cv-09585-AMO, 2024 WL 1354503, at *14 (N.D. Cal. Apr. 2, 2024)).) Defendants contend that scienter cannot be inferred from the fact that the pimavanserin sNDA was central to Acadia's "core operations" because "[t]he Complaint

offers no allegations from which to conclude that this is the 'exceedingly rare' case in which the core operations theory can supply the missing scienter inference." *Id.* at 30 (quoting *S. Ferry LP No. 2 v. Killinger*, 542 F.3d 776, 785 n.3 (9th Cir. 2008)). Defendants contend that allegations concerning Defendants' sales of stock are conclusory and do not support an inference of scienter because "Plaintiffs allege only the amount of shares sold (not the percentage)." *Id.* at 30. Defendants contend that "[a] 'holistic' review of Plaintiffs' scienter allegations demonstrates that they are inadequate." *Id.* at 31 (citing *Zucco Partners*, 552 F.3d at 991).

The Complaint alleges that Defendants and non-party Stankovic intentionally or recklessly failed to disclose that the FDA "would be analyzing the 'actual composition and response of patients' in each dementia subgroup when determining whether to approve pimavanserin for a broad indication for dementia-related psychosis" and that the Harmony and -019 Studies were "fundamentally flawed." (Compl. ¶¶ 78, 80.) Based upon the allegations of the Complaint, Defendants and non-party Stankovic plausibly would have been aware of the terms of any agreement with the FDA and the alleged shortcomings with the design and results of the Harmony and -019 Studies. The Complaint's allegations that Defendants and non-party Stankovic affirmatively misrepresented the terms of the purported agreement with the FDA support an inference that Defendants and non-party Stankovic acted with intent or deliberate recklessness. *See Crihfield v. CytRx Corp.*, No. CV1605519SJOSKX, 2017 WL 2819834, at *11 (C.D. Cal. June 14, 2017) (referencing *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 610 (4th Cir. 2015), which "[found] inference of scienter stronger than other inferences where pharmaceutical company 'fail[ed] to disclose critical information received from the FDA during the new drug application process, while releasing less damaging information that they knew was incomplete'").

Core operations allegations can support a strong inference of scienter "(1) when they, along with other allegations, support a cogent and compelling inference of scienter, (2) when they are themselves particular and suggest that the defendants had actual access

to the disputed information, and (3) in the 'rare circumstances' when they are not particularized, but 'the nature of the relevant fact is of such prominence that it would be absurd to suggest that management was without knowledge of the matter.'" *Prodanova v. H.C. Wainwright & Co., LLC*, 993 F.3d 1097, 1111 (9th Cir. 2021) (*quoting Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1062 (9th Cir. 2014)).

The Complaint pleads particularized facts supporting the first two formulations of the core operations theory. The Complaint alleges that Defendants and non-party Stankovic misrepresented or omitted key facts concerning the agreement with the FDA. The Complaint provides numerous instances in which Defendant Davis and non-party Stankovic are quoted referencing the agreement with the FDA and characterizing it in a way alleged to be misleading. The End of Phase II Meeting Minutes identify non-party Stankovic as attending the meeting in which the agreement with the FDA was allegedly formed. It is likely that Defendants and non-party Stankovic were aware of the terms of any agreement with the FDA.

Unusual or suspicious stock sales by corporate insiders may also constitute circumstantial evidence of scienter. *See Zucco Partners*, 552 F.3d at 1005. "Among [the] factors that must be considered to determine whether stock sales raise a strong inference of deliberate recklessness are: '(1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading history.'" *Id.* (quoting *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 986 (9th Cir. 1990)).

The Complaint alleges that prior to the announcement of results for the Harmony Study on September 9, 2019, neither Defendant Davis nor non-party Stankovic had sold any Acadia stock. (Compl. ¶ 4.) The Complaint alleges that during the relevant period, Davis sold 541,205 shares of Acadia common stock for $24,771,568 and Stankovic sold 368,993 shares for $18,932,729. *Id.* ¶¶ 87–88. The Complaint alleges that although many of these sales were made pursuant to Rule 10b5-1 trading plans, "the majority of those sales were pursuant to plans entered into ***after*** Davis and Stankovic were in possession of

26

the critical results from the Harmony Study in September 2019, which revealed that pimavanserin was not effective in treating dementia-related psychosis in several dementia subgroups and was therefore unlikely to be approved by the FDA." *Id.* ¶ 89 (emphasis added).

The Complaint does not allege the percentage of shares sold by Davis and Stankovic. However, the Complaint alleges the amount of shares sold and their inconsistency with prior trading history. The amount of Acadia stock sold by Davis and Stankovic during the class period is substantial. Although the Complaint alleges that many of these sales were made pursuant to Rule 10b5-1 trading plans, the trading plans in question were not adopted until after the motive and opportunity to mislead investors allegedly arose. Further, the absence of any sales of stock prior to the class period supports an inference that Davis's and Stankovic's sales were unusual or suspicious and weigh in favor of an inference of scienter.

The competing inference—that Defendants did not intentionally or recklessly mislead investors—is supported in part by Defendants' release of the Harmony Study's dataset in connection with a presentation to medical professionals. However, this disclosure occurred almost three months after the initial actionable omission and was followed by Defendants' assurances that the FDA had agreed to analyze the Harmony Study data comprehensively and not by sub-group.

Weighing the allegations holistically, the Court finds that a reasonable person would deem the inference of scienter cogent and "at least as compelling as any opposing inference." *Tellabs*, 551 U.S. at 324. Thus, Plaintiffs have adequately pled a strong inference of scienter.

### iv. **Loss Causation**

Loss causation is a plaintiff's "burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4). "To prove loss causation, plaintiffs need only show a 'causal connection' between the fraud and the loss, by tracing the loss back to

'the very facts about which the defendant lied.'" *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018) (quoting *Nuveen Mun. High Income Opportunity Fund v. City of Alameda*, 730 F.3d 1111, 1120 (9th Cir. 2013)).

When alleging loss causation, the plaintiff must plead "that the defendant's misstatements (or other fraudulent conduct) artificially inflated the price at which the plaintiff purchased her shares." *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 789 (9th Cir. 2020). Then, "the plaintiff must show:" "(1) 'the truth became known,' and (2) the revelation caused the fraud-induced inflation in the stock's price to be reduced or eliminated." *Id.* (quoting *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 347 (2005)). Identifying corrective disclosures is "the most common way for plaintiffs to prove that '[t]he truth became known.'" *Id.* at 790. When "information correcting the misstatement or omission that is the basis for the action is disseminated to the market," a corrective disclosure occurs. 15 U.S.C. § 78u-4(e)(1) (using that event to establish a statutory cap on damages); *see also In re Genius Brands Int'l, Inc. Sec. Litig.*, 97 F.4th 1171, 1184 (9th Cir. 2024).

"[A] corrective disclosure need not reveal the full scope of the defendant's fraud in one fell swoop; the true facts concealed by the defendant's misstatements may be revealed over time through a series of partial disclosures." *In re BofI Holding*, 977 F.3d at 790. However, "[a] corrective disclosure must reveal 'new facts' that, taken as true, 'render some aspect of the defendant's prior statements false or misleading.'" *Pampena v. Musk*, 705 F. Supp. 3d 1018, 1052 (N.D. Cal. 2023) (quoting *In re BofI Holding*, 977 F.3d at 790).

Plaintiffs allege that Defendants' and Stankovic's material misrepresentations and omissions "artificially inflated the market price of Acadia common stock" and "Plaintiffs purchased Acadia common stock" at these "artificially inflated prices." (Compl. ¶ 284.) Plaintiffs allege that "the price of Acadia common stock plummeted[,] and Plaintiffs were damaged" when "a series of partial but inadequate disclosures" partially revealed Defendants' misrepresentations and omissions regarding "the Harmony Study, the terms

and full extent of Acadia's agreement with the FDA …, and the effectiveness of Acadia's internal disclosure controls and procedures" and caused the concealed, foreseeable risks to partially materialize. *Id.* ¶ 260. Plaintiffs allege that the concealed risks were (1) "that the FDA was in fact taking into account the 'actual composition and response of patients'"; (2) "that the Harmony Study and -019 Study were not in fact properly designed and, accordingly, could not provide a basis for approval of the pimavanserin sNDA"; and (3) that "Acadia's internal disclosure controls and procedures were ineffective." *Id.* ¶ 262.

Defendants contend that the two "partial corrective disclosures" alleged to have occurred after April 5, 2021, cannot be used to establish loss causation. (ECF No. 26-1 at 32–33.) Defendants take issue with Plaintiffs' allegations of additional partial disclosures in August and December 2021, contending that Plaintiffs have failed to allege that "any new or different risks materialized with the August and December 2021 releases" and that the only concealed risks alleged by Plaintiffs "fully materialized" on April 5, 2021, when Acadia announced the FDA had denied the sNDA submission. Defendants contend that Plaintiffs are "attempting to extend out the class period (and unlock additional stock-drop damages)" by "tack[ing] on two more post-CRL corrective disclosures."

The Complaint alleges that the risks (1) "that the FDA was in fact taking into account the 'actual composition and response of patients'"; (2) "that the Harmony Study and -019 Study were not in fact properly designed and, accordingly, could not provide a basis for approval of the pimavanserin sNDA"; and (3) that "Acadia's internal disclosure controls and procedures were ineffective" eventually became apparent through a series of revealing events. (Compl. ¶¶ 259–60.) The Complaint alleges that Acadia's March 8, 2021, press release disclosed that, "'the FDA ha[d] identified deficiencies [ ] preclud[ing] discussion of labeling and post-marketing requirements/commitments at this time.'" *Id.* ¶ 261. The Complaint alleges that the April 5, 2021, press release revealed that the FDA had cited issues with the designs of Acadia's studies and the DRP subgroup results as the basis for denying approval. *Id.* ¶ 265. The Complaint alleges that immediately after these

disclosures, Acadia's common stock price fell $20.76 per share (45.35%) on March 9, 2021, and an additional $4.41 (17.23%) on April 5, 2021. A reasonable investor could infer from Acadia's March and April 2021 press releases that they had previously been misled by Defendants' alleged misrepresentations and omissions concerning the studies' designs and Acadia's agreement with the FDA.

However, Plaintiffs' allegations regarding additional partial corrective disclosures following April 5, 2021, cannot substantiate a claim for loss causation. The three risks identified by Plaintiffs fully materialized on April 5, 2021. In their press release that day, Defendants disclosed to the public that "the CRL cited a lack of statistical significance in some of the subgroups of dementia, and insufficient numbers of patients with certain less common dementia subtypes as lack of substantial evidence of effectiveness to support approval" and "[t]he Division also stated … that it considers the … -019 [Study]… to not be adequate and well controlled." (Compl. ¶ 264.) Thus, the market was made aware of the risks that the FDA was indeed evaluating the subgroup data and that the studies were poorly designed through the April 5, 2021, press release. The subsequent "disclosures" identified by Plaintiffs did not introduce any new information regarding these risks.

The Court concludes that the Complaint alleges sufficient facts to support an inference that Plaintiffs' losses were caused by Defendants' alleged misrepresentations and that two revealing events, culminating on April 5, 2021, uncovered the risks concealed by Defendants' alleged misrepresentations. The Court finds that, because the risks Plaintiffs identified fully materialized as of April 5, 2021, the August and December disclosures cannot be used to plead loss causation.

Defendants' motion to dismiss Plaintiffs' Section 10(b) claims is denied, as discussed above.

### 2.  Section 20(a) Claims

Defendants request dismissal of the Section 20(a) claims on the basis that Plaintiffs fail to adequately plead an underlying Section 10(b) violation. *See Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1035 n.15 (9th Cir. 2002) ("[T]o prevail on their claims for

violations of § 20(a) and § 20A, plaintiffs must first allege a violation of § 10(b) or Rule 10b5."). The Court has determined that Plaintiffs adequately allege facts in support of their Section 10(b) claims against Defendants. Defendants' motion to dismiss Plaintiffs' Section 20(a) claims is denied.

### 3. Section 18 Claims

A Section 18 claim requires a plaintiff to plead (1) a misrepresentation or omission (2) of a material fact (3) contained in an SEC filing (4) upon which the plaintiff relied in the purchase of a security. 15 U.S.C. § 78r(a). Unlike a Section 10(b) claim, scienter is not an element of a Section18 claim. *See Howard v. Everex Systems, Inc.*, 228 F.3d 1057, 1063 (9th Cir. 2000) (discussing differences between claims under Section 10(b) and Section 18). However, a plaintiff suing under Section 18 must demonstrate "actual reliance on the fraudulent statement… as opposed to the constructive reliance, or fraud-on-the-market, theory available under § 10(b)." *Id.* Plaintiffs' Section 18 claim is based upon the same theory as their Section 10(b) claims, with the exception that Defendants' alleged misrepresentations and omissions are limited to those statements set forth in Acadia's SEC filings.

Defendants request dismissal of Plaintiffs' Section 18 claim because they contend (1) Plaintiffs' claim is barred by the applicable one-year statute of limitations or by the three-year statute of repose under 15 U.S.C. § 78r(c) or, alternatively, by the statute of limitations and repose found in 28 U.S.C. § 1658(b); (2) Plaintiffs fail to allege "actual reliance" with the required specificity; and (3) Plaintiffs fail to adequately plead falsity and loss causation. (ECF No. 26-1 at 8–9.)

### i. Statute of Limitations & Statute of Repose

Generally, the timeliness of a claim depends on matters outside the pleadings and is not "'amenable to resolution on a Rule 12(b)(6) motion.'" *Hernandez v. City of El Monte*, 138 F.3d 393, 402 (9th Cir. 1998) (quoting *Supermail Cargo, Inc. v. United States*, 68 F.3d 1204, 1206 (9th Cir. 1995)). Thus, "[a] defendant asserting an affirmative statute-of-limitations defense" must show "it is 'beyond doubt' that the plaintiff can

prove no set of facts that would establish the timeliness of his or her claims." *Orbis Glob. Equity Fund Ltd. v. NortonLifeLock Inc.*, No. CV-21-01995-PHX-JJT, 2023 WL 1800963, at \*7 (D. Ariz. Feb. 7, 2023) (quoting *Hernandez*, 138 F.3d at 402). "'[T]he running of the statute [must be] apparent on the face of the complaint'" for dismissal to be appropriate at the pleading stage. *Cervantes v. Countrywide Home Loans, Inc.*, 656 F.3d 1034, 1045 (9th Cir. 2011) (quoting *Jablon v. Dean Witter & Co.*, 614 F.2d 677, 682 (9th Cir. 1980)).

Defendants and Plaintiffs dispute two issues pertaining to the timeliness of Plaintiffs' Section 18 claim: (1) whether, under the rule established by *American Pipe & Construction Company v. Utah*, 414 U.S. 538, 554 (1974), the filing of the Class Action tolled the applicable statute of limitations and (2) whether 15 U.S.C. § 78r(c) or 28 U.S.C. § 1658(b) is the applicable time bar. If the Court finds that *American Pipe* tolling cannot be applied to Plaintiffs' Section 18 claim, then the claim is time barred, regardless of whether 15 U.S.C. § 78r(c) or 28 U.S.C. § 1658(b) applies. Thus, the Court first addresses the tolling issue.

In *American Pipe*, the Supreme Court held that "the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action." 414 U.S. at 554. This is true even for putative class members who later file individual suits. *See Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 350 (1983).

Pending before this Court is a related class action, *City of Birmingham Relief and Ret. Sys., et. al. v. Acadia Pharms. Inc., et. al.*, Case No. 3:21-cv-00762-WQH-MSB (S.D. Cal.) ("Class Action"). Plaintiffs contend that, per *American Pipe*, § 1658(b)'s two-year statute of limitations was tolled when the Class Action was filed on April 19, 2021. (ECF No. 29 at 22.) Defendants contend that "[t]he Class Action complaint did not toll these deadlines because it did not include a Section 18 claim." (ECF No. 26-1 at 9 (citing *Card v. Duker*, 122 F. App'x 347, 349 (9th Cir. 2005)).) Thus, the main dispute concerns whether a class action asserting claims under Section 10(b) triggers *American Pipe*

tolling for an individual opt-out action asserting a Section 18 claim.

Plaintiffs contend yes, relying in part on *Tosti v. City of L.A.*, in which the Ninth Circuit stated there is "no persuasive authority for a rule which would require that the individual suit must be identical in every respect to the class suit for the statute to be tolled." 754 F.2d 1485, 1489 (9th Cir. 1985); ECF No. 29 at 22. Defendants contend that even if the individual suit need not be identical, the suits must still be "'similar enough that the earlier-filed class action claims provided the defendant sufficient notice of the need to preserve evidence and witnesses relevant to the opt-out claims to avoid the potential for unfair surprise.'" (ECF No. 30 at 3–4 (quoting *Orbis Glob. Equity Fund Ltd.*, 2023 WL 1800963, at *7).)

The Ninth Circuit has not addressed whether Section 10(b) claims and Section 18 claims are sufficiently similar to trigger *American Pipe* tolling. Most federal courts that have considered this issue have found that Section 10(b) claims are distinct from Section 18 claims, such that they do not trigger *American Pipe* tolling. *See Orbis*, 2023 WL 1800963, at *7 (citing *Gotham Diversified Neutral Master Fund, LP v. Chi. Bridge & Iron Co.*, No. CV-18-9927 (LGS), 2019 WL 3996519, at *3 (S.D.N.Y. Aug. 23, 2019); *In re Bear Stearns Cos. Inc. Sec., Deriv., & ERISA Litig.*, 995 F. Supp. 2d 291, 308 (S.D.N.Y. 2014), *aff'd sub nom. SRM Glob. Master Fund Ltd. P'ship v. Bear Stearns Cos. LLC*, 829 F.3d 173 (2d Cir. 2016); *Child.'s Hosp. & Med. Ctr. Found. of Omaha v. Countryside Fin. Corp.*, No. CV-11-02056-MRP-MAN, 2011 WL 13220509, at *3–4 (C.D. Cal. Aug. 22, 2011); *Special Situations Fund III, LP v. Am. Dental Partners*, 775 F. Supp. 2d 227, 246 (D. Mass. 2011)). These courts found that the differences in the legal standards and the kinds of proof needed to bring each claim weighed against applying *American Pipe* tolling. *See e.g.*, *Child.'s Hosp.*, 2011 WL 13220509, at *3.

The courts reaching the opposite conclusion base their decisions on the factual similarities between the Section 18 claims and the Section 10(b) claims before them. *Broadway Gate Master Fund., Ltd. v. Ocwen Fin. Corp.*, No. 16-80056-CIV-WPD, 2016 WL 9413421, at *10 (S.D. Fla. June 29, 2016) (finding that Section 10(b) claims tolled

Section 18 claims, when resting on "virtually identical" facts); *see also MYL Litig. Recov. I LLC v. Mylan N.V.*, No. 19-CV-1799 (JPO), 2020 WL 1503673, at *7–8 (S.D.N.Y. Mar. 30, 2020) (finding that a class action which raised Section 10(b) claims tolled later-filed Section 18 claims that were based on the same facts).

This Court finds the reasoning of the majority of courts to be persuasive. "Class action suits trigger the tolling of the limitations period because such suits properly give defendants notice of the 'essential information necessary to determine both the subject matter and size of prospective litigation.'" *Jones v. BMW of N. Am., LLC*, No. 1:20-CV-00057, 2020 WL 5752808, at *5 (M.D.N.C. Sept. 25, 2020) (quoting *American Pipe*, 414 U.S. at 554–55). But Section 10(b) claims require "markedly different" proof than Section 18 claims. *Child.'s Hosp.*, 2011 WL 13220509, at *3. Section 18 claims do not require the plaintiff to plead scienter but do require the plaintiff to plead "actual reliance on the defendant's misrepresentations." *Orbis*, 2023 WL 1800963, at *7. Thus, regardless of whether the factual basis underlying the claims is identical, "almost by definition, filing a § 10(b) class action does not put a defendant on notice that it will be called upon to defend a § 18 claim" because the legal requirements for pleading each claim are so different. *See Child.'s Hosp.*, 2011 WL 13220509, at *4.

The Court finds that the Class Action did not toll either the one-year statute of limitations under 15 U.S.C. § 78r(c) or the two-year statute of limitations under 28 U.S.C. § 1658(b).

The Court now turns to when the statute of limitations began to run. In a federal securities litigation, the statute of limitations begins to run "(1) when the plaintiff did in fact discover, or (2) when a reasonably diligent plaintiff would have discovered, 'the facts constituting the violation'—whichever comes first." *Merck & Co. v. Reynolds*, 559 U.S. 633, 637 (2010) (quoting 28 U.S.C. § 1658(b)(1)). Defendants contend the statute of limitations began to run no later than April 5, 2021, when Acadia received the CRL from the FDA and issued a press release regarding its details. (ECF No. 26-1 at 8.) Plaintiffs do not dispute this contention. (ECF No. 29 at 28.) Indeed, the Court notes that on

December 10, 2021, the Class Action Plaintiffs filed the First Amended Complaint ("FAC") against Defendants, alleging similar allegations as those alleged in the Complaint in this case, which ultimately survived a motion to dismiss. *See City of Birmingham Relief & Ret. Sys. v. Acadia Pharms., Inc.*, No. 3:21-cv-00762-WQH-MSB, 2022 WL 4491093 (S.D. Cal. Sept. 27, 2022).[4] Therefore, the Court finds the statute of limitations must have begun to run by December 10, 2021—meaning a timely Section 18 claim would have needed to be filed by December 10, 2023, under even the most lenient statute of limitations.[5] Plaintiffs filed the Complaint on March 7, 2024. Thus, even under the more lenient two-year statute of limitations found in 28 U.S.C. § 1658(b), "it is apparent on the face of the complaint" that Plaintiffs' Section 18 claim is time barred by the statute of limitations. *Cervantes*, 656 F.3d at 1045.

## ii. __Actual Reliance__

Actual reliance on defendants' misstatements or omissions in purchasing or selling a security is a critical element of Section 18 claims and must be pled with specificity. *See* 15 U.S.C. § 78r(a); *see also* Fed. R. Civ. P. 9(b). "Conclusory assertions of reliance are insufficient, and plaintiffs must 'plead facts probative of their actual reliance on any specific false statement' in the filings at issue." *Kelley v. Rambus, Inc.*, No. C 07-1238JFHRL, 2008 WL 5170598, at *14 (N.D. Cal. Dec. 9, 2008), *aff'd*, 384 F. App'x 570 (9th Cir. 2010) (quoting *In re Suprema Specialties, Inc., Sec. Litig.*, 438 F.3d 256, 284 (3d Cir. 2006)). "Statements to the effect that plaintiffs 'received, reviewed, actually read, and relied upon' certain financial documents, or 'actually read and relied upon

---

[4] Although the Class Action FAC did not allege Section 18 claims, it did allege claims under Section 10(b). The Court notes that the relevant difference between these two claims is that Section 18 specifically requires Plaintiffs to demonstrate "actual reliance" on the Defendants' alleged misstatements or omissions when purchasing their securities. The evidence needed to plead actual reliance will "presumably have been in Plaintiffs' hands from the beginning." *See Orbis*, 2023 WL 1800963, at *8. As a result, Plaintiffs cannot use the distinction to argue they could not have discovered the facts constituting the violation by December 10, 2021.

[5] Since the Court finds Plaintiffs' Section 18 claim is time barred under either statute, the Court declines to address the issue of which statute is applicable.

[them] in making their decisions to invest in [company] common stock,' are inadequate." *Id.* (alteration in original) (quoting *Suprema Specialties*, 438 F.3d at 284).

Defendants contend that "Plaintiffs fail to allege 'actual reliance' with the required specificity" as their allegations are conclusory and fail to "identify[ ] a particular transaction … made in reliance." (ECF No. 26-1 at 9 (alteration in original) (quoting *In re Bear Stearns Cos.*, 995 F. Supp. 2d 291, 309 (S.D.N.Y. 2014)).) Plaintiffs contend that their allegations "comfortably plead actual reliance under Section 18" and that Section 18 claims can be sufficiently pled even "where the complaint 'd[id] not tie specific misstatements to specific transactions.'" (ECF No. 29 at 23 n. 12 (alteration in original) (*quoting In re Petrobras Sec. Litig.*, 152 F. Supp. 3d 186, 195–96 (S.D.N.Y. 2016)).)

The Court finds that Plaintiffs have failed to plead actual reliance with the required specificity. Although Plaintiffs allege, among other things, that they "actually read or heard, reviewed, and justifiably relied on [Defendants'] representations … prior to purchasing Acadia common stock on the dates set forth in Exhibits A-G *to the extent each such statement had been made at the time of purchase*," Plaintiffs' statements are conclusory and inadequate. (Compl. ¶ 243 (emphasis added).) Plaintiffs do not identify specific documents or misrepresentations in making their allegations. *See id.* ¶¶ 242–52. Plaintiffs do not "link [their] review of any particular statements… to any actual purchases of [Acadia] securities and do[ ] not identify a particular transaction that it allegedly made in reliance on … any [ ] document." *Bear Stearns*, 995 F. Supp. 2d at 309. Acadia's "generic response … is not sufficiently particularized." *Id.* (holding that plaintiff's "response that 'every SRM purchase of Bear securities was in reliance on the specific misrepresentations and omissions identified in the Complaint,' (Opp., at 29), is not sufficiently particularized").

Because the Court finds Plaintiffs' claim is time-barred and does not adequately allege actual reliance, Defendants' motion to dismiss the Section 18 claim is granted.

### 4. SLUSA Preemption of the Common Law and State Law Claims

Defendants contend that Plaintiffs' allegations of common law fraud, common law

36

negligent misrepresentation, and violations of California Civil Code § 1709 are preempted under SLUSA. (ECF No. 26-1 at 7.) Plaintiffs counter that SLUSA cannot preempt their state and common law claims because it applies only to "covered class actions," which they contend does not encompass "individual actions" such as their own. (ECF No. 29 at 23–24.)

"SLUSA bars a plaintiff class from bringing (1) a covered class action (2) based on state law claims (3) alleging that the defendants made a misrepresentation or omission or employed any manipulative or deceptive device (4) in connection with the purchase or sale of (5) a covered security." *Northstar Fin. Advisors, Inc. v. Schwab Invs.*, 904 F.3d 821, 828 (9th Cir. 2018) (citing *Freeman Invs., L.P. v. Pac. Life Ins. Co.*, 704 F.3d 1110, 1114–15 (9th Cir. 2013)). Notably, SLUSA was not intended to preempt state law causes of action but, rather, to preclude the use of "a class action as a device to vindicate [securities fraud] claims collectively on behalf of fifty or more plaintiffs." *Id.* at 829.

Plaintiffs do not dispute that their state and common law claims allege a misrepresentation in connection with the purchase or sale of a covered security. (*See* ECF No. 29 at 23–24.) Rather, Plaintiffs dispute whether their individual action constitutes a "covered class action," as defined by SLUSA. *Id.* at 24–25.

SLUSA's definition of a "covered class action" includes "any *group of lawsuits* filed in or pending in the same court and involving common questions of law or fact, in which—(I) damages are sought on behalf of more than 50 persons; and (II) the lawsuits are joined, consolidated, *or otherwise proceed as a single action for any purpose*." 15 U.S.C. § 78bb(f)(5)(B)(ii) (emphasis added).

Plaintiffs do not dispute that their lawsuit is "pending in the same court and involving common questions of law or fact," as the Class Action; nor do they dispute that "damages [in the Class Action] are sought on behalf of more than 50 persons." *Id.*; ECF No. 29 at 24–25. Rather, Plaintiffs contend "this case and the Class" are not "'joined' or 'consolidated'… nor 'otherwise proceed as a single action for any purpose.'" (ECF No. 29 at 24 (quoting 15 U.S.C. § 78bb(f)(5)(B)(ii)).) Defendants do not dispute that

37

Plaintiffs' lawsuit and the Class Action are neither joined nor consolidated. (ECF No. 26-1 at 7–8.) Thus, the only issue remaining is whether the two lawsuits "otherwise proceed as a single action for any purpose." 15 U.S.C. § 78bb(f)(5)(B)(ii).

In *Highfields Cap. I, LP v. SeaWorld Ent., Inc.*, the court laid out several relevant factors for determining whether an individual action and a related class action "proceed as a single action for any purpose" under SLUSA. 365 F. Supp. 3d 1050, 1060–62 (S.D. Cal. 2019). These factors include: (1) whether plaintiffs' claims are nearly identical to those asserted in the class action; (2) whether plaintiffs filed a "Notice of Related Action or Proceeding" (regardless of whether required to by local rule); (3) whether plaintiffs' complaint expressly incorporates documents publicly filed in the class action; (4) whether plaintiffs' pleadings rely on the court's previous decisions in the class action; and (5) whether plaintiffs were previously class members—privy to the pleadings and deriving a benefit from the class action. *Id.*

In *Gearing v. China Agritech, Inc.*, the court relied on similar factors in determining that an opt-out action, proceeding in the same court as a class action, met the definition of "covered class action." No. CV 11–04417–RGK, 2011 WL 11682735, at *5 (C.D. Cal. Oct. 31, 2011). The court paid particular attention to "[t]he fact that this case was transferred to this Court where the Class Action is also pending," holding that this "represents a strong inference that the cases were intended to be adjudicated concurrently." *Id.*

As in *Highfields* and *Gearing*, Plaintiffs' claims are nearly identical to those asserted in the Class Action, except for Plaintiffs' Section 18 claim and their state and common law claims. (S*ee, e.g.*, ECF No. 29 at 2 (stating "Plaintiffs' complaint pleads the same allegations that the Court has already twice upheld in the Class Action…").) Further, pursuant to the Local Rules, Plaintiffs noted on their Civil Cover Sheet when filing the Complaint that the Class Action was a related case. (ECF No. 1-1 at 1.) Soon after the Complaint was filed, Plaintiffs' action was accordingly transferred to the undersigned as a related case. (ECF No. 6.) Additionally, Plaintiffs' Complaint expressly

incorporates documents publicly filed in the Class Action and Plaintiffs' pleadings extensively rely on this Court's previous decisions in the Class Action. (*See, e.g.*, Compl. ¶¶ 120, 176, 179, 184, 186, 189, 191, 193, 195, 197, 202, 206, 208, 215, 219, 234–36, 240–41, 248; ECF No. 29 at 8–9.) Lastly, Plaintiffs were members of the Class Action for approximately three years prior to the filing of the Complaint.

Plaintiffs contend that, although they filed a notice identifying the Class Action as related to their action, the fact that they were required to do so by the Local Rules negates the significance of the relation. (ECF No. 29 at 25.) However, as in *Highfields*, the Court finds that "the transfer of [an opt-out] action to [the same judge] supports a finding that the actions are proceeding as a single action," even though the relation was compelled by the rules. 365 F. Supp. 3d at 1060. Additionally, Plaintiffs contend they "have otherwise made no effort to coordinate this case and the Class Action." (ECF No. 29 at 25.) Even if this is true, taking Plaintiffs' coordination efforts into consideration would only "'incentive[ize] opt-out plaintiffs to object to every act of judicial efficiency that could eventually lead to a finding that the matter is a covered class action.'" *Highfields*, 365 F. Supp. 3d at 1060 (quoting *Hound Partners Offshore Fund, LP v. Valeant Pharm. Int'l, Inc.*, No 19-8705-MAS-LHG, 2018 WL 4401731, at *3 (D.N.J. Sept. 14, 2018)).

The Court finds that Plaintiffs' action constitutes a covered class action under SLUSA because it is "part of a group of lawsuits," "filed in the same court," "involving common questions of law and fact," which "otherwise proceed as a single action for any purpose." 15 U.S.C. § 78bb(f)(5)(B)(ii). As such, Plaintiffs' state law and common law claims are preempted under SLUSA and Defendants' motion to dismiss these claims is granted.

## V.    CONCLUSION

IT IS HEREBY ORDERED the Motion to Dismiss (ECF No. 26) is granted as to Plaintiffs' Section 18 claim and their state and common law claims. The Motion to Dismiss is denied as to Plaintiffs' Section 10(b) and Section 20(a) claims, as discussed

above. All claims dismissed in this Order are dismissed without prejudice and with leave to amend.

IT IS FURTHER ORDERED that no later than twenty-one (21) days from the entry of this Order, Plaintiffs may file a first amended complaint addressing the deficiencies identified in this Order. If no amended complaint is filed, Defendants shall file an answer to the portions of the Complaint that have not been dismissed no later than thirty (30) days from the entry of this Order.

Dated:  October 31, 2024

Hon. William Q. Hayes
United States District Court

24-cv-451-WQH-MSB